IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

               Plaintiff,

    vs.

JESSICA JOYCE SPAYD,

               Defendant.

Case No. 3:19-cr-00111-JMK

**ORDER DENYING DEFENDANT'S
FEDERAL RULE OF CRIMINAL
PROCEDURE 29(c) MOTION**

Pending before the Court at Docket 336 is Defendant Jessica Spayd's Federal Rule of Criminal Procedure Rule 29(c) Motion for Judgment of Acquittal (the "Motion"). The Government opposed the Motion at Docket 337. The Court ordered supplemental briefing at Docket 338, which the parties filed at Dockets 339 and 343, respectively. The Court also heard oral argument on the Motion on March 23, 2023.[1] For the foregoing reasons, the Motion is DENIED.

## I.  BACKGROUND

On January 20, 2021, Ms. Spayd was charged in a First Superseding Indictment with the distribution and dispensing of controlled substances resulting in death in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts One, Three, and Five); the

---

[1] Docket 345 (text entry).

distribution and dispensing of controlled substances resulting in death in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 841(b)(2) (Counts Two and Four); the distribution and dispensing of a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts Six through Nine); and maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1) (Count Ten).[2] Ms. Spayd's jury trial began on September 26, 2022.[3] On October 19, 2022, at the close of the Government's case-in-chief, Ms. Spayd's counsel made an oral motion challenging the sufficiency of the evidence for each Count under Rule 29(a) of the Federal Rules of Criminal Procedure.[4] The Court reserved ruling on the Motion pursuant to Rule 29(b).[5] On October 28, 2022, the jury returned a verdict of guilty on all Counts in the Superseding Indictment.[6] On October 31, 2022, the Court issued an Order denying Ms. Spayd's Rule 29 Motion.[7] On January 13, 2023, Ms. Spayd renewed her Rule 29 Motion pursuant to Rule 29(c), moving for a judgment of acquittal on Counts One through Five and Count Ten.[8]

## II.  LEGAL STANDARD

Rule 29 provides that the Court "may set aside [a] verdict and enter an acquittal" on "any offence for which the evidence is insufficient to sustain a conviction."[9] When ruling on a Rule 29 motion, the Court asks "whether, after viewing the evidence in

---

[2] Docket 87.
[3] Docket 246 (text entry).
[4] Docket 293 (Trial Tr. 64:16–20).
[5] Id. (Trial Tr. 64:21–25, 65:1–3).
[6] Docket 320; Docket 321.
[7] Docket 322.
[8] Docket 336.  Ms. Spayd is not contesting the jury's verdict on Counts Six through Nine. Id. at 1.
[9] Fed. R. Crim. P. 29(a), (c)(2).

the light most favorable to the prosecution, any rational trier of facts could have found the essential elements of a crime beyond a reasonable doubt."[10]  "In ruling on a Rule 29(c) motion, a district court must bear in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts.'"[11]

## III.  DISCUSSION

### A.  Counts One through Five

To find Ms. Spayd guilty of the distribution and dispensing of controlled substances in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), the jury was required to find that (1) Ms. Spayd knowingly distributed or dispensed methadone, fentanyl, oxycodone, hydromorphone, diazepam, and/or carisoprodol; (2) Ms. Spayd knew at the time of distribution or dispensing that the substance was a controlled substance; (3) the distribution or dispensing of the controlled substance(s) was unauthorized; (4) Ms. Spayd knowingly or intentionally distributed or dispensed the controlled substance(s) in an unauthorized manner; and (5) the listed decedent died as a result of using the controlled substance(s) that Ms. Spayd distributed or dispensed to them.[12]  A prescription is authorized when it is

---

[10] *United States v. Niebla-Torres*, 847 F.3d 1049, 1054 (9th Cir. 2017) (quoting *United States v. Corona-Garcia,* 210 F.3d 973, 978 (9th Cir. 2000)).

[11] *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (quoting *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969)).

[12] Docket 319 at 18; *see also Ruan v. United States,* 142 S. Ct. 2370, 2376 (2022); MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS FOR THE NINTH CIRCUIT, Instruction 12.4 (2022 ed.).

"issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his [or her] professional practice."[13]

Ms. Spayd presents two arguments for acquittal: (1) the evidence did not show that Ms. Spayd knew or intended to prescribe controlled substances in an unauthorized manner, and (2) the Government did not prove that Ms. Spayd's prescriptions caused the deaths of the decedents listed in the Superseding Indictment.[14] The Court addresses each of these arguments in turn.

