S. LANE TUCKER
United States Attorney

RYAN D. TANSEY
MICHAEL J. HEYMAN
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Emails: Ryan.Tansey@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JESSICA JOYCE SPAYD,<br><br>Defendant. | No. 3:19-cr-00111-JMK-MMS |

## UNITED STATES' SENTENCING MEMORANDUM[1]

"Almost every doctor that I encountered was alarmed by the amount of medication [Spayd had] given to [my mother, who had Alzheimer's].... and that night I sat with her, while she very shallow breathed all night long in her home. I was just hoping that she would make it through the night."

- *Chris Jones, Trial Testimony* (Dkt. 268 at 148:17-149:4).

"[L.D.] was one of those cases that you remember ... he was prescribed the highest dose of chronic narcotics that I had seen in our community. And it was striking how much he was on day-to-day. It was also striking because of his age as well, he was older. . . . I don't see daily doses that high in anybody.... Even cancer patients.... Ms. Spayd was prescribing the majority."

- *Dr. Andrew Elsberg, Providence E.R., Trial Testimony* (Dkt. 283 at 17-18, 20).

---

[1]    An unredacted version of this sentencing memorandum and the attached exhibits have been concurrently filed under seal with this memorandum.

"[My wife] had a lower back injury from work, she was a certified nurse's assistant. . . . I physically brought her to the hospital because she tried to detox at home, and she was basically going through withdrawal symptoms... and they couldn't do anything for her.... during [both of her] pregnancies [she] was visiting Jessica Spayd.... She's spiraled downward, she's been in and out of jail at least six times."

- *Abraham Salmon, Trial Testimony* (Dkt. 269 at 13-22).

"K.B. no longer baked. She had lost her ability to truly do much more than sleep.... What I learned from the [pharmacist] was that the medication was prescribed at the ... highest level possible for that particular item.... [I told Spayd] I was K.B.'s mother and that I was calling to discuss her medication, and that's about all I got to say.... I was [] told that it was none of my business and the conversation ended.... The phone was hung up [by] Ms. Spayd."

- *Ruby Steppe, Trial Testimony* (Dkt. 288 at 16-19, 24).

"[I told Spayd] that I felt like I was possibly taking very high doses and that it kind of scared me.... Her response [was] that it was actually low dosages.... [after] Ms. Spayd was arrested ... [I saw] Dr. Ninefeldt and learned [that] the amount of [] opiates that I was taking.... It was enough to kill a horse. I was off all [opioid] medications in December of that year.... Two months."

- *E▆▆▆▆ ▆▆▆▆▆▆-V▆▆, Trial Testimony* (Dkt. 283 at 50-55).

On October 27, 2022, after hearing testimony from 51 witnesses over a month-long trial, a jury concluded that Jessica Spayd ran an illegal drug-dealing operation for at least five years and caused the overdose deaths of five patients. Because of that verdict, on Counts one through five of the Superseding Indictment, Ms. Spayd faces a twenty-year mandatory minimum sentence and the maximum advisory Guidelines Range of life imprisonment. The United States asks the Court to impose the life sentence called for by the Guidelines. It does not do so lightly. This is the deadliest drug case in this district's history. And disturbingly, the five deaths the Defendant was convicted of at trial are just the tip of the iceberg. As explained below and in the attached sentencing exhibits, Spayd may have caused or contributed to the deaths of dozens: 20 total confirmed drug overdoses and many others suspected. She was a serial killer with a "poison pen."

Unlike a street-level drug dealer, Spayd had the authority of her credentials and position to fall back on. She not only profited from supplying drugs, but also encouraged

and escalated her patients' addictions while discouraging them from seeking addiction treatment. She created all the same risks as a street level drug dealer, but her conduct was far more insidious because she sanctioned (and supplied) lethal levels of drugs for her patients, day after day, year after year, under the shroud of a prescribing license, assuring them that it was safe and necessary. In the process, she abused her authority and violated her oath as a medical professional, prescribing higher doses per patient than any other prescriber in Alaska during the charging period.

Throughout this time period, she showed no regard for the lives and well-being of her patients, many of whom were vulnerable and suffering from chronic pain, addiction, and mental illness. She ignored their medical histories, risk factors, past overdoses, symptoms, and pleas to reduce or taper their doses. She ignored warnings from patients' family members, pharmacists, and other medical providers. The scope of harm caused by her misconduct is shocking, and it underscores the need for the recommended sentence to reflect the seriousness of the crimes, the immense harm she caused to her victims and their families, and her complete failure to accept responsibility. The recommended sentence further serves the important purpose of deterring others from engaging in similar misconduct and avoids sentencing disparities with other cases involving similarly situated medical practitioners around the country who have been sentenced to life or effective life sentences in less serious cases.

//

//

# I. FACTUAL BACKGROUND

The evidence at trial showed that for at least five years and likely longer the Defendant abused her license as an Advanced Nurse Practitioner and flooded Alaska with nearly 4.5 million opioids. She knowingly prescribed these highly addictive and deadly drugs to hundreds of Alaskans outside the usual course of professional practice and without any legitimate medical purpose. She admitted at trial to being acutely aware of the standards of medical care in pain management and the risks of death and addiction that accompany chronic, high dose opiate therapy, yet she actively ignored standard medical practices, such as conducting tests, physical exams, or multi-modal treatment plans. (Dkt. 310 at 170:8-173:25; 177:7-187:11). She disregarded safer alternatives to opioids. She continued prescribing even when the opioids were not helping her patients' pain. She routinely prescribed dosages that were far beyond the safe bounds set by state and federal health agencies, and often mixed them with other narcotics that increased the risk of addiction and overdose, such as the 1,445 "holy trinity" prescriptions she admittedly wrote, totaling 135,511 pills. (Dkt. 310 at 193-94). No other prescriber in Alaska prescribed higher opioid dosages than the Defendant. She averaged nearly 300 MMEs per day for a sample of her patients, topping a list of 2,120 prescribers in the state. *See* GX 246.01.[2] As aptly stated by her own witness, Spayd "was pretty much the only one that was doing what she was doing." (Dkt. 304 at 158).

---

[2]     Government trial exhibits cited in this memorandum are labeled "GX" and will be copied to a CD and hand-delivered to the Court clerk. New exhibits submitted for sentencing are designated "SE" and were filed via CM/ECF under seal with this memorandum.

She provided prescriptions to patients she never saw. She ignored requests from her patients to taper off opioids. Patient visits focused on *the Defendant's* personal issues and barely touched on issues concerning the patients. The Defendant provided prescriptions to her patients with knowledge that the patients had serious mental illnesses, were abusing their medication, overdosing on their medication, and abusing alcohol with their medication. She provided early refills and blatantly falsified hundreds (and possibly thousands) of pages of medical records indicating she had conducted extensive physical examinations. She illegally prescribed thousands of opioids to her boyfriend using other people's names. She sold opioids to an undercover DEA agent for $300 cash, admitting on video that she was committing a felony. She wrote prescriptions while visibly impaired on what were likely the very pills she was unlawfully prescribing to her patients. She ignored thousands of warnings from pharmacists, doctors, and insurers who told her to stop her unlawful prescribing. She caused untold harm to thousands of her patients, their families, and their communities.

### A. Former Patients

The trial testimony demonstrated that the Defendant did not care about the pain or suffering of her "patients," many of whom came to her with common chronic ailments like back and knee pain, migraine headaches, or depression; conditions that Spayd knew are not properly treated with high-dose opioids (E.g., Dkt. 310 at 170-75). Each of her patients also suffered from severe opioid addiction fueled by the Defendant's prescribing. This was confirmed by the Defendant's own expert, who testified there was "no doubt" that Spayd's

Case 3:19-cr-00111-JMK-MMS   Document 359   Filed 06/08/23   Page 5 of 58

patients were addicted. (Dkt. 289 at 128) ("MR. WELLS: Would there be any doubt that any of these five were medically speaking addicted? DR. BROAD: No doubt."); (*Id.* at 195) ("AUSA HEYMAN: And you said, quote, it's no doubt these five patients were addicted, right? DR. BROAD: Yes."). The Defendant, however, remained in deep denial of this reality, claiming on cross that her expert "misspoke." (Dkt. 310 at 239-40).

Witnesses discussed the devastating impact of these addictions at trial. For 18 years Spayd prescribed opioids to T██ G█████, including 1,582 fentanyl lollipops for migraine headaches, despite those powerful and addictive opioids only being approved for treating battlefield injuries and breakthrough end stage cancer pain. (Dkt. 288 at 193-94). Indeed, Defendant's own witness acknowledged that the Patient Counseling Guide for fentanyl lollipops specifically instructs providers to "[i]nform patients" that these medicines "must not be used to treat acute or postoperative pain, including *headache/migraine*…." *See* GX 487 at 3 (emphasis added); (*see also* Dkt. 304 at 164-67). Yet Spayd never gave Ms. G█████ this advisement and prescribed these and other dangerous opioids to her for 18 years without any attempt to reduce her dosage or help her with her addiction. Ms. G█████ described Spayd's practice as a "poison pen" that kept her hooked on the drugs: "[Spayd] didn't start me on narcotics, I took it already for migraines, so she didn't start it, but she sure finished it." (Dkt. 288 at 202). She acknowledged her own responsibility for her choices, but also credited her other doctors with saving her life from Spayd: "Dr. Westley and Dr. Luke Liu [saved my life from] from fentanyl and Jessica and addiction. . . . from the nightmare and the chaos and the poison pen." (Dkt. 288 at 203). She "still struggle from

this and I will the rest of my life." (Dkt. 288 at 202). Dr. Westley, who treated Ms. G█████ for a heart condition, testified that he encouraged Ms. G█████ to reduce her opioid medications because she was at a high risk of overdosing. However, when Ms. G█████ "tried to get Ms. Spayd to taper her medications down…. Ms. G█████ did not have success in getting that request honored..." (Dkt. 288 at 216). After Ms. G█████ stopped seeing Spayd she discontinued the opioid medications and "tremendously improved." (Dkt. 288 at 216).

The Court heard nearly identical testimony from five other former patients. For all of them, the Defendant drastically increased their opioid dosages, never performed physical exams, and continued prescribing after they tested positive for non-prescribed drugs, alcohol, or negative for the prescribed drugs, and after the Defendant told many of them that they probably had addiction issues. J████ H█████ also explained that "[q]uite a bit of times I would get prescriptions that I shouldn't have been getting, that I would have to remind her what my script was. And this was months and months after I started seeing her… it wasn't like I was a brand new patient…." (Dkt. 269 at 140-41).

They all had difficulty filling her prescriptions at pharmacies. They all said the Defendant never disclosed the overdose risks or the "thousands" of letters she acknowledged receiving from insurance companies warning her of those risks. (Dkt. 310 at 187-98; GX 310). They all testified about being addicted, having severe withdrawal symptoms, about being "dope sick," and to seeing other doctors who expressed grave concerns about the dosages and medications Spayd was prescribing. When M██ O█████

told Spayd that his kidney doctor said he "needed to get off the methadone" because it posed "problems with a [lifesaving kidney] transplant" he needed, Spayd's response was that the "methadone was working and … we were going to just leave it like that for now." (Dkt. 283 at 150-51).

L███ M███ explained that being a patient of Spayd's "was crazy. You would count [the pills] everywhere you went to make sure you had enough when you were out, even if you were only gone two hours…. You count them every month to make sure you had enough to last the month…. It was -- it ruled your life, how many pills you had…. My life was ruled by pills." (Dkt. 279 at 26). Each of these former patients also testified that, after they stopped seeing Spayd, they got off opioids completely or got on medication for opioid addiction. All testified that their pain was well managed, that their lives are substantially improved, but that they will battle the addiction Spayd caused for the rest of their lives. Even the former patients Ms. Spayd called in her defense hurt her case. Most struggled to remember physical examinations or discussions of medical issues, and *all* of them are now on substantially lower opioid dosages or taking medication for addiction treatment.