### 1. Knowledge or intent to prescribe controlled substances in an unauthorized manner

Ms. Spayd maintains that she believed her prescriptions were authorized. To support this contention, Ms. Spayd highlights the differences between her practice and a typical "pill mill," arguing that (1) her patients were not drug addicts and had legitimate medical issues; (2) she did not control any pharmacy; (3) she accepted Medicare and Medicaid and her clinic did not depend on cash payments; (4) her facilities were clean and professional; and (5) she did random urinalysis on patients.[15] Further, relying on the Supreme Court's decision in *Ruan v. United States*[16] (hereinafter, "*Ruan*"), Ms. Spayd argues that there was insufficient evidence for the jury to convict her on Counts One through Five because the Government's case essentially was a medical malpractice case "built upon showing different medical professionals who disagreed with Ms. Spayd's

---

[13] *Ruan*, 142 S. Ct. at 2375; 21 C.F.R. § 1306.04(a).
[14] Docket 336 at 2–16.
[15] *Id.* at 4–8.
[16] 142 S. Ct. 2370 (2022).

medical practice" and the Government failed to show that Ms. Spayd knew her prescriptions were unauthorized.[17]

The Government presented sufficient evidence for a rational jury to conclude that Ms. Spayd knew she was prescribing controlled substances in an unauthorized manner. First, Ms. Spayd's assertions that her clinic was not a run-of-the-mill pill mill are inconsequential. The Government is not required to show that Ms. Spayd's clinic bore all the hallmarks of a pill mill to establish a violation of 21 U.S.C. § 841(a)(1). Second, the Government presented evidence regarding knowledge of lack of authorization in a manner that complied with *Ruan*. Ms. Spayd asserts that "the Government latches on to parts of *Ruan* that allow it to use evidence of an objective standards [sic] of medical practice and then bootstraps that evidence as the means to judge Ms. Spayd."[18] As Ms. Spayd appears to acknowledge, the Government's approach was explicitly approved by the *Ruan* Court; the Court stated that "[t]he Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence . . . [a]nd the regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria such as 'legitimate medical purpose' and 'usual course' of 'professional practice.'"[19] "'The more unreasonable' a defendant's 'asserted beliefs or misunderstandings are,' especially as measured against objective criteria, 'the more likely the jury . . . will find that the Government has carried its burden of proving knowledge.'"[20] Here, the Government

---

[17] Docket 336 at 2–8.
[18] *Id.* at 7.
[19] *Ruan*, 142 S. Ct. at 2382.
[20] *Id.* (quoting *Cheek v. United States,* 498 U.S. 192, 203–04 (1991)).

presented the testimony of Dr. Timothy King, who reviewed Ms. Spayd's files for each of the five decedents named in the Superseding Indictment and opined that Ms. Spayd's treatment of the decedents represented an "extreme" departure from the standard of care.[21] Although Ms. Spayd asserted that she believed her prescriptions were authorized, under *Ruan*, a jury could have properly found her beliefs were unreasonable when measured against objective criteria and discounted her testimony accordingly.

Further, contrary to Ms. Spayd's suggestions, the Government's case was not confined to medical experts disagreeing with her medical decisions. The Government presented testimony from multiple pharmacists around Alaska, each testifying that they voiced concerns to Ms. Spayd about her prescribing practices.[22] Certain pharmacies informed Ms. Spayd that they would no longer fill any of her prescriptions due to the high dosages.[23] The Government also showed that Ms. Spayd received numerous letters from insurance companies indicating that her patients were on dangerously high doses of opioids and requesting that she review her records and modify her treatment plan.[24] Evidence regarding Ms. Spayd's behavior also suggests that she knew she was prescribing outside the bounds of normal professional practice. The jury heard evidence that Ms. Spayd expressed concern to her office staff that new patients were undercover DEA agents.[25] She even astutely suggested on a video recorded by an undercover agent posing as a patient

---

[21] Docket 299 (Trial Tr. 81:1–4).
[22] Docket 268 (Trial Tr. 105:20–25, 106:1–25, 107:1–4, 168:2–22, 178:22–25, 179:1–18, 180:1–16); Docket 279 (Trial Tr. 200:3–25).
[23] Docket 268 (Trial Tr. 106:1–14); Docket 269 (Trial Tr. 153:6–9).
[24] Docket 279 (Trial Tr. 24:18–25, 25:7–9); Docket 299 (Trial Tr. 27:13–21, 73:4–11).
[25] Docket 293 (Trial Tr. 90:4–6).

that the undercover agent could be DEA.[26]  Finally, as described further below, information found in Ms. Spayd's own files indicates that she was aware that each decedent presented with multiple serious "red flags," yet she continued prescribing them high doses of opioids.

### (a) Count One (J.L.)

When J.L. first saw Ms. Spayd, she indicated she had been off opioids for a month—making her "opioid naive"—notwithstanding, Ms. Spayd prescribed her high doses of methadone and oxycodone without performing a physical examination.[27] Dr. King described this as "an extremely dangerous situation," noting that "a prudent provider would never have done that."[28]  J.L. had eight inconsistent urine drug screens during her treatment with Ms. Spayd, which is highly suggestive of diversion and abuse.[29] Ms. Spayd's files indicated that J.L. had a history of heavy alcohol use as well as a history of multiple prior overdoses on pain medication, including one shortly after her initial appointment with Ms. Spayd.[30]  During that overdose, the emergency room physician wrote that he "spoke with [J.L.'s] primary advanced nurse practitioner . . . [she is] aware that we have to get pain meds, weaning down."[31]  After this incident, rather than attempting to start the wean process, Ms. Spayd continued to prescribe J.L. the same high dose of opioids.[32]

---

[26] Docket 298 (Trial Tr. 160:6–8).
[27] Docket 280 (Trial Tr. 15:13–25, 16:12–25).
[28] Id. (Trial Tr. 15:25, 16:1–3).
[29] Id. (Trial Tr. 34:5–19).
[30] Id. (Trial Tr. 11:11–16, 21:15–25, 22–26).
[31] Id. (Trial Tr. 25:3–5).
[32] Id. (Trial Tr. 30:25, 31:1).