The pattern of Spayd's criminal prescribing extended far beyond the six former patients called by the government at trial. The United States interviewed dozens more former patients during its investigation, all of whom conveyed strikingly similar accounts of Spayd's practices: no medical or physical exams, extremely high opioid dosing, non-fatal overdoses, other medical practitioners advising them to taper down, and Spayd

disregarding their concerns and maintaining or increasing their opioid dosages, pressuring them to stay with her. Attached hereto as Sentencing Exhibits 11-16 are just a few of these interview reports for the Court's consideration at sentencing. These additional accounts underscore the gravity, scope, and *consistency* of Spayd's misconduct over many, many years, across many, many patients. *See* SEs 11-16.

### B. Pharmacists and Physicians

Half a dozen pharmacists from across Alaska testified about their experiences telling Spayd to stop her dangerous prescribing and to lower the dosages for her patients. Spayd regularly responded to these concerns "in a contentious manner" or a "'how dare you question [me]' type response," if she responded at all. *See, e.g.,* GX 339 ¶ 4. Other times, she simply instructed her patients "to go to another pharmacy." (Dkt. 268 at 178-79; Dkt. 310 at 187-98). Her prescribing was so dangerous and far outside the normal course that multiple major pharmacy chains like Walmart and Safeway, as well as the Chief of Pharmacy at Joint Base Elmendorf-Richardson (JBER), enacted unprecedented policies refusing to fill her narcotic prescriptions. Colonel Matthew Cowan, the former chief of pharmacy at JBER, testified that Spayd was the first medical practitioner in his 22-year career for whom he had to enact such a blank refusal to due to the high danger of her prescriptions. Despite being informed of these concerns and policies on numerous of occasions, the Defendant was still undeterred. (E.g., Dkt. 310 at 201).

Case 3:19-cr-00111-JMK-MMS   Document 359   Filed 06/08/23   Page 9 of 58

Justin Ruffridge, the head of the Alaska Board of Pharmacy and owner of a pharmacy in Soldotna, testified about Spayd's practice of giving patients "whatever they wanted," and the seismic shifts he witnessed after those patients got clean:

> one of the hallmarks of high dose opiate therapy is essentially you are, for lack of a better term, zombified, it's very difficult to recognize some of those traits amongst people that would typically define their personality, such as humor or, you know, conversation, many of them will become demanding or angry when they don't have access to the medication that they're really wanting. Upon treatment for opiate dependency, and it's not just these two people, but multiple people that we have been able to get treatment for over the past few years, when they return you -- they are almost unrecognizable, their personality is back, they're conversational, many of them are very grateful. It's almost as close to like a 180-degree turn that you could ever witness really in -- in our profession based on one medication alone."

(Dkt. 279 at 204, 207).

In December 2018, Spayd expressed to a patient via text message how she felt about these pharmacists who expressed concerns about her dangerous prescribing practices: "These pharmacists are f$&@ing my sh@t up!" *See* GX 292.06.

Multiple physicians around Alaska, such as Dr. Elsberg at Providence Hospital, Dr. Teresa Bormann, and Dr. Benjamin Westly, testified about their treatment of former patients of Spayd's and their grave concerns about the amounts and combinations of opioids those patients were receiving. (Dkts. 279 at 33; 283 at 11; 288 at 209). These concerns were well founded. Dr. King analyzed Spayd's PDMP data, explaining that Spayd prescribed 4.4 million opioid pills during the five-year charging period, many of which were the highest permissible dose. He

explained that an alarming number of Spayd's patients were prescribed opioids in dosages exceeding 200 MME per day—the level at which 1 in 32 patients are likely to die of an overdose. (Dkt. 290 132-33). He also explained that many of her patients were prescribed dangerous combinations of opioids, benzodiazepines and muscle relaxers, which are also a red flag of substance abuse and greatly exacerbate the risk for overdose death. He explained that Nurse Practitioners average 174 opiate prescriptions per year and pain medicine physicians average 1,315 prescriptions per year. By contrast, Spayd averaged 7,763 controlled substance prescriptions per year, of which 6,123 were opiates. This is 3,500% greater than other nurse practitioners and 466% higher than pain medicine specialists. He explained that these averages are consistent with controlled substance use outside the usual course of medical practice. (*See* Dkt. 299 at 83-84; *see also* Sealed Dkt. 192.3 (Dr. King Report)).

### C. Patient Family Members

Concerned family members of Spayd's patients, like Chris Jones, V.B., and K.B.'s mother, Ruby Steppe, pleaded with Spayd to stop prescribing excessive opioids to their loved ones. Mr. Jones witnessed firsthand his mother's brief and infrequent appointments with Spayd, who was actually in the office "maybe a third of the time" and never physically examined or discussed medical issues with his mother. (Dkt. 268 at 132). Yet Spayd still prescribed his mother, who Spayd knew to be suffering from Alzheimer's, almost nine instant release morphine tablets per day, plus hydromorphone, fentanyl patches, and valium, a dangerous combination that that increased her overdose risk and worsened her

dementia. (Dkt. 268 at 134).[3] Spayd knew that other doctors at Providence had expressed "concerns" about his mother's excessive opioid use, but she never told this to Mr. Jones, never reduced the dosage, and never addressed Mr. Jones' concerns about his mother's misuse of the drugs. (Dkt. 268 at 144-47). In 2018, his mother was hospitalized for months for an injury and the doctors discontinued her opioids and other drugs that Spayd had prescribed, and she "has not been on them since." (Dkt. 268 at 151). In the end, Mr. Jones had amassed two large suitcases full of unused hydromorphone, morphine, and fentanyl patches, which overflowed the prescription "take back" drop box twice. (Dkt. 268 at 147-48). He explained that:

> Almost every doctor that I encountered was alarmed by the amount of medication given to [his mother]. For instance, in 2015, when I became her … care assistant after her knee surgery…. The doctors at the hospital were unable to get her pain under control because she had such a high tolerance for narcotics that she was in excruciating pain in the hospital. Jessica made sure that she had plenty of narcotics to leave the hospital with, and that night I sat with her, while she very shallow breathed all night long in her home. I was just hoping that she would make it through the night.

(Dkt. 268 at 148-49).

V.B.'s mother suffered from bipolar disorder and alcoholism. In 2016, she lost her job and began to "struggle with everyday life," "she'd often mix up words, get really confused, had no sense of time," to the point that in 2016 V.B. had to obtain a power of attorney over her. (Dkt. 268 at 187-88). After V.B. arrived home one night and found her mother in the shower incoherent, she called an

---

[3]      This equated to approximately 482 MME per day, plus a benzodiazepine. *See* PDMP ██████, GX 256.

ambulance and had her mother admitted to Providence Hospital. (Dkt. 268 at 189). Prior to that, Spayd had been prescribing V.B.'s mother nearly 210 oxycodone pills, a mix of 60 Xanax or Klonopin, and 30 Ambien every month since at least 2013.[4] During her mother's two-week hospitalization doctors discontinued this medication, and her mother was suddenly "fine, she was back to being my mom." (Dkt. 268 at 189-90). When she was released from the hospital Spayd "increased her Percocet [oxycodone] dosage from five 325 milligrams to ten 325 milligrams… that was the first time she saw Jessica after the hospitalization." (Dkt. 268 at 190). Soon thereafter her mother was hospitalized again after she took "14 of [the Xanax pills Spayd prescribed] in the span of just a few hours." (Dkt. 268 at 190-91). Her mother then received substance abuse treatment for a number of months, "was released from the treatment facility, she was able to get a job and go back to work, she was able to get an apartment on her own. And she's been fine since" and did not return to Spayd. (Dkt. 268 at 192-93).

The Defendant responded to these concerned family members by ignoring them or, as discussed below in Ms. Steppe's case, by hanging up the phone. (Dkt. 288 at 16-19, 24).

### D. Earnings, Falsified Patient Records, Undercover Video

In five years Spayd personally earned over $1.3 million dollars, drove a $45,000 BMW, and barely worked four days per week while her "patients" became addicted, suffered, and died at alarming rates because of her "treatment." On many days when she

---

[4]     *See* PDMP K.L., GX 256.

did not feel like working, she instructed her non-medical office staff to forge her signature on opioid prescriptions and hand them out to patients for a cash "prescription pickup fee."

Even more galling, all of Defendant's conduct was highly pre-meditated. The trial evidence showed she created hundreds of fake medical records to justify her blatantly illegal prescriptions. She fabricated statements and physical exams about patients' "pain" and treatment that were contradicted by the testimony of former patients and the undercover videos. For instance, L███ M█████ testified that Spayd never performed physical exams and that her medical records contained provably false physical examination narratives, claiming that M████ had normal hearing (she wore two hearing aids), a normal thyroid (she had a thyroidectomy due to thyroid cancer), and no heart murmur (she had a congenital heart murmur). (Dkt. 279 at 13-15). T███ G█████ testified that Spayd performed less than a handful of physical exams over the 18 years she was a patient, and never informed her of the risks of opioid overdose or that migraines are not supposed to be treated with opioids. (Dkt. 288 at 187-88, 191, 207). She was shocked and angry when she saw Spayd's medical records that contradicted her experience: "I called you a liar. I said it's a lie, that's not --I mean, all of it that's on here, honestly, it – I – well, I'd never seen it before and I – I don't – like I said, she's never checked my ears, my nose…" *Id*. Ms. G█████'s physician, Dr. Westly, explained that falsified medical records like this "could endanger a patient's life" and that "[i]n some ways having wrong information could be worse than no information at all." (Dkt. 288 at 210-11). Each former patient witness called

by the government echoed these sentiments and confirmed the falsity of Spayd's physical exam records.

Testimony from James Eleazer and Nick Walsh further demonstrated the lengths the Defendant was willing to go to cover up her criminal activities. Their testimony conclusively established that Spayd fabricated dozens of full appointment records, listing detailed medical examinations that could not have occurred because, for example, Mr. Eleazer's passport showed he was in the Philippines at the time of the fabricated appointments.



What's more, the Defendant took these steps so she could forge Eleazer's and Walsh's names on dozens of oxycodone prescriptions that her boyfriend, Rick Dupuis, then

filled at various pharmacies to split the pills with the Defendant. In total, the Defendant prescribed 4,590 oxycodone pills to Dupuis and herself until confronted about it by pharmacist Paul Cho. The Defendant initially lied to Mr. Cho and told him Mr. Eleazer was her patient. However, when he pressed further, the Defendant admitted to lying and begged him not to report her conduct to the police or DEA. (Dkt. 269 at 38-41).

Finally, the Defendant admitted on the undercover video that she knew it was illegal and dangerous to prescribe oxycodone to an addict without pain. *See* GX 1. But she did it anyway. She sold nearly 200 oxycodone pills to a DEA undercover officer who posed as an addict with no pain. He paid her $300 cash for his first prescription. She never physically examined him, again lying about it in her medical records. During the first video, she also appears visibly impaired on drugs or alcohol during the appointment.[5] She only stopped prescribing him oxycodone when she expressed concerns that a DEA investigator was asking questions about her. She told the undercover officer that she had no records to justify her prescribing and that she could go to jail for it.