*(b)*     *Count Two (K.B.)*

Ms. Spayd's files indicate that K.B. also had a history of overdosing on her medication—Ms. Spayd wrote in her medical file that, after receiving a note from Mat-Su Emergency Room, she spoke to K.B. on the phone "and she does admit to overtaking her Xanax."[33] K.B.'s mother testified that she called Ms. Spayd to discuss the high dosages that Ms. Spayd was prescribing to K.B. and Ms. Spayd refused to speak with her and hung up on her.[34] Ms. Spayd's medical file also revealed that K.B.'s functionality and quality of life was declining during her treatment; she experienced homelessness, relationship issues, and was prone to passing out.[35] Ms. Spayd's medical files indicated that, prior to her last visit, K.B. had not taken opioids for approximately eight months.[36] Nevertheless, at K.B.'s first appointment after her months-long absence from Ms. Spayd's care, Ms. Spayd prescribed K.B. an "exceptionally dangerous" combination of Dilaudid and Soma.[37]

*(c)*     *Count Three (B.S.)*

After reviewing Ms. Spayd's medical files, Dr. King testified that B.S. presented with "almost every aberrant predictor that I could come up with that would point towards . . . an ultimate outcome of overdose and death."[38] B.S.'s patient file revealed a history of running out of her medications early, borrowing controlled substance

---

[33] *Id.* (Trial Tr. 65:5–10).
[34] Docket 288 (Trial Tr. 19:24–25, 20:3–5, 24:3–9).
[35] Docket 280 (Trial Tr. 67:16–25, 68:1–19).
[36] *Id.* (Trial Tr. 54:3–16).
[37] *Id.* (Trial Tr. 55:3–25).
[38] Docket 299 (Trial Tr. 40:9–12).

medications from other people, and using somebody else's urine for a least one urinalysis.[39] B.S. had thirteen inconsistent urinalyses during her treatment with Ms. Spayd, indicating the presence of non-prescribed medications or the absence of certain prescribed medications.[40] Ms. Spayd appears to have been aware of B.S.'s addiction issues, writing in her medical file that B.S. had a diagnosis of "opioid type dependence."[41]

> (d) Count Four (E.K.)

E.K.'s medical file revealed that she had a history of alcohol abuse and psychiatric issues.[42] During her treatment, E.K. had twelve inconsistent urine drug screens, six of which indicated the presence of alcohol in her system.[43] Ms. Spayd wrote in her file that she "believe[d] [E.K. was] abusing substances, and that is why she is experiencing so much conflict in her life."[44] Ms. Spayd's files indicated that E.K. called Ms. Spayd's clinic on multiple occasions while crying, slurring her speech, and complaining that she could not find anywhere to fill her prescriptions.[45] E.K. also had multiple previous failed trials of high-dose opioid therapy with different medical providers, yet her pain level did not seem to improve.[46]

---

[39] *Id.* (Trial Tr. 38:5–10).
[40] *Id.* (Trial Tr. 38:12–15).
[41] *Id.* (Trial Tr. 43:8–10).
[42] *Id.* (Trial Tr. 53:7–20).
[43] *Id.* (Trial Tr. 69:5–8).
[44] *Id.* (Trial Tr. 72:3–6).
[45] *Id.* (Trial Tr. 62:21–25, 63:1–14, 66:2–25, 67:1–25, 74:19–25).
[46] *Id.* (Trial Tr. 56:2–21).

*(e)* *Count Five (L.D.)*

L.D.'s medical file was replete with indications that he was overtaking his medications; he frequently was finishing his prescriptions early and calling Ms. Spayd's office to request additional medication.[47]  Dr. King calculated that L.D.'s file contained fifty-one "obvious indications of treatment noncompliance."[48]  Ms. Spayd's files also reveal that L.D. suffered a non-fatal overdose in 2016.[49]  The emergency room doctor wrote that "at these levels of pain medication, [L.D.] is at an extremely high risk of accidental overdose" and recommended tapering L.D.'s medications.[50]  After this incident, Ms. Spayd initially lowered L.D.'s medications before escalating his dose again.[51]  Before L.D.'s death in 2019, Ms. Spayd was prescribing him a dosage that was "very close" to what he was taking prior to his 2016 overdose.[52]

Viewing the evidence in the light most favorable to the prosecution, there was sufficient evidence to sustain a conviction as to Ms. Spayd's knowledge or intent that her prescriptions to the decedents listed in Counts One through Five were unauthorized.