### E. Five Overdose Death Convictions

The jury also convicted the Defendant of causing the overdose deaths of five patients in five years. The government's expert Dr. King "testified that Ms. Spayd was not practicing medicine when she wrote the decedents the prescriptions described in the

---

[5]     To the extent the Court has any doubt about the Defendant's impairment on drugs during patient visits, the government encourages it to re-watch the first undercover video (GX 1), particularly from 45:17 – 45:34, where the Defendant can be seen losing consciousness for approximately five seconds in the middle of a sentence, and can be heard snoring. This is called being "on the nod," and is a common side effect of heavy opioid use.

Superseding Indictment, and that her care was outside the usual course of medical practice, and represented 'extreme departure[s] from the standard of care.'" *See* Dkt. 322 at 4 (citing and quoting Docket 280 at 45 (Trial Tr. 45:22–25; 78:4–8); Docket 299 (Trial Tr. 19:9–13; 50:20–23; 299:1–25–300:1–7)). He also noted the numerous "red flags" in each of the decedents' medical records that "supported the inference that Ms. Spayd was aware of those 'red flags' when she was prescribing the decedents controlled substances." *Id.* (citing and quoting Docket 299 (Trial Tr. 2:10–17)). Medical records established that the Defendant knew these overdoses were likely, and expert testimony squarely established that the Defendant's drugs caused each death. Each of these victims had their lives cut short by the Defendant's criminal conduct, in most cases long before their deaths.

**J█████ L██████ ("J.L.") / Age at Death: 42 | MMEs: 1,200 per day:** J.L. died of a drug overdose less than one day after filling a prescription for nearly 400 methadone and oxycodone pills from the Defendant. She was 42 years old. The trial evidence showed that Spayd did not establish a proper diagnosis for J.L.'s pain and prescribed deadly doses of opioids without considering J.L.'s multiple risk factors and aberrant behaviors, including a history of chronic alcoholism, illegal drug use, mental illness, suicide attempts, and multiple prior overdoses on the drugs the Defendant was prescribing. *See* GX 267. Dr. King described these as "show stopper" red flags that should have caused the Defendant to cease opioid prescribing and refer J.L. to addiction treatment due to the dangers of opioid addiction and overdose. (Dkt. 298 at 33). Instead, on her first appointment with Spayd in 2012, Spayd prescribed J.L. extremely high doses of methadone, even though J.L. claimed

she had tapered herself off the medications for a month. (Dkt. 298 at 22-26). Spayd then significantly escalated the dosage to 1,200 MMEs per day. (Dkt. 298 at 27, 33).

J.L. survived prior overdoses on the Defendant's medications because her son found her and brought her to the ER. After a 2012 overdose the ER physician contacted Spayd directly and informed her that J.L. suffered "narcotic induced respiratory failure" and "recommend[ed]" Spayd "weaning [J.L.] off pain meds." (Dkt. 298 at 37-38, 40, 42). The medical records show that the hospital had already begun the weaning process and that J.L.'s family had disposed of her prescriptions. As Dr. King explained: "[w]e can't diminish the importance and significance of an overdose event. If a patient is addicted and also is a chronic alcoholic and binges and now has an established hospital admission with overdose of medications, as if we needed more information to decide to stop opioids, this is it. The next best predictor of at-risk use of opioids is having a history of an overdose event." (Dkt. 298 at 39). Indeed, Spayd herself acknowledged that "overdose incidents are very concerning red flags.... In regards to patient safety." (Dkt. 310 at 193-94). Despite knowing all of this, at J.L.'s next appointment with Spayd on November 1, 2012, Spayd again prescribed her opioids at nearly 1,200 MMEs. Dr. King described this as "an extreme departure from the standard of care." (Dkt. 298 at 43-44). J.L.'s son testified that, the day before her death, J.L.'s roommate called and told him that J.L. was "effed up," but because he "was out of town [he] didn't make it to check on her that night." (Dkt. 283 at 139).

The Medical Examiner determined that J.L. died from a drug overdose, with the methadone and oxycodone Spayd prescribed being the lethal combination that caused her

Case 3:19-cr-00111-JMK-MMS   Document 359   Filed 06/08/23   Page 18 of 58

death. In describing a post-mortem photograph of J.L., Dr. King explained: "It's a chaotic and heart-wrenching picture. It's often said that an overdose is a quiet event where the patient goes to sleep. That's not the case. It's an extremely violent death where they choke on their own vomit. It's like being drowned because they're getting hypoxic and can't breath. And it ends up being a situation where froth comes from the mouth, where the vomit is coming out and they're generally lying in it, in a position that is -- how should I describe it -- nonanatomic, where they lay is where they lay. And it's a very -- overdose is a very traumatic event. And this is fairly representative of what we would see with that." (Dkt. 298 at 55).

J.L.'s obituary appeared as the front page in Spayd's medical records, demonstrating that Spayd knew of her death and did nothing to change her prescribing practices. (Dkt. 298 at 26).

**K██████ B██████ ("K.B.") | Age: 51 | MMEs: 180-690 per day:** On September 10, 2015, less than a year after J.L., K.B. died of an overdose on Spayd's pills, also less than 24 hours after filling her last prescription. She was 51 years old. Spayd's records showed no objective diagnosis of any chronic pain condition, but she did have many physical and mental health problems, such as obesity, hepatitis C, COPD, hypertension, bipolar disorder, schizophrenia, and borderline personality disorder, all of which put her at high risk for opioid abuse and overdose. She also had extreme psychosocial stressors, including a history of suicide attempt and drug-related hallucination. (Dkt. 298 at 77). Despite these enormous risk factors that should have disqualified K.B. from opiates

entirely, Spayd prescribed her combinations of hydromorphone (a/k/a "prison heroin") and muscle relaxers reaching nearly 700 MMEs per day, for almost six years. *See* GX 263; (Dkt. 298 at 69).

K.B. suffered terribly during these six years. She lost her job as a phlebotomist, dropped out of school, got divorced, became homeless, suffered non-fatal overdoses on Spayd's medications, and experienced no decrease in her pain levels. (Dkt. 288 at 17; 298 at 79-80, 82). As K.B.'s mother, Ruby Steppe, explained:

> K.B. was always a very active person…. K.B. was a phlebotomist, she had a degree in phlebotomy…. She would volunteer for all sorts of health clinics on the weekend. She taught herself Russian so that she could ask many of the people who lived in the area questions…. K.B. was no longer able to do those things…. she was not able to function…. She would go to sleep in class…. K.B. no longer painted, she no longer worked on her art projects…. K.B. used to bake and make lots of bread, she made all different kinds of bread to give to people. Just following the recipe, K.B. no longer baked. She had lost her ability to truly do much more than sleep.

(Dkt. 288 12-18). After one of K.B.'s overdoses, Ms. Steppe received a call from a concerned pharmacist, who told her that K.B.'s "medication was prescribed at the … highest level possible for that particular item." (Dkt. 288 at 19). Understandably concerned herself, Ms. Steppe called Spayd and told her "I was K.B.'s mother and that I was calling to discuss her medication, and that's about all I got to say…. I was [] told that it was none of my business and the conversation ended…. The phone was hung up [by] Ms. Spayd." (Dkt. 288 at 16-19, 24).

Prior to K.B.'s final appointment with Spayd on September 9, 2015, she had not seen Spayd and had been off opioids nearly eight months. During that time, K.B. was living

with her mother in Texas, graduated from rehab, and had gotten clean. Ms. Steppe described the change in K.B. during this time: "K.B. was once again her funny self…. K.B. was always naturally funny, and so we had humor and we had love of hockey, but not -- not the brilliance that was there…. I don't know how to say it, other than to say K.B. was not the old K.B., but she was a good K.B." (Dkt. 288 at 27). K.B. then temporarily returned to Alaska in September 2015, planning to clean out her storage locker and return to live with her parents. Unfortunately, "K.B. was not able to return to Texas." (Dkt. 288 at 34).

Despite Spayd not having seen K.B. in eight months and performing "no evaluation whatsoever," and despite seeing a uranalysis test confirming that K.B. was opioid naive, Spayd prescribed K.B. a combination of nearly 200 MMEs per day of hydromorphone, combined with muscle relaxers. (Dkt. 298 at 74, 76-77). Dr. King described these prescriptions as "exceptionally dangerous" for an opioid naive patient like K.B. and an "extreme" departure from the standard of care. (Dkt. 298 at 67). K.B. died less than 24 hours later. Law enforcement found Spayd's prescription bottle, a needle, and crushed up hydromorphone near her body. (Dkt. 290 at 10). She had nearly five times the normal therapeutic dose of hydromorphone in her blood in addition to a non-fatal amount of carisoprodol, which can enhance the respiratory depressive effects of hydromorphone. The forensic toxicologist Ms. Papsun testified unequivocally that the level of hydromorphone and carisoprodol in K.B.'s blood were sufficient to cause her death, particularly given that K.B. had been off opioids for eight months prior to receiving the 180 MME prescription

from Defendant. (Dkt. 293 at 133-36). Dr. Rolf, the Medical Examiner who autopsied K.B.'s body, found no other anatomical cause of K.B.'s death. (Dkt. 279 at 165-70).

**B███ S████████ ("B.S.") | Age: 74 | MMEs: 1,440 per day:** Just a few months after K.B., B.S. died of an overdose on December 22, 2015, at 74 years old. She had been addicted to and abusing the drugs that the Defendant prescribed to her for years. She also had multiple chronic breathing problems that made her more likely to overdose and die from opioids. As described by Dr. King: "I was somewhat appalled with Ms. Spayd -- B.S.'s clinical course. She had almost every aberrant predictor that I could come up with that would point towards to an ultimate outcome of overdose and death. So … it was a disaster in coming…. there were so many red flags here -- they were predictors of the -- of the terrible thing that was going happen in the end, that she was going to die." (Dkt. 299 at 40, 45). Despite knowing all this and even writing in her medical records that B.S. had "opioid dependence," (Dkt. 299 at 43), in the last month of her life, Spayd prescribed B.S. almost 500 methadone and hydromorphone pills, equating to nearly 1,440 MMEs per day. Dr. King described this level of opioids as "uncharted territory," explaining that there are no studies that examine the effects of that level of opioids because "generally patients don't survive when they're receiving medications at that level." (Dkt. 299 at 40-41). Dr. Zientek, Ms. Papsun, and Dr. King each testified that the amount of methadone in B.S.'s post-mortem blood was the highest they had ever seen in their careers, and that it was independently sufficient to cause her death regardless of any other possible anatomical causes. (Dkt. 293 at 157-58).

**E̶̶̶̶ K̶̶̶̶̶̶̶ ("E.K.") | Age: 59 | MMEs: 1,350 per day:** Less than 2-months after B.S., E.K. died of an overdose in her bed on February 7th, 2016, at 59 years old. Eleven days before her death, the Defendant prescribed her 307 methadone and oxycodone pills for two weeks—*i.e.*, 21 pills per day. The Defendant also prescribed E.K. valium, which can interact fatally with opioids. Indeed, three months prior to E.K.'s death, Defendant wrote in E.K's chart notes "[t]old her I cannot give her more Valium because she has a high chance of accidental overdose." (Dkt. 299 at 75). Yet despite this notation, Spayd *still* prescribed E.K. more valium *that same day*. (*Id.*) The medical records also conclusively established that Defendant knew E.K. was heavily abusing alcohol, along with the methadone and valium Defendant was prescribing her. (Dkt. 299 at 163). Defendant also testified to knowing that "people that take methadone are at higher risk to overdose when they add other agents, like alcohol or benzodiazepines," and that E.K. was addicted to and abusing the pills. (Dkt. 310 at 54:9-11).