## 2. Causation

Counts One through Five invoke the "death results" enhancement codified at 21 U.S.C. § 841(b)(1)(C), which provides that "[i]n the case of a controlled substance in schedule I or II . . . if death or serious bodily injury results from the use of such substance

---

[47] *Id.* (Trial Tr. 12–14); Docket 280 (Trial Tr. 84:22–25, 85–86).
[48] Docket 299 (Trial Tr. 20:1–2).
[49] *Id.* (Trial Tr. 20:9–25, 21–22).
[50] *Id.* (Trial Tr. 22:1–12).
[51] *Id.* (Trial Tr. 22:16–19).
[52] *Id.* (Trial Tr. 23:6–10).

*United States v. Spayd*                                          Case No. 3:19-cr-00111-JMK
Order Denying Motion for Judgment of Acquittal                                    Page 10
Case 3:19-cr-00111-JMK-MMS   Document 348   Filed 04/11/23   Page 10 of 23

[the defendant] shall be sentenced to a term of imprisonment of not less than twenty years or more than life . . . ."[53] The Supreme Court has held that the "death results" enhancement is an element that must be proved beyond a reasonable doubt.[54] In *Burrage v. United States*[55] (hereinafter "*Burrage*"), the Supreme Court considered the standard of causation under the "death results" enhancement, holding that, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death . . . a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death . . . ." Although the Supreme Court reserved ruling on the viability of the independently sufficient theory of causation, courts interpreting *Burrage* have held that the Government may prove that death resulted from use of a drug by demonstrating either that (1) the drug was a but-for cause of the decedent's death, or (2) in a situation where "multiple sufficient causes independently, but concurrently, produce a result," the drug was an independently sufficient cause of the decedent's death.[56]

---

[53] 21 U.S.C. § 841(b)(1)(C).

[54] *Burrage v. United States*, 571 U.S. 204, 210 (2014).

[55] 571 U.S. 204, 218–19 (2014).

[56] *See id.* at 214–15; *see also United States v. Robinson*, 55 F.4th 390, 401 (4th Cir. 2022); *United States v. Feldman*, 936 F.3d 1288, 1313 (11th Cir. 2019); *Roundtree v. United States*, 885 F.3d 1095, 1098 (8th Cir. 2018); *Gaylord v. United States*, 829 F.3d 500, 507 (7th Cir. 2016); *United States v. Ducasse*, No. 3:16-cr-00017-SLG, 2019 WL 5058583, at *4 (D. Alaska Oct. 7, 2019) ("In *Burrage*, the Supreme Court held that the drugs distributed by a defendant must be an "independently sufficient cause of the victim's death or serious bodily injury" or a "but-for cause of the death or injury" to establish liability under 21 U.S.C. § 841(b)(1)(C)."); *United States v. Snider*, 180 F. Supp. 3d 780, 796 (D. Or. 2016) (noting that the *Burrage* Court did not decide, but "strongly implies, however, that the but-for standard ordinarily applicable under 21 U.S.C. § 841(b)(1)(C) either does not apply to or may encompass a situation when use of a drug distributed by a defendant is independently sufficient to cause death despite the presence of other concurrent sufficient causes").

Ms. Spayd argues that the Government failed to prove that her prescriptions caused the deaths of the decedents listed in the Superseding Indictment. "Ms. Spayd acknowledges that the government does not have to prove that the deaths were foreseeable under applicable Ninth Circuit law," but includes a discussion on foreseeability "to show why foreseeability is crucial in this case."[57] Ms. Spayd then asserts that when a patient is on a dosage of medication for several years "it is simply not foreseeable that someone would suddenly die."[58] As Ms. Spayd concedes, binding precedent forecloses her foreseeability arguments. Consistent with other circuits, in *United States v. Houston*,[59] the Ninth Circuit held that "[c]ause-in-fact is required by the 'results' language, but proximate cause, at least insofar as it requires that the death have been foreseeable, is not a required element [of 21 U.S.C. § 841(b)(1)(C)]".[60] Accordingly, Ms. Spayd's arguments regarding intervening causes or breaks in the causal chain have no bearing on the sufficiency of the evidence in this case.[61]

Viewing the evidence in the light most favorable to the prosecution, the Court finds that the Government presented sufficient evidence for a reasonable jury to conclude

---

[57] Docket 336 at 8.

[58] *Id.* at 10.

[59] 406 F.3d 1121, 1125 (9th Cir. 2005).

[60] *See also United States v. Arcila,* 727 F. App'x 279, 280 (9th Cir. 2018) ("In *United States v. Houston*, we held that the death resulting from the distribution of a controlled substance need not have been reasonably foreseeable in order for the penalty enhancement in § 841(b)(1)(C) to apply."); *see also United States v. Gonzalez,* 906 F.3d 784, 799 (9th Cir. 2018) (noting that "nothing in [*Burrage v. United States*, 571 U.S. 204 (2014)] calls into question the reasoning or result in *Houston*").