Like the majority of Spayd's other patients, E.K. did not have terminal cancer or need hospice care. She was a 59-year-old woman with neck pain and abdominal pain. But Spayd hardly did anything to verify, treat, or diagnose those conditions. E.K. would call the Defendant's office slurring her words, causing even the Defendant's office staff to

express        their        extreme        concern        for        E.K.'s        safety:

Patient: ███████████████
Date/Time: 01/27/2015 06:21 PM
Provider:


636

Ellen had left us several messages in last week that she was unable to get her med's file anywhere in town, that the pharmacy's are mean to her and she sounded ou t of it, crying and carrying on for several minutes.  I did call her back on the 26th of Jan. to see if she did get her med's.  ==She was so out of it she never really underst ood who I was.==  She was having a had time getting her words out, ==kept calling me Scott.== (?).  I finally got her to let me talk to her boyfriend Johnny, he stated that s he hates for him to talk about her to anyone, that he will catch it when we get off the phone.  ==I ask him if he  knew if she was drinking, he believes that she was, but== didn't see it.  ==He said he did get her Medadone filled but he didn't do the Oxy because he really thinks she is over medicating.==  He said she has got in to fights with s everal of the pharmacy's in town and that is why she has a difficult time getting her scripts filled.  He stated that she has these tangents all the time now and he is re ally getting
tired of them, but he doesn't know what to do, cause nothing he does is right with her. JH

I called Ellen back around 5: PM, she was crying when she answered the phone, I ask her why again, same story over and over again, she was jumping for one thing to another, put the phone on speaker for Sarah to hear, ==her speech was slurring  crying, not listening to me. I== tried to raise her spirits but that didn't work. ==I ask her about the valium she told me earlier she had taken all,== I told her Jessica was very upset with her over that and would not give her anymore.  Than she stated that she had plenty, she did not take them all, she didn't need any. ==I explained to her that she can get a partial fill and we would write her another script for the difference.== She said she didn't know that, and would try to do it. She stated that maybe she needed help with her fears, I told her Jessica said for her to go to Prov. Mental health, she changed her attitude right away and started saying she should of never called she didn't need anything, she would be alright. Called ended with her saying she should of never called.  JH
Ellen had left us several messages in last week that she was unable to get her med's file anywhere in town, that the pharmacy's are mean to her and she sounded out of it, crying and carrying on for several minutes.  I did call her back on the 26th of Jan. to see if she did get her med's.  She was so out of it she never really understood who I was.  She was having a had time getting her words out, kept calling me Scott. (?).  I finally got her to let me talk to her boyfriend Johnny, he stated that she hates for him to talk about her to anyone, that he will catch it when we get off the phone.  I ask him if he  knew if she was drinking, he believes that she was, but didn't see it.  He said he did get her Medadone filled but he didn't do the Oxy because he really thinks she is over medicating.  He said she has got in to fights with several of the pharmacy's in town and that is why she has a difficult time getting her scripts filled.  He stated that she has these tangents all the time now and he is really getting tired of them, but he doesn't know what to do, cause nothing he does is right with her. JH
Ellen called stated that Prov. Heath Care, ( was upset again she is having issues with getting an appt. They are tell her, per her, that it will be six months before they will be able to get her in.  She called off a list of places that she has called and no will will take her, per her. She also said that Fred Meyers Old Seward/NLB are giving her a hard time about filling her scripts.  ==She said they are complaining about the clinic here handing out Pills like Candy.  Jh==


0807

        *See* Ex. 111.01. The Defendant knew all this, yet she kept prescribing E.K. these

highly dangerous controlled substances, which eventually resulted in E.K.'s death, just as

the Defendant herself had predicted. Dr. Gallagher concluded that E.K. died of a drug

overdose and specifically noted a "foam cone" when she was found deceased, "which is

very characteristic of opiate overdose." (Dkt. 288 at 151).

**L██ D███ ("L.D.") | Age: 71 | MMEs: 572:** L.D. died of an opioid overdose on March 2, 2019, at Providence Hospital. ER doctors had to tear off two 100-microgram fentanyl patches from his chest when they tried to revive him with CPR. The Defendant prescribed those to him along with almost 200 oxycodone pills. The Defendant knew L.D. regularly overtook his oxycodone and fentanyl medications, documented in dozens of early refill requests in her medical file. *See, e.g.*, GX 266. She even knew L.D. was overly sedated from the medication, resulting in multiple motor vehicle accidents from falling asleep behind the wheel. (Dkt. 298 at 95-96). As Dr. King explained, "[t]his individual might as well have put a sign on himself that says, I'm an addict, because these indications of repeatedly overtaking and early out … is an indication that the patient is dependent on the medications and is taking them for reasons of dependency not for treatment of pain." (Dkt. 298 at 95).

Dr. Andrew Elsberg treated L.D. in 2016 when he came into the Providence ER during a non-fatal overdose episode. Dr. Elsberg explained that "[L.D.] was one of those cases that you remember … he was prescribed the highest dose of chronic narcotics that I had seen in our community. And it was striking how much he was on day-to-day. It was also striking because of his age as well, he was older. . . . I don't see daily doses that high in anybody…. Even cancer patients…. Ms. Spayd was prescribing the majority." (Dkt. 283 at 17-18, 20). He performed a full work-up on L.D. and found no other explanation for his symptoms other than signs of overdose. (*Id.*) He explained that older people like L.D., have less ability to metabolize opioids and are more at risk of adverse effects, such as respiratory

Case 3:19-cr-00111-JMK-MMS   Document 359   Filed 06/08/23   Page 25 of 58

depression. He said that he rarely saw doses higher than 200 MME, even in cancer patients, and that Spayd was prescribing L.D. over 600 MMEs per day, and increased the dosage shortly before his death. (Dkt. 283 at 20). He explained that "as doses go up, that window between accidental overdose and ability to … stop pain gets narrower and narrower, it becomes more risky." (Dkt. 283 at 22).

The evidence also showed that the Defendant knew these prescriptions were wildly outside the normal course for a senior citizen for chronic, non-cancer pain, evidenced by the fact that she falsified L.D.'s final opioid prescriptions by indicating on the prescription itself that it was for prostate cancer, when her own records showed she was treating L.D. for chronic *non*malignant pain. *Compare* GX 109.1 *with* GX 108.1. When the Defendant was cross-examined about a similar falsity in another patient's medical record, she had no explanation. (Dkt. 310 at 163-66).

Dr. Rolf ruled that L.D.'s death occurred from "the intake of oral and transdermal drugs" caused by lethal levels of fentanyl and oxycodone in his system, both of which the Defendant prescribed. (Dkt. 279 at 178). Prior to collapsing in 2019, L.D.'s symptoms were nearly identical to his symptoms before his 2016 ER visit, when Dr. Elsberg confirmed he suffered an opioid overdose and ruled out stroke or other causes. (Dkt. 299 at 30-31). Critically, just prior to both overdoses, Defendant sharply increased L.D.'s opioid dosage to nearly 600 MME per day, (*see id*.), which Dr. Elsberg described as the "highest" opioid dosage he had ever seen in his fourteen years of practicing emergency medicine, *see* (Dkt. 283 at 16-18, 27-28).

Case 3:19-cr-00111-JMK-MMS   Document 359   Filed 06/08/23   Page 26 of 58

### F.    Uncharged Overdose Deaths

The Defendant's five overdose death convictions are alarming for many reasons, but particularly in light of the multiple elements that have to coalesce for the United States to even consider *charging* a medical practitioner with an overdose death. These factors include that the victim: (1) died within the five-year charging period under circumstances warranting a Medical Examiner scene investigation; (2) had opioid amounts or combinations at the scene that warranted an ME overdose examination; (3) had lethal levels of the drug prescribed by the Defendant in their blood; (4) had no other explainable causes of death based on autopsies or other evidence; (5) had PDMP data showing no other prescriptions from other providers before their deaths that could explain the presence of the drug; (6) were under the Defendant's care when they died; and (7) received prescriptions from the Defendant that were so excessive, inappropriate, and riddled with red flags that two separate medical experts (Dr. Munzing and Dr. King) independently agreed that she was not practicing medicine at all when she wrote them. And because of this exacting charging criteria, the trial evidence did not come close to capturing the full extent of the deaths that Spayd may have caused or contributed to with her prescribing.

The Defendant's own records reveal the further deadly consequences of her criminal prescribing. Between 2004 and 2011, the Defendant kept a list of patients who had died in her practice. She herself designated five of those deaths as overdoses ███████████████ ████████████████████████████████████████). *See* SE 3. Responding to a request from the U.S. Attorney's Office, the Medical Examiner's Office confirmed

four more overdose deaths from that list, all of which the Defendant had falsely attributed to "old age" or "health reasons." (█████████████████████████████████████ █████████). *See* SE 17. In total, the Defendant's list revealed nine additional overdose deaths between just 2004 and 2011. Just one example from these patient records demonstrates how long Spayd has known about the serious overdose death problem in her clinic:

> **Thursday February 9, 2006:** Pt James ████ was in the office today- he informed us that he was highly concerned "About someone who I know for a fact is one of your <u>pts</u>"--named Richard

---

> **Eagle River Pain and Wellness, LLC**   Jessica Spayd, M.S.N., A.N.P.-...
> 11823 Old Glenn Highway, Suite 110, Eagle River, Alaska 99577   (907) 622-HOPE (4673)   FAX (907) 622-4674
> Patient Name: ██████████

> ████ James kept stating (over and over in the hallway outside our office in front of our records room) that he knew Richard would "die if he keeps on the way he's going-abusing drugs and drinking like he has been". "If someone doesn't do something, he will be dead!" James stated that Richard was abusing his medications, like "soaking his patches in lemon juice" along with the use of illegal street drugs. James stated that when his last UA (of 11-15-05), when he was positive for cocaine, that he was with Mr. ████, they were both involved. James many times stated his concern and felt that pt "is going die" very soon if something was not done. James was very adamant about the pt dying.  Per Jessica, will call Richard in for mandatory pill count and UA on the morning of Monday, February 13th. (This <u>note</u> also in Mr ██████ file.) NRP & LMS
> - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
> **Monday, February 13, 2006:** Pt's stepfather ██████████ called and left msg this morning stating that pt had **passed away** over the weekend and that if pt had any scheduled appts to go ahead and cxl them. ████ did not state as to how pt <u>died, but</u> did leave a contact number (696-7013). NRP
> - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
>  **2/13/2006 10:31 AM** <u>Step father</u> believes Richard died of fentanyl OD from somehow abusing the patch.  <u>Step father</u> said he was good at hiding things.  Father also stated that he was

R███ ████ was 39 years old when he died. JP, whose husband J██ H██████ fatally overdosed in 2018, submitted a victim impact statement that further exposes Spayd's awareness of the rampant drug addiction and abuse among her patients as early as 2000, the year she started her practice. It also serves as yet another example of Spayd consistently and stubbornly refusing to heed those warnings or alter her practices.

Perhaps due to her concerns about mounting overdoses, the Defendant stopped updating her internal list after 2011, but the death toll continued to rise. Using public sources, the United States identified 36 more patients who died between 2014 and 2020. *See* SE 10. Dr. King stated that this is "an extraordinarily high number of deaths" for a nurse practitioner in this field. (*See* Sealed Dkt. 192.3 (Dr. King Report)). Out of the 93 total patient deaths identified between the two lists, the Medical Examiner's Office examined 37 cases. Out of those 37 cases, the ME's office ruled 18 were drug overdoses, with two additional overdoses confirmed by the government at trial (K.B.) and by the Defendant on her list (J████ A██████). *See* SE 10 (Orange and Green rows).[6] This means that nearly half of the cases investigated by the Medical Examiner's Office involving a present or former Spayd patient involved an overdose death. Of these 20 patients, five were in their forties or younger, and twelve were under 60 years old. The other 56 confirmed deaths were never investigated by the Medical Examiner's Office, either because no ME

---

[6] The United States compiled these deaths into a single spreadsheet in Sentencing Exhibit 10, with the Orange and Green Rows denoting confirmed overdose deaths. "Blank" spaces in the spreadsheet denote that the specified category of information was unavailable to the United States at the time of this memo.