[61] *See Snider*, 180 F. Supp. 3d at 797 n.27 (rejecting argument that decedent's suicidal intent rendered defendant's conduct too attenuated from decedent's death because *Houston* does not require that the death be foreseeable).

that the drugs prescribed by Ms. Spayd caused the deaths of the decedents. The Court first addresses causation as to Counts One, Three, and Five (J.L., B.S., and L.D.), which involve only Schedule II drugs. The Court then addresses the more complicated issue of causation as to Counts Two and Four (E.K. and K.B.), which involve both Schedule II and Schedule IV drugs.

   (a) *Counts One, Three, and Five (J.L., B.S., and L.D.)*

   Ms. Spayd prescribed J.L. methadone the day before she died.[62] Dr. Gallagher, a medical examiner at the Alaska State Medical Examiner's Office, performed J.L's autopsy and determined that the cause of death was multiple drug intoxication.[63] Dr. Gallagher testified that J.L. had a number of preexisting health issues, such as cirrhosis of the liver and an enlarged heart, none of which were sufficient, by themselves, to cause her death.[64] Dr. Gallagher and forensic toxicologist Donna Papsun testified that alprazolam found in J.L.'s system, would not, by itself, have caused J.L.'s death.[65] Dr. Gallagher testified that the methadone level in J.L.'s blood was within the lethal range and the methadone was the most significant finding in terms of drugs, with the other drugs in her system having potential additive effects.[66] Dr. Gallagher opined that if J.L. had not taken the methadone and oxycodone prescribed by Ms. Spayd, J.L. probably would have lived.[67] Ms. Papsun testified that the methadone and oxycodone could be

---

[62] Docket 288 (Trial Tr. 147:16–18).
[63] *Id.* (Trial Tr. 43:12–14).
[64] *Id.* (Trial Tr. 53:15–18).
[65] *Id.* (Trial Tr. 63:2–5, 139:17–23).
[66] *Id.* (Trial Tr. 64:21–25, 65:20–25).
[67] *Id.* (Trial Tr. 68:4–6).

*United States v. Spayd*         Case No. 3:19-cr-00111-JMK
Order Denying Motion for Judgment of Acquittal     Page 13
Case 3:19-cr-00111-JMK-MMS  Document 348  Filed 04/11/23  Page 13 of 23

sufficient to have caused J.L.'s death.[68]  Based on this evidence, a reasonable jury could have concluded that the methadone was the but-for cause of J.L's death because, without its incremental effect, she would not have died.

L.D. died at the hospital with oxycodone, oxymorphone, and fentanyl in his system.[69]  When he arrived at the hospital, L.D. had two fentanyl patches attached to his body, both of which were immediately removed by the emergency room doctors.[70] Medical Examiner Dr. Rolf performed a consultation related to L.D.'s death and testified that L.D.'s oxycodone and oxymorphone levels were within therapeutic ranges.[71]  Dr. Rolf also testified that L.D.'s fentanyl level was within the range known to cause overdose deaths.[72]  Ms. Papsun testified that the level of fentanyl in L.D.'s system could have been fatal.[73]  Although L.D. had the flu at the time of his death, Dr. Rolf opined that he died from the oral and transdermal use of drugs.[74]  Dr. Elsburg, an emergency room doctor who treated L.D., testified that L.D.'s symptoms immediately prior to his death were more consistent with an opioid overdose than with the flu.[75]  This evidence is sufficient for a reasonable jury to conclude that the fentanyl prescribed by Ms. Spayd was the but-for cause of L.D's death.

---

[68] *Id.* (Trial Tr. 147:6–12).
[69] Docket 279 (Trial Tr. 175:1–9).
[70] *Id.* (Trial Tr. 173:17–19).
[71] *Id.* (Trial Tr. 175:12–25, 176:1–15).
[72] *Id.* (Trial Tr. 176:24–25, 177:1).
[73] Docket 288 (Trial Tr. 154:5–8, 155:2–3).
[74] Docket 279 (Trial Tr. 192:8–11).
[75] Docket 283 (Trial Tr. 33:16–25).

*United States v. Spayd*                                                                                 Case No. 3:19-cr-00111-JMK
Order Denying Motion for Judgment of Acquittal                                                          Page 14
Case 3:19-cr-00111-JMK-MMS   Document 348   Filed 04/11/23   Page 14 of 23

B.S. died with only one drug in her system: methadone.[76] B.S. was found dead in her home near a methadone prescription bottle, which listed Jessica Spayd as the prescriber.[77] Dr. Zientek, the chief medical examiner at the Alaska State Medical Examiner's Office, listed "methadone intoxication" as B.S.'s cause of death.[78] He opined that a physical injury B.S. had sustained a week prior to her death did not cause or contribute to her death.[79] Dr. Zientek testified that the level of methadone in B.S.'s blood was independently sufficient to cause her death and that he had never seen a level that high in any person, living or dead.[80] Ms. Papsun also testified that the level of methadone in B.S.'s system was independently sufficient to cause her death, regardless of how high B.S.'s tolerance was.[81] Ms. Papsun reviewed data from the past seven years and found that B.S.'s methadone level was higher than ninety-nine percent of all other reported concentrations.[82] A reasonable jury hearing this evidence could conclude that the methadone in B.S.'s system was the but-for cause of her death.