Investigator was alerted (*see* SE 10, Column I, "Not in Database"), or because the Investigator did not find evidence at the scene to warrant further investigation (*see* SE 10, Column I, "No Jurisdiction"). While unconfirmed, there is reason to suspect that some of those other 56 deaths were also caused by overdoses or were at least situations that should have raised red flags for the Defendant.[7]

**B█████████C██████ | Age: 50 | MMEs: 315 per day:** Ms. C█████ died on August 6, 2019, at 50 years old. According to her husband's testimony, he suspected she suffered a fatal asthma attack. (Dkt. 293 at 183). Although the Medical Examiner responded to the scene, the office did not investigate the case as an overdose and the investigator narrative mentioned nothing about Ms. C█████ extremely high opioid prescriptions. *See* SE 4. This omission is particularly odd given that asthma is highly correlated with an increased risk of opioid overdose, (Dkt. 297 at 95:13-22), and because Ms. Spayd nearly doubled Ms. C█████'s dosage in the months leading up to her death, raising it from 180 MMEs per day in March to 315 MMEs just prior to her death.

| Rx Fill Date | Rx Written Date | Drug Name | Qty | MME/D |
|---|---|---|---|---|
| 7/22/2019 | 7/15/2019 | OXYCODONE HCL 15 MG TABLET | 150 | 112.5 MME |
| 7/22/2019 | 7/15/2019 | OXYCONTIN ER 10 MG TABLET | 90 | 45.0 MME |
| 7/22/2019 | 7/15/2019 | OXYCODONE HCL 15 MG TABLET | 150 | 112.5 MME |
| 7/22/2019 | 7/15/2019 | OXYCONTIN ER 10 MG TABLET | 90 | 45.0 MME |
| 6/18/2019 | 6/13/2019 | OXYCODONE HCL 15 MG TABLET | 165 | 123.75 MME |

---

[7]     The United States conducted a diligent search for overdose deaths connected to Spayd's patient population by cross referencing patients listed in Spayd's PDMP for the five-year charging period with public data regarding deaths during that five-year period, then requesting any records related to those deaths from the Alaska Medical Examiner. However, because Spayd's PDMP data only extended back to 2014, and given the de-centralized nature of medical examiner offices and incomplete data on pre-2014 patients, it is almost certain that many overdose deaths caused by Spayd will never be fully accounted for.

| 6/18/2019 | 6/13/2019 | OXYCODONE HCL 15 MG TABLET | 165 | 123.75 MME |
|---|---|---|---|---|
| 5/22/2019 | 5/13/2019 | OXYCONTIN ER 10 MG TABLET | 90 | 45.0 MME |
| 5/21/2019 | 5/13/2019 | OXYCODONE HCL 15 MG TABLET | 165 | 123.75 MME |
| 4/23/2019 | 4/15/2019 | OXYCONTIN ER 10 MG TABLET | 90 | 45.0 MME |
| 4/19/2019 | 4/7/2019 | OXYCODONE HCL 15 MG TABLET | 165 | 285.58 MME |
| 3/20/2019 | 3/20/2019 | OXYCODONE HCL 15 MG TABLET | 180 | 135.0 MME |
| 3/23/2019 | 3/18/2019 | OXYCONTIN ER 10 MG TABLET | 90 | 45.0 MME |

*See* GX 256; *see also* (Dkt. 293 at 61). Indeed, Ms. C███████'s post-mortem chest x-ray revealed a "bilateral pneumothorax," a condition that could be consistent with an opioid overdose.[8] *See* SE 4 at 2. Tellingly, even the Defendant's office staff—both of whom knew the high opioid levels Ms. C██████ was being prescribed—believed she likely overdosed. However, because the Medical Examiner found no evidence of opioid prescriptions at the scene, no follow up toxicology or autopsy was performed to determine if opioids contributed. (Dkt. 279 at 88). Of course, the trial evidence revealed why the investigator found no pill bottles at the scene:

> K.T.: B████ passed....
>
> N.L.: What?!?!?!???!?!! Is Jess freaking out?
>
> K.T.: I got a medical examiner fax this morning not reading it, thinking someone needs records...
>
> K.T.: It says she passed today
>
>    …
>
> K.T.: OMG. I'm shocked about *this one* (emphasis added)
>
>    …

---

[8] *See* https://link.springer.com/article/10.1007/s12016-013-8373-z (last visited May 18, 2023).

K.T.: I'm thinking she did OD (overdose) and on top of breathing prob it just did it for her. I could be way off

K.T.: Ugh. I'm really shocked

…

K.T.: I just told JS (Jessica Spayd)

K.T.: She's talking with Mike [Ms. C██████'s husband] right now asking him a bunch of questions

K.T.: She just told Mike "do me a favor, don't let anyone see those bottles!" What does that mean????!!!!

N.L.: Ugh she is so paranoid

See GX 289.

This text message exchange between Spayd's office staff, which occurred on the date of Ms. C█████'s death, is one of many examples showing that Defendant knew patients like Ms. C█████ were dying and feared that their deaths were overdose related. Indeed, the mere receipt of a fax from the Medical Examiner sent the Defendant and her staff into a panic. Sarah Fountain confirmed that Spayd regularly reacted this way when a patient died, consistently worried about overdoses. (Dkt. 283 at 117). However, instead of critically evaluating her prescribing practices to determine if opioids may have contributed to these deaths, *the first thing* Spayd did was call Ms. C█████s widower on *the day his 50-year-old wife suddenly died* and ask him to do *her* a "favor": "don't let anyone see those bottles." And the precise language she used shows the intent behind her request. K.T. did not quote Spayd as saying "dispose of those bottles for safety reasons." She quoted her as

saying: "don't let anyone *see* those *bottles*."[9] Spayd was not concerned about the safety of others who might take the lethal pills; she was concerned about the prescription bottles that had her name, address, and DEA number on them to hide her possible involvement in Ms. C████'s death.

**████████████ S████████ | Age: 59 | MMEs: 230 per day:** Ms. S█████ died on May 2, 2014, at 59 years old, also while under Spayd's care. The Medical Examiner's Office investigated the scene and noted that S████████'s husband found her unresponsive with no readily apparent cause of death. *See* SE 2 at 1. At the time the ME investigator declined to investigate further, documentation shows that he had only identified one bottle of opioids and appeared unaware of the ***nine*** other recent opioid prescriptions Spayd gave to Ms. S███████ in just an 11-day period the month before her death. *See* SE 2 at 2-5.

| Rx Written Date | Drug Category | Drug Name | Qty | MME/D |
| --- | --- | --- | --- | --- |
| 4/10/2014 | Narcotic | HYDROCODON-ACETAMINOPHN 10-325 | 25 | 50.0 MME |
| 4/10/2014 | Narcotic | MORPHINE SULFATE ER 60 MG CAP | 5 | 60.0 MME |
| 4/10/2014 | Narcotic | OXYCONTIN 40 MG TABLET | 10 | 120.0 MME |
| 4/16/2014 | Narcotic | OXYCONTIN 40 MG TABLET | 10 | 120.0 MME |
| 4/18/2014 | Narcotic | MORPHINE SULFATE ER 60 MG CAP | 5 | 60.0 MME |
| 4/18/2014 | Narcotic | HYDROCODON-ACETAMINOPHN 10-325 | 25 | 50.0 MME |
| 4/23/2014 | Narcotic | HYDROCODON-ACETAMINOPHN 10-325 | 75 | 50.0 MME |
| 4/23/2014 | Narcotic | OXYCONTIN 40 MG TABLET | 30 | 120.0 MME |

---

[9] Mr. Crocker complied with Ms. Spayd's request, but four years after the fact, he did not recall the precise language she used. (Dkt. 293 at 183, 187-88). During trial, the FBI interviewed K.T. and showed her the text message exchange recounted above. The agent asked K.T.: "would you have written that in quotes if that wasn't what Spayd said?" K.T. answered: "If I wrote it in quotes, that's what she said."

*U.S. v. Spayd*  
3:19-cr-00111-JMK

Page **33** of **58**

| 4/23/2014 | Narcotic | MORPHINE SULFATE ER 60 MG CAP | 15 | 60.0 MME |
|---|---|---|---|---|

*See* GX 256. Once the ME declined jurisdiction, Spayd completed Ms. S███████'s death certificate herself, listing vague, non-lethal conditions such as "tobacco abuse" and "severe depression and anxiety" as her *causes of death*, requesting no toxicology tests or autopsies. *See* SE 1. For that reason, although Dr. Munzing concluded in his report that Spayd's prescriptions to Ms. S███████ were "an extreme departure of the standard of care," he could not opine on cause of death due to the lack of toxicology. *See* SE 5 at 153-55.

**D████ W██████ | Age: 69 | MMEs: 170 per day (fentanyl):** Spayd prescribed high doses of fentanyl and hydrocodone to Mr. W████, an alcoholic, for six years. She ignored his daughter J.R.'s warnings and another doctor's opinion that she was overmedicating him. *See* SE 8 ¶¶ 2-3. J.R. started attending her father's appointments with Spayd and found that most of them were about Spayd's personal problems rather than her father's health. *See id.* ¶ 3. J.R. noticed that her father was losing his friends and family due to his opioid addiction and that he was becoming more depressed and isolated. *See id.* She confronted Spayd about the harmful effects of the medication, but Spayd did not listen. *See id.* ¶ 4. Spayd even wrote a letter stating that Mr. W████ was "mentally unstable," yet she continued giving him opioids. *See id.* ¶ 7. Most egregiously, Spayd told Mr. W████ that he could drink alcohol while taking fentanyl, despite knowing the lethal consequences of mixing the two substances. *See id.* ¶ 4. Mr. W████ died of a fentanyl and alcohol overdose nearly eight months after Spayd was arrested, showing that she had supplied him

with such an excessive amount of fentanyl that he was able to hoard enough to overdose months after her arrest. *See* SE 7; SE 8 ¶ 7. Mr. ████'s PDMP shows that Spayd was the only source of his fentanyl and, although he also had cancer, that did not cause his death. *See* SEs 7 and 9.

**A██ C████** | **Age: 54** | **MMEs: 723 per day:** According to Dr. Munzing's report, Mr. C████ saw Spayd between approximately 2003 until the time of his death in August 2014, at 54 years old. *See* SE 5 at 27-35. He screened positive for depression and possible suicidal ideation, which was not explored by Spayd. Between January 2014 and July 2014, his morphine milligram equivalent had been increased from 293 MME per day, to 595 MME per day in April, up to 723 MME per day in July 2014. Mr. C████ was concurrently receiving benzodiazepine medication from other prescribers, which Spayd appeared to have known. Mr. C████'s last prescription from Spayd was August 13, 2014. On August 19, 2014, he committed suicide by gunshot. Dr. Munzing identified "Multiple Standard of Care deficiencies" in Spayd's treatment and concluded that her treatment "put this patient at risk for side effects, including substance use disorder (addiction), overdose and/or overdose death. Sadly, this patient died. In my opinion, ***the opioid / controlled substance medications prescribed by ANP Spayd were a significant contributing factor in this patient's death, despite the cause of death being suicide***." *See* SE 5 at 27-35 (emphasis added).