Ms. Spayd argues that, because no autopsy was performed on L.D. or B.S., the Government could not have established causation beyond a reasonable doubt.[83] However, Dr. Zientek testified that there is no standard that requires a medical examiner to perform an autopsy in a suspected overdose death.[84] Ms. Spayd also asserts that there

---

[76] Docket 279 (Trial Tr. 99:25, 100:1).
[77] *Id.* (Trial Tr. 101:1–10).
[78] *Id.* (Trial Tr. 116:5–7).
[79] *Id.* (Trial Tr. 98:4–14).
[80] *Id.* (Trial Tr. 112:1–5, 113:13–18, 116:21–25).
[81] Docket 288 (Trial Tr. 157:21–25, 177:14–21).
[82] *Id.* (Trial Tr. 158:6–24).
[83] Docket 336 at 14–15.
[84] Docket 279 (Trial Tr. 81:5–17).

were problems with the autopsies performed on the other decedents.[85]  These arguments are inappropriate for resolution on a Rule 29 motion.  Ms. Spayd presented these arguments at trial and the jury apparently discredited them.  On the present motion, the Court cannot usurp the role of the jury and reweigh evidence or make its own credibility determinations.

In conclusion, based on the record at trial, the Court cannot say that no rational jury could have concluded that causation was proven beyond a reasonable doubt as to J.L., B.S., and L.D.

(b)　　Counts Two and Four (K.B. and E.K.)

The application of the "death results" enhancement to Counts Two and Four presents a more complex question because Ms. Spayd is charged with distributing a combination of Schedule II and Schedule IV drugs to these decedents and, at trial, the Government pursued a theory that it was the combination, rather than the Schedule II drug, that killed E.K. and K.B.  Because "the death results" enhancement only applies to Schedule I and II drugs, it follows from the statutory language that the government must specifically prove that the Schedule I or II drug was a cause of the decedent's death.  The Court requested supplemental briefing and held oral argument on the issue of whether, when the evidence is construed in the light most favorable to the prosecution, a rational trier of fact could have found that E.K. and K.B.'s deaths resulted from their use of the Schedule II controlled substance(s) that Ms. Spayd prescribed to them.

---

[85] Docket 336 at 12–16.

*United States v. Spayd*　　　　　　　　　　　　　　　　　　　　　Case No. 3:19-cr-00111-JMK
Order Denying Motion for Judgment of Acquittal　　　　　　　　　　　　　　　　Page 16
Case 3:19-cr-00111-JMK-MMS　　Document 348　　Filed 04/11/23　　Page 16 of 23

The Ninth Circuit has not addressed the post-*Burrage* application of the "death results" enhancement to multi-drug use situations involving the ingestion or a Schedule I or II drug with a non-Schedule I or II drug, but other circuits have provided useful guidance. Confronted with a multi-drug use case, the Eleventh Circuit found that "*Burrage* does not require proof that a Schedule I or II drug be the 'only' cause of a victim's death" and "to prove but-for causation, the Government must drill down and show that, but for the Schedule I or II drug's inclusion in the drug cocktail, the victim would have lived. If the Government makes that showing, it is 'beside the point' that other drugs were necessary to make the drug cocktail deadly."[86] The Sixth Circuit has also confronted this issue, concluding that but-for causation exists where the government presents sufficient Schedule II-specific evidence for a rational jury to find that "without the incremental effect' of [the Schedule II substance], [the decedent] would not have died."[87]

In an ideal world, the Government would have asked its causation experts their opinions as to whether E.K. or K.B. would have lived had they not taken the Schedule II drug or whether the Schedule II drug was independently sufficient to cause their deaths. It did not. Instead, the Government asked their causation experts whether the *combination* of drugs in E.K. and K.B.'s systems was independently sufficient to cause their deaths. The Government's questions at trial piqued this Court's concern about the adequacy of the Schedule II-specific evidence, leading the Court to request supplemental

---

[86] *United States v. Feldman*, 936 F.3d 1288, 1314 (11th Cir. 2019).
[87] *United States v. Volkman*, 797 F.3d 377, 395 (6th Cir. 2015); *see also Roundtree v. United States*, 885 F.3d 1095, 1098 (8th Cir. 2018) (concluding that the Government established that without the incremental effect of a Schedule II drug the decedent would have lived).

*United States v. Spayd*                                                     Case No. 3:19-cr-00111-JMK
Order Denying Motion for Judgment of Acquittal                                               Page 17
Case 3:19-cr-00111-JMK-MMS   Document 348   Filed 04/11/23   Page 17 of 23

briefing and oral argument on that issue. The Government seemed to change tack at oral argument, embracing a Schedule II-specific but-for causation theory that was largely absent at trial. Although it may have taken a non-linear path to get there, after reviewing the evidence in the light most favorable to the prosecution, the Court is satisfied that the Government elicited sufficient evidence to allow a rational jury to decide that a Schedule II drug was a but-for cause of E.K and K.B.'s deaths.