**C██ D████** | **Age: 50** | **MMEs: 1,842 per day:** Ms. D████ died on August 28, 2017, the same day she filled her final opioid prescription from the Defendant. Spayd

again completed the death certificate herself, listing brain cancer as the cause of death without performing any kind of autopsy, toxicology or other testing that would confirm such a cause. *See* SE 18. Dr. Munzing noted that while Spayd's patient file made some mention of a brain cancer diagnosis, it did not appear Spayd received confirmation of that diagnosis or any concrete information about her status or the trajectory of her reported condition. *See* SE 5 at 223. In February 2017, just six months before her death, Spayd's records indicate Ms. D███████went to the ER for an opioid overdose. Dr. Munzing notes that while the ER records referenced a history of narcotic withdrawals and other pre-existing conditions, they made no mention of cancer at that time. *See* SE 5 at 223. She died six months later one day after filling her 1,842 MME prescription from Spayd. No one other than Spayd appears to have made a cause of death determination.

**R██████ J████████ | Age: 47 | MMEs: 1,140 per day:** R██████ J██████ died on October 5, 2015, at 47 years old. According to Dr. Munzing's review of medical records, Ms. J██████ was seen by Jessica Spayd many times over multiple years. She had multiple medical problems, including those that would reasonably result in pain, however her MME was over 1,000 mg/day with multiple red flags and standard of care deficiencies observed by Dr. Munzing. He concluded that Spayd's prescriptions to Ms. J██████were an "extreme departure from the standard of care." He also noted that although "Medical Examiner / Death Certificate information is not available to determine cause of death[,] [b]ased on the extremely high opioid dosing, and the patient's death approximately one week after the last prescription from Spayd, an association is likely." *See* Sentencing Ex. 5 at 121-28.

Aside from overdose deaths, Spayd's prescribing practices made her patients susceptible to other risks, including potentially increased risk of motor vehicle or other accidents. This was a concern discussed by multiple former patients at trial and was highlighted in multiple medical records, including L.D.'s, which stated he had been involved in multiple motor vehicle crashes after falling asleep behind the wheel due to over sedation.

## II.    STATUTORY PENALTY RANGE

After a month-long trial with 51 total witnesses (33 government and 18 defense), a Jury convicted the Defendant on all ten counts of the Superseding Indictment, including five overdose deaths and operating a drug involved premises. As the PSR correctly notes, there is a statutory mandatory minimum sentence of 20 years to life for each of Counts 1 through 5 under 21 U.S.C. § 841(b)(1)(C), distribution resulting in death. Counts 6 through 10 carry a maximum penalty of 20 years' imprisonment.

## III.   GUIDELINES CALCULATION

The Defendant's case presents the rare scenario where her actual total offense level exceeds 43, the maximum offense level in the Guidelines, resulting in a Guidelines Range of life imprisonment. The United States agrees with the PSR's conclusion on this point and submits that it accurately reflects the Defendant's conduct and culpability.

The United States notes that the Defendant's criminal drug distribution of 4.5 million opioid pills between 2014 and 2019 was so high that the drug quantity attributable to Defendant on Count 10 should be *at least* over 30,000 kilograms of mixed drug weight,

which triggers the second highest base offense level, 36, on Counts 6 (Dupuis and UCs) through 10 (maintaining a drug involved premises). Indeed, even the drugs prescribed to a small sample of her patients exceeds that 30,000kg threshold. Sentencing Exhibits 5 and 6 are expert reports prepared by Dr. Tim Munzing after his review of 50 of Spayd's patient files and her prescriptions to those patients. Of those 50 patients, Dr. Munzing found that the prescriptions to 42 were unlawful, two were lawful, and for six he was unable to reach a conclusion. Attached as Sentencing Exhibit 20 is a filtered PDMP including only those 42 patients, which shows that Spayd conservatively prescribed those patients 406,861 tablets of various powerful opioid pills, including 176,670 oxycodone 15mg pills, 78,591 methadone pills, and 50,161 hydromorphone pills. After filtering that spreadsheet and determining the amount of each specific drug type and strength, the Probation Officer correctly applied the conversion formulas in Comment 8(D) of the Guidelines Drug Equivalency Table to each drug total to derive the amount of converted drug weight. These totals are set out in Sentencing Exhibit 19 and ¶ 61 of the PSR.[10] After adding up these totals for each type and strength of opioid, the converted drug weight associated with

---

[10] For example, 176,670 oxycodone 15mg pills amounts to 2,650 grams of oxycodone. One gram of oxycodone equals 6,700 grams of converted drug weight. *See* USSG § 2D1.1 cmt. 8(D). Accordingly, the converted drug weight associated with Defendant for just the 176,670 15mg oxycodone pills is 17,755kg (2,650gm x 6,700gm). Notably, not all of the opioids Spayd prescribed to these individuals are included in these calculations. For instance, Spayd prescribed these patients 6,154 units of fentanyl in various preparations, both patches and lollipops. However, because the PDM P does not include the total milligrams of fentanyl in each unit (and merely includes the amount of drug administered per hour), it would be burdensome to calculate the converted drug weights for those units. However, the United States does not believe adding fentanyl and the other omitted opioids would change the ultimate Base Offense Level.

Defendant was 31,259kg, yielding a base offense level of 36. *Id.* § 2D1.1(c)(2) (converted drug weight is "[a]t least 30,000 KG but less than 90,000 KG.").[11]

The United States notes that these totals still likely underrepresent the drug totals attributable to the defendant given the breadth and scope of her misconduct related to Count 10. However, because the result of these calculations do not change Defendant's ultimate Guidelines Range, these conservative estimates suffice.

Further, while the United States agrees with the Guidelines enhancements currently included in the PSR, the United States believes that a number of additional enhancements apply here that are not included in the PSR. Although these additional enhancements will not change the Defendant's ultimate Offense Level of 43, they should nonetheless be included based on the facts and circumstances of this case. They are also relevant aggravating factors for this Court to consider in fashioning its ultimate sentence:

- <u>Obstruction of Justice, +2 under U.S.S.G. § 3C1.1</u>: During the PSR interview in this case, the Defendant told the probation officer that "she tried a Percocet in 2012 or 2014, and she has otherwise never used any other controlled substances." PSR ¶ 99. The Defendant made similar denials during her trial testimony. These statements directly conflict with the Defendant's previous admissions and the evidence in this case, as noted in a footnote by the probation officer: "during the Defendant's pretrial

---

[11] This is the standard method courts use to calculate drug quantities in pill mill cases because the offenses generally involve drugs not listed in the main Drug Quantity Table. *See, e.g., United States v. Flores,* 725 F.3d 1028, 1034 (9th Cir. 2013) ("Where, as here, an offense involves a drug that is not listed in the Drug Quantity Table, sentencing courts use the Drug Equivalency Tables in § 2D1.1 to convert the drug into an equivalent amount of marijuana. *See* U.S. Sentencing Guidelines Manual § 2D1.1 cmt. n.8(A) (2012). The Drug Equivalency Tables provide that one gram of actual oxycodone equals 6,700 grams of marijuana…. Multiplying 689 days by the district court's estimate of 500 pills per day results in a total of 344,500 80–milligram pills. Multiplying this amount by the 80 milligrams in each pill results in 27,560,000 milligrams, or 27,560 grams, of oxycodone. Finally, after converting oxycodone to its marijuana equivalent using the 1:6,700 gram ratio in the Drug Equivalency Tables, the district court's adopted start date and daily quantity yield a total of 184,652 kilograms of marijuana."); *see also, e.g.*, *United States v. Wilcox,* 704 F. App'x 784 (10th Cir. 2017) (same).

services interview, the Defendant advised she had been abusing prescription *pain medication* since 2017. Additionally, during a search of the Defendant's purse in the instant offense, it contained loose Oxycodone and Xanax pills. The investigation also revealed text messages exchanged between the Defendant and Dupuis where they discuss using drugs and trading prescription pills." PSR ¶ 99, n.4. The guidelines commentary supports application of the obstruction enhancement when "the Defendant's obstructive conduct (A) occurred with respect to the investigation, prosecution, *or sentencing* of the Defendant's instant offense of conviction, and (B) related to (i) the Defendant's offense of conviction and any relevant conduct…."). U.S.S.G. § 3C1.1, Comment 1. The defendant's denials at trial and to the probation officer directly conflict with her previous statements and the trial evidence. The defendant's use of controlled substances also relates to her offense of conviction and relevant conduct because the government argued at trial that her motive for committing the Richard Dupuis counts was to share the drugs with him. The government also alleged that the defendant was visibly impaired during the first undercover visit, explainable by her use of drugs.[12] The enhancement should apply.

- +2 under U.S.S.G. § 3A1.1(b)(1), Vulnerable Victims: Defendant took advantage of large numbers of drug-addicted, mentally ill patients, and caused many of them to be addicted. She also did so in a way that endangered their lives due to her proclivity for combining large quantities of opioids with benzodiazepines and muscle relaxers, which she well knew was a significant risk. Her prescribing directly killed at least five patients and contributed to the deaths of many more. As used in the Guidelines, "'vulnerable victim' means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, n.2. Although drug distribution is often considered a victimless crime, Defendants' patients were exposed to unnecessary and risky medication and cocktails of medication and are therefore victims of her conduct within the meaning of the Guidelines. *See, e.g., United States v. Sidhu*, 130 F.3d 644, 655 (5th Cir. 1997) (affirming vulnerable victim enhancement for doctor who involved patients "debilitated by pain or depression" in his fraudulent billing scheme); *United States v. Burgos*, 137 F.3d 841, 844 (5th Cir. 1998) (finding that patients were victims where they 'were often admitted to the hospital needlessly or their stays in the hospital were extended beyond what was necessary"); *United*

---

[12]     The defendant also testified falsely at trial multiple times, including that the hundreds of falsified physical exam records were simply "mistakes;" that she didn't know Ms. Salmon was using heroin (despite nearly a dozen uranalysis to the contrary); that she didn't know Ms. Kubiak was using alcohol (despite substantial evidence to the contrary); that she didn't know what the "holy trinity" was despite a 2016 warning letter she received defining it (see Exhibit 510).

*States v. Volkman*, 797 F.3d 377, 398 (6th Cir. 2015) (same). Further, due to the recognized mental and physical condition of addiction and numerous instances of mental health conditions being treated as falsified physical conditions and treated with opioids, patients were also vulnerable due to those mental conditions.

- <u>+4 under U.S.S.G. § 3B1.1, the defendant managed five or more participants in her criminal activity (her office staff)</u>:  The defendant directed and supervised those employees at her clinic who assisted her in issuing fraudulent prescriptions, collecting fees, and maintaining records. She also directed those employees to fraudulently sign opioid prescriptions for her while she was out of the office. *See* Dkt. 283 at 74. *See, e.g., United States v. Fearnow*, 468 F. App'x 466, 469 (6th Cir. 2012) (applying four level leader organizer enhancement to physician convicted of unlawful prescribing under 21 U.S.C. § 841, reasoning that the Dr. "exercised managerial authority over staff members at Wickman, including nursing student interns, who assisted him in accomplishing the offenses. *See United States v. Baker*, 559 F.3d 443, 449 (6th Cir.2009) (noting "a defendant whose sentence is enhanced under § 3B1.1(a) need only supervise or manage one of the five or more other participants") (citation omitted).