Ms. Spayd prescribed K.B. two drugs the day before her death in 2015: hydromorphone (Schedule II) and carisoprodol (Schedule IV).[88] After performing an autopsy, Dr. Rolf determined that the cause of K.B.'s death was "cardiac dysrhythmia of unknown etiology" and the manner of death was "undetermined."[89] Dr. Rolf testified that the level of hydromorphone in K.B.'s system was "higher than a normal average level, but it's lower than the . . . lethal level."[90] Dr. Rolf also testified that K.B.'s carisoprodol level was well below the lethal level.[91] Ms. Spayd's expert witness, forensic pathologist Dr. James Fulcher testified that the examining pathologist (Dr. Rolf) described K.B.'s hydromorphone and carisoprodol levels as "nontoxic" and, due to postmortem redistribution, those levels may have actually been lower than they appeared.[92] Ms. Papsun testified that, to a reasonable degree of scientific certainty, the hydromorphone and carisoprodol together were sufficient to cause K.B.'s death.[93] Ms. Papsun also testified

---

[88] Docket 288 (Trial Tr. 34:3–25, 34:1–4).
[89] Docket 279 (Trial Tr. 165:16–25).
[90] Id. (Trial Tr. 162:7–11).
[91] Id. (Trial Tr.164:1–7).
[92] Id. (Trial Tr. 37:13–25).
[93] Docket 288 (Trial Tr. 136: 4–9).

that the hydromorphone level found in K.B.'s system could be capable of causing an overdose.[94] Ms. Papsun noted that K.B. had not taken opioids for months prior to her death and she was "confident" that was a "sufficient timeframe [for K.B.] to lose a tolerance."[95] Ms. Papsun opined that the loss of K.B.'s opioid tolerance meant that K.B. could have overdosed on a smaller dose of opioids than she previously had been used to and the presence of carisoprodol would have further increased her risk of overdose.[96] Finally, Ms. Papsun testified that the circumstances of K.B.'s death—she was found deceased with a hypodermic needle near her as well as a white powder that was later determined to be hydromorphone—were very consistent with an opioid overdose because injecting a drug increases the risk of adverse effects.[97] A rational jury could have concluded that but-for the hydromorphone, K.B. would have lived, especially given that all witnesses agreed that the carisoprodol could not have killed K.B. on its own,[98] the evidence suggesting that she injected the hydromorphone, and the evidence indicating that she was opioid naïve at the time of her death.

Ms. Spayd prescribed E.K. oxycodone (Schedule II), methadone (Schedule II), and diazepam (Schedule IV).[99] Dr. Gallagher performed E.K.'s autopsy and

---

[94] *Id.* (Trial Tr. 127: 19–22).
[95] *Id.* (Trial Tr. 133:9–16).
[96] *Id.* (Trial Tr. 133:23–25, 134:1–11).
[97] *Id.* (Trial Tr. 134:12–25, 135:1–12).
[98] *See United States v. Feldman,* 936 F.3d 1288, 1314 (11th Cir. 2019) (concluding that in a situation where a Schedule II drug would not have caused the deceased's death had it been taken alone, and likewise the deceased would not have died if they took only the Schedule IV drug, the Schedule II drug can be considered the straw that broke the camel's back or, in other words, "consistent with *Burrage,* the but-for test for the [Schedule II drug] is met in this scenario").
[99] *See* Docket 87 at 4.

concluded that E.K.'s cause of death was mixed drug intoxication.[100] Dr. Gallagher testified that E.K. was found deceased with methadone in her system at a level that was within the fatal range.[101] On cross-examination, Dr. Gallagher testified that E.K.'s methadone level could have been therapeutic because methadone has overlapping therapeutic and overdose ranges.[102] Dr. Gallagher also testified that the two other drugs that Ms. Spayd prescribed to E.K.—diazepam and oxycodone—were present in her system at non-fatal levels.[103] E.K. had alcohol in her system, but Dr. Gallagher testified that the alcohol itself was not sufficient to cause death.[104] E.K. also had fluoxetine in her system at a level within the fatal range, although Dr. Gallagher testified that he had never seen an overdose death from fluoxetine in his career.[105] Dr. Gallagher opined that the combination of drugs that Ms. Spayd prescribed to E.K. was independently sufficient to cause her death.[106] Dr. Gallagher and Ms. Papsun also opined that the presence of a "foam cone" around E.K.'s mouth at the time of her death, an indication of a pulmonary edema, was very consistent with an opioid overdose.[107] Ms. Papsun testified that the circumstances surrounding E.K.'s death were consistent with an opioid overdose "to a reasonable degree

---

[100] Docket 288 (Trial Tr. 82:15–25).

[101] *Id.* (Trial Tr. 80:3–5).

[102] *Id.* (Trial Tr. 87: 12–19).

[103] *Id.* (Trial Tr. 78:8–16, 80: 13–20).