- <u>+2 under U.S.S.G. § 2D1.1(b)(16)(B), distributed a controlled substance to an individual the defendant knew was… "…(ii) 65 or more years of age, (iii) pregnant, or (iv) unusually vulnerable due to physical or mental condition or otherwise particularly susceptible to the criminal conduct.</u>" Defendant acknowledged that as early as 2009 she knew the standard of care was to cease the prescribing of opioids during pregnancy due to high risks to the mother and unborn child, yet she nonetheless prescribed hundreds of MMEs of opioids per day to Abraham Salmon's wife through two of her pregnancies, even after Ms. S█████ had three miscarriages under Defendant's care and tested positive for heroin multiple times while she was pregnant. (Dkt. 310 at 230:10-18; 237:5-11). Spayd acknowledged all of this on cross, during which she baselessly minimized her role: "Q: And so you believe that you [] prescribing her oxycodone while pregnant after testing positive for heroin, after she had already had three miscarriages, you think that was within the standard of care? A. Well, I don't think her miscarriages had anything to do with her taking opioids." (Dkt. 310 at 237).

//

//

//

*U.S. v. Spayd*
3:19-cr-00111-JMK

Page **41** of **58**

## IV. GOVERNMENT'S RECOMMENDATION

The government respectfully submits that a sentence of life imprisonment is appropriate and necessary in this case to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant, and avoid unwarranted sentence disparities among similar defendants who have been found guilty of similar conduct after trial.

### A. Nature and Circumstances of the Offense

The defendant committed the deadliest known drug offense in this district's history. Although the total number of deaths she caused or contributed to will never be fully known, the numbers recounted above are startling. The evidence of her persistent and excessive over prescribing in the face of a consistent, steady stream of patient deaths, shows that her conduct was not based on honest errors in medical judgment. She knew her practices were killing people, yet she continued her pattern of illegal prescribing and kept a steady stream of patients coming in the door. Many times, Defendant was the one pushing the drugs, as she deflected patients' like T███ G██████'s, M██ O████'s, and B███████████-V██'s requests to taper their medication or enter a true pain management program.

The true motives for Spayd's behavior may never be known. While she presented herself to the world as a medical provider, she acted more like a drug dealer. As Dr. King explained:

in a situation where the patient says I need or want this, and the provider gives it to them without any foundation, any medical foundation for the use of opioids, that's akin to running -- well, that is a pill mill. It's akin to going out and buying the pills on the street where the dealer doesn't really care about your medical history, doesn't really care about exercising universal precautions, doesn't really care about the dose that you're on and the harms that you may be suffering.

(Dkt. 290 at 146).

She abused her position of trust as a medical professional to flood the community with millions of opioids from illegitimate prescriptions, knowing full well the harm they caused. She showed no regard for the health and safety of her patients or anyone else who came into contact with her drugs. She caused the deaths of at least five people, young and old, who had their lives cut short by her unlawful conduct. She may have contributed to dozens of other deaths and caused countless others to suffer addiction and trauma, and caused immeasurable pain and grief to the families and friends of her victims. She lied to investigators and routinely falsified medical records, further demonstrating that her conduct was no mistake. She has shown minimal remorse or acceptance of responsibility for her actions.

While she operated more like a drug dealer hiding in plain sight behind her medical credentials, her conduct was more dangerous because she encouraged and escalated her patients' addictions while discouraging them from seeking addiction treatment. Despite knowing that many of her patients were addicted and seeking opioids, she prescribed them indiscriminately. She drastically increased their dosages, intensifying their dependence on drugs and, in turn, on her. She discouraged patients from lowering their dosages or

receiving addiction treatment, leading directly to fatalities. The Defendant also endangered the lives of countless others who trusted her with their well-being.

As noted, the Defendant was acutely aware of the overdose risks her prescribing posed to her patients, yet she persisted in her practices. She knew that all the overdose victims had severe mental health and addiction issues, which her own expert confirmed. She knew that E.K., L.D., J.L., and K.B. had each previously suffered non-fatal overdoses on the medications Defendant prescribed to them, one of the strongest predictors of a future drug overdose. Defendant knew J.L. was using illegal benzodiazepines; she knew L.D. was regularly doubling his fentanyl patches and overtaking his oxycodone to shovel snow; she knew E.K. was abusing alcohol in combination with opioids and benzos; and she knew B.S. had COPD and had abused her opioids multiple times in the past. And she knew that K.B. was opioid naïve before prescribing her 180 MME per day of hydromorphone, a level at which 1 in 32 people will statistically die of an overdose. (Dkt. 290 132-33). Indeed, Defendant acknowledged that this dosage was more than sufficient to cause an overdose on the undercover video: "if you give an opiate naïve person that much [30 MME per day], would they overdose? It's a potential that they could. And if you have an addiction issue, there is more of a potential you could take more than I'm prescribing and overdose." *See* GX 1 at 20:14-20:25.

The Defendant's conduct violated not only federal law but also basic ethical principles that govern medical practice. She violated her oath to do no harm and betrayed her duty to care for her patients. The Defendant's conduct also undermined public

confidence in the medical profession and contributed to the stigma and discrimination faced by people who suffer from chronic pain or substance use disorders. She sullied the status of legitimate pain management providers who follow evidence-based guidelines and best practices. She also fueled public mistrust towards people who need opioids for legitimate medical reasons or who struggle with addiction and need treatment, as demonstrated by the Defendant's own trial witnesses.

She exploited a vulnerable population of people who were suffering from pain, injury, and mental illness and turned them into customers for her illicit drug business. She performed no meaningful medical evaluations or interventions; she merely sat behind a desk and issued prescriptions for excessive controlled substances. Any child with a prescription pad could have done what she did, but no responsible medical practitioner should have.

The Defendant's consciousness of guilt is further evident from her own words and actions. Her former office assistant, Sarah Fountain, testified that the Defendant routinely questioned the identity of new patients, asking her staff if they thought they were DEA agents: "[Spayd] would ask all of us, individually, do you think that this patient is a DEA agent?" (Dkt. 283 at 117). She did this with "every new patient." She also regularly expressed concerns when a patient died, "worried about if it was []an overdose." *Id.* A nurse practitioner who believed she was practicing medicine ethically and legally would not be overly preoccupied with worries about DEA agents wearing cameras or patients overdosing on her prescriptions. The Defendant knew that her actions were wrong and that

she would eventually face justice. That day has come. A life sentence is necessary to send a clear message that such conduct will not be tolerated and will be punished severely.

### B. History and Characteristics of the Defendant

The Defendant has no prior criminal record, but she has a history of substance abuse and mental health issues. She has been diagnosed with bipolar disorder and has alcohol and substance abuse issues and has been treated for these conditions at various facilities.

A defendant's mental and emotional conditions "may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics are present to *an unusual degree* and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.3 (emphasis added). The United States submits that Spayd's mental condition, which consists of a diagnosis that she suffers from bipolar disorder, is not unusual or severe enough to distinguish her case from the heartland of cases covered by the Guidelines. To be sure, her actions in furtherance of the drug crimes she now stands convicted of were organized and calculated—not delusional or incoherent as one might expect from someone suffering from a severe mental condition. Spayd was able to organize and operate a multi-million dollar business for nearly 20-years. Spayd's motive for these crimes, possibly to improve her financial lot in life and maintain power and control over vulnerable patients, is no different than any other drug dealer across the United States.

Likewise, Spayd's voluntary drug and alcohol abuse is not "unusual" when viewed alone or in combination with any other offender characteristic, nor does it distinguish her

case from the typical cases covered by the Guidelines. Section 5H1.4 expressly provides that "[d]rug or alcohol dependence or abuse ordinarily is not a reason for a downward departure" because "[s]ubstance abuse is highly correlated to an increased propensity to commit crime." U.S.S.G. § 5H1.4. As this Court is well aware, drug addiction is unfortunately the rule, not the exception, for federal Defendants. While Spayd's voluntary drug and alcohol abuse may have led to poor decision making, it in no way excuses her conduct. Although she sought treatment for these problems, she continued to abuse drugs and alcohol while "treating" and endangering the lives of her patients. She did not show any remorse or contrition for her actions; she denied any wrongdoing and blamed others for her situation.

### C.    Protection of the Public

The communities of Alaska have suffered significantly from Spayd's crimes. Alaska has been hit hard by the opioid epidemic, which has claimed hundreds of lives and strained the resources of law enforcement, health care, and social services. Spayd contributed significantly to this public health crisis by flooding the state with millions of opioids that were diverted to the illicit market or abused by her patients. Indeed, based on the 4.5 million pills she prescribed in just five years, Spayd likely injected 18 million pills into the state over her 20-year career assuming similar prescribing rates.

Defendant personally earned $1.3 million in just over five years through her illegal prescribing. Increased profits from having a larger, long term, and dependent patient base, are one likely motive for her behavior. Indeed, the Defendant described how this worked

during cross examination, reading from a transcript of her prior statement: "[t]here's so much money tied up in these clinics, it's just -- and I'm sorry. A lot of it has to do with opiates because they get the patients there, and they take them. They're dependent, and they have to pretty much do whatever providers tell them to maintain their opiate prescription." (Dkt. 323 at 76:2-7). C▉▉▉ B▉▉▉, a former patient and employee, previously discussed his perspective that this served as a motive for Spayd's actions:



*See* SE 21.

These examples, coupled with Spayd's continual disregard for the warnings of dozens of pharmacists and medical professionals, also suggests she may have enjoyed the power she held over her patients. Spayd's long-term addiction to opioids herself likely also fueled her conduct by impairing her judgment and making her more prone to prescribe large doses of those same drugs to her patients.

Case 3:19-cr-00111-JMK-MMS   Document 359   Filed 06/08/23   Page 48 of 58

### D. The Need for Adequate Deterrence

The medical profession has a critical role and responsibility in preventing and treating opioid misuse and addiction, as well as in ensuring the appropriate and safe use of opioids for legitimate medical purposes. Medical professionals who violate their ethical and legal duties by prescribing opioids without medical necessity, oversight, or accountability put their patients and the public at risk of serious harm and undermine the trust and confidence that society places in them.

This case presents a unique opportunity for the Court to remind the public at large, and those associated with the medical community in particular, of the serious consequences that will result when people like Spayd seek to exploit vulnerabilities in our health care system and target vulnerable individuals who are susceptible to drug dependence or addiction. The prospect of federal imprisonment, as the Court is undoubtedly aware, goes a long way toward discouraging offenders like Spayd who risk a certain and substantial loss of liberty. The recommended sentence would also reflect the Court's recognition of the gravity and urgency of the opioid crisis and its commitment to addressing it effectively.

Indeed, cases within the Ninth Circuit and throughout the country have recognized that general deterrence is especially important in cases like this, where prison sentences can have a significant impact in deterring other medical professionals from engaging in these types of offenses driven by monetary incentives. Substantial prison sentences in these cases are impactful because white collar criminals like medical professionals

typically make rational and calculated decisions, including weighing the prospect of potential incarceration against the potential economic gains.

"[P]rosecution may carry enhanced value as a means of general deterrence where, as here, the alleged offense is a white-collar crime…" *United States v. Slavin*, 2022 WL 576016, at *2 (9th Cir. Feb. 25, 2022) (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[b]ecause economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") and *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (recognizing that Congress, in adopting the Sentencing Factors at 18 U.S.C. § 3553(a), determined general deterrence to be "particularly important in the area of white collar crime")). "White collar criminals may be particularly susceptible to general deterrence because '[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.'" *Sample,* 901 F.3d at 1200 (10th Cir. 2018) (internal citations omitted); *see also Slavin*, 2022 WL 576016, at *2 (9th Cir. Feb. 25, 2022); *United States v. Swenson*, 2020 WL 7847204, at *2 (D. Idaho Dec. 31, 2020) (white collar Defendants "are more rational, deliberate, purposeful, nonimpulsive, and calculated.")