[104] *Id.* (Trial Tr. 77:14–22); *see Roundtree v. United States*, 885 F.3d 1095, 1098 (8th Cir. 2018) (holding that, given testimony that "alcohol and metabolized heroin worked synergistically to cause [decedent's] death, but the level of alcohol in his bloodstream by itself was not enough to cause death, no reasonable jury would have found that the heroin provided by [defendant] was a contributing factor, but not a but-for cause, of [decedent's] death").

[105] Docket 288 (Trial Tr. 81:16–20).

[106] *Id.* (Trial Tr. 82:10–25, 83:1–5).

[107] *Id.* (Trial Tr. 84:11–22, 151:14–25).

of scientific certainty."[108]  Finally, although there was evidence that E.K. had developed a tolerance to opioids, Dr. Gallagher testified that when an individual's tolerance increases, the "window between therapeutic effect and possible respiratory suppression . . . gets narrower."[109]  Given the evidence supporting the conclusion that E.K died of an opioid overdose, a reasonable jury could have concluded that the drugs in E.K.'s system worked synergistically to cause her death, but it was the methadone prescribed by Ms. Spayd that was the straw that broke the camel's back and, without its effect, E.K. would have lived.[110]

At oral argument, the Court also expressed concern that its jury instructions and special verdict form did not make it clear to the jury that they had to find that the Schedule II drug was a but-for or an independently sufficient cause of E.K. or K.B.'s deaths.  Ms. Spayd does not argue that any perceived flaw in the jury instructions or special verdict form impacts the sufficiency of the evidence in this case.[111]  Therefore, the Court does not address any issues relating to the jury instructions or special verdict form in connection with the present motion.

## B.    Count Ten

To find Ms. Spayd guilty of the distribution and dispensing of controlled substances in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2, the jury was required to find that Ms. Spayd knowingly and intentionally maintained Eagle River Pain &

---

[108]  *Id.* (Trial Tr. 153:2–4).
[109]  *Id.* (Trial Tr. 42:1–3).
[110]  *See United States v. Cockrell,* 769 F. App'x 116, 118 (5th Cir. 2019) ("[E]ven if there was evidence that the victims had used or were using other drugs or alcohol, so long as those other drugs or alcohol alone would not have triggered an overdose, a showing that the heroin triggered the victims' overdoses is sufficient.").
[111]  Docket 347 at 1–2.

Wellness, LLC, for the purpose of illegally distributing controlled substances.[112] The illegal distribution of controlled substances need not be the sole purpose of the property, rather it must be one of the "primary or principal uses to which the [property] is put."[113] Neither Ms. Spayd nor the Government specifically address Count Ten in their briefs. The Court will not guess as to what shortcomings Ms. Spayd perceives in the evidence supporting her conviction on Count Ten.

Nevertheless, viewing the evidence in the light most favorable to the Government, the Court concludes the Government introduced sufficient evidence upon which a jury could have reasonably concluded that one of Ms. Spayd's primary purposes in maintaining her clinic was to distribute controlled substances without a legitimate medical purpose while acting outside the usual course her professional practice. Evidence was presented at trial indicating that Ms. Spayd had her office staff sign prescriptions for her when she was out of the office.[114] Ms. Spayd's office staff testified that she would pre-sign and pre-print prescriptions so that her staff could distribute those prescriptions when she was not there.[115] Multiple former patients of Ms. Spayd testified that she did not physically examine them prior to issuing prescriptions and their medical records described physical examinations that never occurred.[116] The Government also showed videos

---

[112] Docket 319 at 20; MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS FOR THE NINTH CIRCUIT, Instruction 12.18 (2022 ed.).
[113] *United States v. Mancuso*, 718 F.3d 780, 796 (9th Cir. 2013) (quoting *United States v. Shetler*, 665 F.3d 1150, 1162 (9th Cir. 2011) and extending *Shetler*'s holding to the non-residential context)).
[114] Docket 293 (Trial Tr. 87:1–25).
[115] *Id.*
[116] Docket 288 (Trial Tr. 186:2–25, 188:1–25): Docket 283 (Trial Tr. 47:1–25).

recorded by an undercover agent posing as a patient in which Ms. Spayd does not physically examine the agent, the agent makes clear that he is an addict, and Ms. Spayd prescribes him opioids anyways.[117] This evidence was sufficient for a jury to conclude that one of the primary purposes to which Eagle River Pain & Wellness, LLC was put was to distribute controlled substances outside the usual course of professional practice.

## IV. CONCLUSION

For the reasons described in this Order, Ms. Spayd's Rule 29 Motion for Acquittal at Docket 336 is DENIED. Ms. Spayd's sentencing is currently scheduled for Thursday, May 18, 2023, at 1:00 p.m. in Anchorage Courtroom 3.

IT IS SO ORDERED this 11th day of April, 2023, at Anchorage, Alaska.

*/s/ Joshua M. Kindred*
JOSHUA M. KINDRED
United States District Judge

---

[117] Docket 298 (Trial Tr. 150–162).