Moreover, crimes like the Defendant's often occur over long periods of time and can be difficult to detect. Where offenses are lucrative and difficult to detect, general deterrence is essential. *See United States v. Morgan*, 635 F3d. Appx. 423, 450 (10th Cir. 2015) (failure to impose significant consequences in white collar crimes "creates the

impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.") (citing S.Rep. No. 98–225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("In a number of opinions … we have explained that general deterrence is an important factor in white collar cases, where the motivation is greed.").

### E. Sentencing Range and the Need to Avoid Unwarranted Sentence Disparities

A sentence of life imprisonment would also accord with sentences imposed on other medical practitioners who have been convicted of similar offenses involving opioid distribution resulting in death or serious bodily injury. "'Congress's primary goal in enacting § 3553(a)(6) was to promote *national uniformity* in sentencing.'" *United States v. Kwon Woo Sung*, 740 F. App'x 878, 880 (9th Cir. 2018) (quoting *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007)) (citations omitted) (emphasis in original). "Although [*United States v. Booker*, 543 U.S. 220 (2005)] rendered the Guidelines advisory, it did not extinguish the objective of ensuring nationwide consistency in federal sentencing." *United States v. Ringgold,* 571 F.3d 948, 951 (9th Cir. 2009). "A within-Guidelines sentence ordinarily needs little explanation…because both the Commission and the sentencing judge have determined that the sentence comports with the [section] 3553(a) factors and is appropriate in the ordinary case." *United States v. Carty*, 520 F.3d 984, (9th Cir. 2008).

Other pill mill operators who contributed to far fewer deaths than Spayd have received life or effective life sentences, which courts have affirmed as substantively reasonable:

- *United States v. Volkman*: Chicago physician sentenced to four consecutive life sentences for illegally prescribing and dispensing opioids outside the scope of a legitimate medical practice that resulted in the deaths of four people between 2003 and 2005. 797 F.3d 377, 398 (6th Cir. 2015).[13]

- *United States v. Webb*: Florida physician sentenced to life in prison after conviction on multiple counts of unlawful distribution, including three overdose deaths. 655 F.3d 1238 (11th Cir. 2011).[14]

- *United States v. Henson*: Kansas physician sentenced to life imprisonment following convictions on multiple controlled substance offenses, including one overdose death and other, related charges. 9 F.4th 1258 (10th Cir. 2021).[15]

- *United States v. Kincaid*: Affirming sentences of 830 and 470 months for two non-medical practitioner owners of a pill mill, with no convicted overdose deaths. 631 F. App'x 276, 285 (6th Cir. 2015).

- *United States v. Lang*: Affirming a 3,360 month (280-year) sentence for a non-medical professional pill mill operator with no conviction for overdose deaths for distributing "massive quantities of opioids." 717 F. App'x 523, 527 (6th Cir. 2017).

- *United States v.* Smithers: West Virginia physician sentenced to 480-months (40-years') imprisonment for the unlawful distribution of opioids, including one overdose death count and a one count for maintaining a drug involved premises. He faced a Guidelines Range of life. 1:17-cr-00027, Dkt. 280 (Oct. 2, 2019, S.D.W. Va).[16]

---

[13] https://archives.fbi.gov/archives/cincinnati/press-releases/2012/chicago-physician-receives-four-life-sentences-for-illegally-distributing-pills-that-led-to-deaths-of-four-people

[14] https://archives.fbi.gov/archives/jacksonville/press-releases/2010/ja012810a.htm

[15] https://www.justice.gov/usao-ks/pr/wichita-doctor-sentenced-life-diverting-rx-drugs-streets. Note that certain counts of conviction were vacated by *Ruan*, however the previously imposed sentence is still relevant for this Court's consideration of sentencing disparities.

[16] https://www.npr.org/2019/10/02/766403612/doctor-gets-40-years-for-illegally-prescribing-more-than-half-a-million-opioid-d

- *United States v. Craig*: Two defendants (a physician/medical director and an administrator/owner of a clinic) sentenced to 420 months following convictions on four counts of controlled substance offenses. 823 F. App'x 231 (5th Cir. 2020).

- *United States v. Joseph*: Affirming sentence of 360 months (30-years) for a pharmacist who unlawfully dispensed a controlled substance that caused death. 709 F.3d 1082, 1105 (11th Cir. 2013).

- *United States v. Schneider*: one defendant (a doctor) received a sentence of 360 months while another (a registered nurse) received a sentence of 396 months. Defendants had been convicted of controlled substances offenses (including those that resulted in death), health care fraud, and money laundering. 704 F.3d 1287 (10th Cir. 2013).

- *United States v. O'Brien*: Physician sentenced to 360-months following convictions for multiple controlled substance offenses, including one overdose death count. 738 F. App'x 38 (3d Cir. 2018).[17]

- *United States v. Diaz*: Upholding a top-of-the guidelines sentence of 327 months imprisonment (27 years) where physician defendant unlawfully distributed 5 million opioid pills, with no convicted overdose deaths (with 20 suspected). 792 F. App'x 491 (9th Cir. 2020).[18]

Spayd's offense conduct was objectively more serious than *any* of these other defendants. She prescribed millions of opioids, not hundreds of thousands. She was convicted of causing five overdose deaths, not one or two. Indeed, the United States has found no other case in which a medical practitioner was convicted of causing five overdose deaths.

A sentence of life imprisonment would reflect these aggravating factors and avoid unwarranted sentencing disparities. *See United States v. Lang,* 717 F. App'x 523, 548 (6th

---

[17] https://www.justice.gov/usao-edpa/pr/former-philadelphia-doctor-sentenced-30-years-running-pill-mill-and-distributing

[18] https://www.justice.gov/usao-cdca/pr/santa-barbara-doctor-sentenced-over-27-years-federal-prison-writing-prescriptions-huge

Cir. 2017) (an "effective life sentence is not an inappropriate response to a drug conspiracy of this size and a defendant who remains in deep denial of her personal culpability."). By contrast, sentencing the defendant to the statutory mandatory minimum of 20-years here would be inconsistent with 18 U.S.C § 3553(a)(6), particularly in light of the sentences imposed in other cases involving far fewer deaths. Indeed, even defendants who pled guilty received sentences above the mandatory minimum where the case involved overdose deaths. *See, e.g.*, *United States v. Escobar* (2022) (sentencing Ohio physician to 25-years in prison after *pleading guilty* to multiple counts of unlawful distribution of controlled substances, including two overdose deaths).[19] A mandatory minimum sentence here would effectively give the Defendant a "bulk" discount for causing and being convicted of multiple deaths.

## V. FORFEITURE

As part of Defendant's sentence, the Court should order, pursuant to 21 U.S.C. § 853, Defendant to forfeit proceeds of the sale of two real properties named in the First Superseding Indictment, including $117,000 in proceeds from the sale of one real property. Counsel for Defendant has represented that the proceeds of the sale are currently held in his attorney trust account.

---

[19]     https://www.justice.gov/usao-ndoh/pr/former-mahoning-county-physician-sentenced-25-years-prison-illegally-prescribing#:~:text=of%20Two%20Patients-,Former%20Mahoning%20County%20Physician%20Sentenced%20to%2025%20Years%20in%20Prison,the%20Deaths%20of%20Two%20Patients&text=CLEVELAND%20%2D%20Martin%20Escobar%2C%202058%2C,U.S.%20District%20Judge%20Donald%20C.

After her conviction, Defendant stipulated to the government's forfeiture allegations. (Dkt. 314). Among other assets, the government had alleged that two real properties were subject to forfeiture pursuant to 21 U.S.C. § 853 as proceeds of controlled substances offenses, property used to facilitate those offenses, or both, specifically naming real property located at: (1) 5201 East Northern Lights Blvd, Building #4, Unit #2S, Anchorage, AK 99508; Tax Parcel: 0063222102418 and (2) 16425 Brooks Loop, Eagle River, AK, 99577. (Dkt. 87). The government then filed a motion for a preliminary order of forfeiture to forfeit these real properties, and any proceeds from their sale, which the Court granted. (Dkt. 334, 335).

The government had previously agreed with counsel for Defendant that Defendant could sell these two real properties if the proceeds were preserved for forfeiture. On December 23, 2022, counsel for Defendant represented to the government in an email that he was holding $117,000 in his trust account from the sale of the 16425 Brooks Loop property, and asked the government whether Defendant could use these proceeds for legal expenses pending sentencing. Counsel for the government responded that the proceeds were subject to forfeiture and could not be used for legal expenses. Counsel for Defendant never directly responded to the government's email. On January 19, 2023, counsel for Defendant represented to the government in an email that there were no proceeds from the sale of the 5201 East Northern Lights Blvd after paying the mortgage for that property and costs of the sale.

That these two real properties and the proceeds of their sales are subject to forfeiture is undisputed. If there is a dispute, it is only over Defendant's apparent contention that she was entitled to use property subject to forfeiture for legal expenses pending sentencing. Any such argument is meritless. As the U.S. Supreme Court has explained, "there is no exemption from § 853's forfeiture … provisions for assets which a Defendant wishes to use to retain an attorney." *United States v. Monsanto*, 491 U.S. 600, 614 (1989). Under § 853, " '[a]ll right, title, and interest in [forfeitable] property ... vests in the United States upon the commission of the act giving rise to forfeiture.' Permitting a defendant to use assets for his private purposes that, under this provision, will become the property of the United States if a conviction occurs cannot be sanctioned." *Id.* at 613.

For these reasons, the Court should order as part of Defendant's sentence that Defendant forfeit any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of Defendant's controlled substance offenses, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, those offenses, and specifically order that Defendant forfeit $117,000 in proceeds from the sale of the 16425 Brooks Loop property which are held in her attorney's trust account.

## VI. RESTITUTION

Under the Mandatory Victims Restitution Act (MVRA), when a defendant is convicted of an offense resulting in bodily injury that results in the death of the victim, the court shall order the Defendant to pay an amount equal to the cost of necessary funeral and

Case 3:19-cr-00111-JMK-MMS   Document 359   Filed 06/08/23   Page 56 of 58

related services. *See* 18 U.S.C. § 3663A(b)(3). The United States will provide eligible victims notice of their right to file a petition under 28 C.F.R. Part 9 for remission of property forfeited in this case.

## **CONCLUSION**

The United States respectfully requests that the Court impose the life sentence called for by the Sentencing Guidelines. This sentence is sufficient but not greater than necessary to reflect the seriousness of the crimes, the immense harm the defendant caused to her victims and their families, her failure to accept responsibility, and would deter others from engaging in similar misconduct and avoid sentencing disparities with other cases involving similarly situated medical practitioners around the country who have been sentenced to life or effective life sentences in less serious cases.

The Judgement should impose a sentence of life imprisonment on each of Counts 1 through 5 to run concurrently, and a sentence of 20-years on Counts 6-10, to run concurrently with the sentences on other counts. The United States expects approximately 5 to 10 victim witnesses to attend sentencing both in-person and telephonic, some of whom may wish to give a statement.

RESPECTFULLY SUBMITTED this 8th day of June, 2023, in Fairbanks, Alaska.

S. LANE TUCKER
United States Attorney

*s/ Ryan D. Tansey*
RYAN D. TANSEY
Assistant U.S. Attorney

*U.S. v. Spayd*                    Page **57** of **58**
3:19-cr-00111-JMK

**CERTIFICATE OF SERVICE**

I hereby certify that on June 8, 2023,
a true and correct copy of the foregoing
was served electronically on all counsel of
record via the CM/ECF system:

*s/ Ryan Tansey*
Office of the U.S. Attorney