Steven M. Wells
Steven M. Wells, P.C.
1029 W. 3rd Ave.
Ste. 110
Anchorage, AK  99501
(907)279-3557
(907)279-3558 fax
steve@alaskalegaldefense.com

Attorney for Defendant

United States District Court
District of Alaska

| | |
|---|---|
| State of Alaska, | Case No. 3:19-cr-111-JMK |
| Plaintiff, | |
| v. | Sealed Sentencing Memorandum |
| Jessica Spayd, | |
| Defendants. | |

Jessica Spayd, accused, hereby files this memorandum to aid in the imposition of sentence currently scheduled for June 15, 2023. Ms. Spayd recommends a sentence of two-hundred forty (240) months followed by three (3) years of supervised release.

1. Guideline Analysis

The pre-sentence report calculation for Count Group 6 presupposes that all prescriptions discussed are for illegitimate purposes. Several of Ms. Spayd's former patients testified about how Ms. Spayd's prescriptions were medically necessary and that their medical treatment subsequent to Ms. Spayd's arrest remained quite similar. Ms. Spayd disagrees that all of the prescriptions were illegitimate but there is no practical way, given the evidence at trial and the jury instructions regarding Count X, to distinguish between a legitimate prescription and a non-legitimate prescription for Guideline purposes.

However, that objection would not have any perceptible impact upon the guideline calculation given the jury's verdict. Counts 1 – 5 result in an offense level of 40 and as they are grouped, they exceed level 43, which results in a final offense level of 43. Put simply, even if there were a way to determine legitimate from illegitimate prescriptions, and even if that reduced the offense level on Counts 6 – 10 to the point that it did not add any offense levels, Ms. Spayd would still have an offense level of 43.

Ms. Spayd thus disagrees with the guideline calculation for Count Group 6 but ultimately, there is no practicable way to address those disagreements and given the remaining counts of conviction, Count Group 6 does not add anything to the Guideline calculation anyway. Ms. Spayd thus does not oppose the final Guideline calculation of Criminal History Category I, offense level 43.

2. OBJECTIONS TO PRE-SENTENCE REPORT

Ms. Spayd's objections to the pre-sentence report were resolved.

3. 3553(A) FACTORS

18 U.S.C. §3553(a) requires this court to consider a variety of factors before imposing a sentence that is sufficient but not greater than necessary. The parties have greatly differing views about how this case should be viewed and thus their view on what is sufficient but not greater than necessary is quite different. For numerous reasons, Ms. Spayd urges this court to find that twenty (20) years is sufficient but not greater than necessary.

### 3.1 Ms. Spayd Believed Her Prescriptions Were Appropriate

This is the biggest area of disagreement between the parties. Even after *Ruan*, the government continued to argue that only the 'legitimate' practice of medicine was protected. As a result, their case kept focusing upon what constituted 'legitimate' medical practice. At one point, counsel for the government stated that if Ms. Spayd's interpretation of *Ruan* was correct, then using leeches to bleed someone would not be a crime. Ms. Spayd agreed because *Ruan* imposes no reasonableness requirement. *Ruan* only requires good faith.

Ms. Spayd took the stand and explained why she wrote the prescriptions she did. She admitted she was guilty of Counts 6 – 9. She explained how she ran her practice. Her office manager and her patients testified about the medical care she provided. Her office manager testified that Ms. Spayd appeared to run a typical medical practice. She made that comment after having worked for another medical provider for the past three (3) years since Ms. Spayd's arrest.

Significantly, the government's testimony to undermine Ms. Spayd consisted of testimony about the reasonableness of Ms. Spayd's medical practice, of how Ms. Spayd's practice did not conform to 'acceptable' medical practices.

Contrast the trial testimony from Ms. Spayd's office manager, bookkeeper, and patients about how Ms. Spayd ran her medical clinic compared to another group of physicians who actually did run a pill mill:

> Although this case is about Iriele and Ofume's pharmacy, the story starts with AMARC. It was a pain management clinic owned and operated by Godfrey and Bona Ilonzo. The clinic had multiple locations throughout Georgia, but the one at issue here was located in Lakewood, a low-income neighborhood in Atlanta. AMARC operated out of an old house surrounded by a barbed wire fence. It had only two exam rooms and little medical equipment.
> Patients and employees described the clinic as small, dirty, rundown, and "sketchy." A witness testified that at one appointment, there were "roaches crawling across the exam table." Another witness testified that the clinic had "[h]oles in the floor, doors that didn't close all the way, bugs, roaches,

[and] broken chairs." The sign out front described it as a clinic for "urgent care, family medicine, internal medicine, adults, women, [and] children," but did not mention pain management.

AMARC didn't operate like a normal clinic or medical facility. Instead of allowing patients to schedule appointments, employees would call patients once a month and tell them what day they could come in to see a doctor. When patients arrived, they had to put their names on a sign-in sheet and would be seen on a first-come, first-served basis. As a result, patients often showed up hours before the clinic opened and waited in line in the parking lot. One patient said there was a "rat race" to be the first person seen. Eventually the clinic hired a security guard to see that people waited in their cars instead of congregating in front of the building.

One doctor worked per shift, and he or she would normally arrive around 11:00 a.m. but sometimes much later. The doctor would see between 40 and 100 patients per day, sometimes causing the clinic to stay open until 10:00 or 11:00 p.m. Physical exams lasted between five and ten minutes and often included nothing more than a basic vitals check, a quick evaluation of whatever area of the body the patient claimed was hurting, and a urine test for drugs. After the examination, the doctor would write one or more prescriptions. At least one AMARC doctor would often write prescriptions for patients without ever examining them at all.

In almost all cases, AMARC would prescribe its patients opioids, Xanax, or Soma (a muscle relaxant). Usually the clinic would prescribe all three of those drugs to the same patient at the same time.[2] The doctors often gave patients prescriptions for the specific drugs that they asked for by name. The clinic did not accept insurance, credit cards, debit cards, or money orders for doctor visits; it was cash only. First-time patients paid between $300 and $350 for their visit, while returning patients paid $150. Some long-time patients of the clinic paid only $100 per visit.

Former patients and clinic employees testified that most of AMARC's clientele was made up of drug addicts and drug dealers, many of whom traveled from far away and in groups to visit the clinic. Witnesses recalled seeing patients who were underweight, had track marks on their arms, were missing teeth, had lost their hair, and were otherwise "disheveled" and "shaggy." Witnesses also described how patients showed up "high" and would fall asleep, exchange medications, and shoot up drugs in the bathroom while *1163 waiting to see a doctor. One witness described AMARC's patients as "living and talking and wanting and breathing for one thing": pills.[1]

---

[1] *United States v. Iriele,* 977 F.3d 1155, 1162 - 1163 (11th Cir. 2020).

Ms. Spayd has made this argument from the beginning of this matter. She has argued that *Ruan* only made her argument stronger. She has preserved these issues for appeal. For purposes of the imposition of sentence, Ms. Spayd is not seeking to re-litigate these issues but rather to show that the evidence at trial regarding her mental state, how she ran her practice, how those closest to her saw her practice, and how some of her patients viewed her practice are all reasons why a sentence of greater than twenty (20) years is unnecessary.

3.2 The Deaths Were Not Foreseeable

Dovetailing with the first point, the deaths from Counts 1 – 5 were not foreseeable. Prior to trial, Ms. Spayd raised this issue, acknowledging that her argument was foreclosed by Ninth Circuit precedent and that she was raising the issue to preserve it for any potential appeal. This Court found that Ms. Spayd had preserved the issue for appeal.

While the foreseeability issue is not relevant at this point regarding guilt, it can and should be a factor for this court to consider in determining a sentence. Contrast Ms. Spayd's conduct with the typical case involving distribution of a controlled substance that results in death, namely, a street-level dealer who distributes some controlled substance to a friend or client. In such a distribution, the strength of a drug is unknown. The recipient's use will likewise be unknown – will the recipient ingest it all at once or use it for several hits?

Here, Ms. Spayd prescribed drugs from a pharmacy. The drugs were manufactured according to professional standards. The patients had been on these drug levels for a lengthy period of time. They had demonstrated a tolerance for the drugs at the level Ms. Spayd had prescribed. Further, as Ms. Spayd has previously argued, an integral part of a prescription is the instructions for how to take medicine. Someone who purchases heroin from a street dealer does not get any instructions on the best way to ingest it. Ms. Spayd's patients, though, were given clear instructions regarding how and when to take the prescription she wrote.

When comparing Ms. Spayd's distribution with a street dealer's distribution, it is clear why the deaths listed in Counts 1 – 5 were unforeseeable. Because they were unforeseeable, there is a legitimate reason to sentence Ms. Spayd to twenty (20) years.

### 3.3 This Is Ms. Spayd's First Felony Conviction

There are a few reasons why this being Ms. Spayd's first felony conviction justifies a lower sentence. First, numerous Circuits have upheld a below-Guideline sentence for a first felony offense.[2] Second, courts have also recognized that a first felony conviction that occurs later in life justifies a lower prison sentence.[3] Finally, courts recognize that prison time is much more impactful for a first time offender.[4]

---

[2] *U.S. v. Paul*, 561 F.3d 970 (9th Cir. 2009) (where defendant convicted of embezzlement and guidelines 10-16 months, court's within guideline sentence of 15 months unreasonably high in part because Paul was a first-time offender with no criminal record whatsoever); *U.S. v. Autery*, 555 F.3d 864 (9th Cir. 2009) (where defendant convicted of poss. of porn. And where guidelines 41-51 months, court's sua sponte variance to probation not unreasonable in part because defendant's first conviction and Crim. History Level I "did not fully account or his complete lack of criminal history" because defendant with minor criminal history still falls in cat. I); *U.S. v. Huckins*, 529 F.3d 1312 (10th Cir. 2008)(in a child porn case with guideline level of 78-97 months, court's variance to 24 months proper in part because this was defendant's first conviction. The Court rejected government's argument that guidelines already considered this by placing defendant in Criminal History Category I).

[3] *U.S. v. Smith*, (4th Cir. April 23, 2008), 2008 WL 1816564 (4th Cir. 2008)(unpub.) (in child porn case where the guidelines were 78-97 months, sentence of 24 months not abuse of discretion where district court noted defendant was 64 years of age and had avoided violations of the law "up until this point in his life"); *U.S. v. Hanson*, 561 F.Supp.2d 1004 (E.D. Wisc. 2008) (in possession of child pornography case where guidelines were 210-262 months, court imposed sentence of 72 months in part because he was 49 years of age and "had no prior record whatsoever" and "he had never before been to jail for even one day"); *U.S. v. Ward*, 814 F.Supp. 23 (E.D.Va. 1993) (departure warranted because guidelines fail to consider length of time defendant refrains from commission of first crime, here until age 49); *U.S. v. Collington*, 461 F.3d 805 (6th Cir. 2006) (in case involving drugs and machine guns, where guidelines 188 -235, sentence of 120 months affirmed in part because the criminal history did not reflect that "this incident was the first time that this quantity of drugs and guns had been found in Collington's possession.); *U.S. v. Germosen*, 473 F.Supp.2d 221, 227 (D.Mass. 2007) (in conspiracy to import heroin by swallowing pellets, below guideline sentence of 6 months home detention warranted in part because first offense and " there is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I.")

[4] *U.S. v. Baker,* 445 F.3d 987 (7th Cir. 2006) (in distribution of child porn case, court affirms below guideline sentence of 78 months (guidelines called for 108) noting that "significant is the district court's finding that a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned. Consideration of this factor is consistent with§ 3553's directive that the sentence reflect the need for "just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)"); *U.S. v. Santoya*, 493 F.Supp.2d 1075 (E.D. Wisc. 2007) (in distribution of cocaine case where client career offender, below guideline sentence appropriate because a lesser period of imprisonment necessary to deter a defendant who has not previously been subject to lengthy incarceration and where "the sentencing commission has acknowledged that when career offender status is based on relatively minor drug offenses, the guidelines may create a sentence greater than necessary"); *U.S. v. Willis,* 479 F.Supp.2d 927 (E.D.Wis. 2007) (in drug case where guideline range was 120 months but statutory maximum was 60 months, sentence of one year and

Ms. Spayd has no criminal history prior to this point in her life and this conviction stems from her medical practice. This conviction is outside the heartland of the typical offense in this matter.

### 3.4 Ms. Spayd Behaved Exceedingly Well On Pre-Trial Supervision

Ms. Spayd was released from custody in April, 2020 and was remanded upon her conviction in October, 2023. For the intervening thirty (30) months, she was out of custody on pre-trial supervision. During that time, her behavior was exemplary. This is another reason courts have found that justifies a lower prison sentence.[5]

### 3.5 Ms. Spayd's Age Makes Recidivism Improbable

---

one day sufficient in part because sentence "sentence provided a substantial punishment for someone like defendant, who had never before been to jail and who engaged in no violence or dealing herself"); *U.S. v. McGee*, 479 F.Supp.2d 910 (E.D. Wisc. 2007) (in heroin distribution case where guideline range was 21-27 because defendant got mitigating role reduction and safety valve, sentence of one year and one day imposed below guideline range because the defendant "had never before been to prison and 'generally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served some serious time yet continues to reoffend."); *U.S. v. Cull*, 446 F.Supp.2d 961 (E.D. Wisc. 2006) (in marijuana case where guidelines 10 to 14 months, though defendant "not entitled to departure under pre-*Booker* standards" and where there was "nothing extraordinary about the case or the defendant," court imposes 2 months jail with 4 months home confinement as a condition of supervised release imposed because "Defendant had never been confined before, so [2 months jail time] was sufficient to impress upon him the seriousness of the offense and to deter others under similar circumstances."); *U.S. v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

[5] *U.S. v. Munoz-Nava*, 524 F.3d 1137, 1149 (10th Cir. 2008)(in drug case where guidelines 47-56 months, district court's sentence of one year and day in prison and one year home detention reasonable in part because of defendant's "behavior while on a year-and-a-half pretrial release, which the district court found to be exemplary" which is shows defendant unlikely to reoffend); *U.S. v. Baker,* 502 F.3d 465, 468 (6th Cir. 2007)(where defendant pled guilty to possession of unregistered firearm arising from altercation with wife during which gun accidentally discharged and the guideline range was 27-33 months, a below-guideline sentence of probation with one year house arrest proper in part because he behaved "exceedingly well" while under supervision of pretrial services); *United States v. Nesbeth,* 188 F.Supp.3d 179, 190 (probationary sentence for cocaine trafficking where defendant did well on pre-trial release).

*United States v. Spayd*
Case No. 3:19-cr-111-JMK
Sentencing Memorandum
Page 7 of 9

Ms. Spayd is fifty-two years old. Even if this court sentences her to the twenty years she suggests, she will be well over seventy (70) at the time of her release. The U.S. Sentencing Commission has found that individuals over the age of sixty-five (65) are the least likely to re-offend of any group.[6]

Furthermore, Ms. Spayd, as a woman in the United States, has a life expectancy of 79.1 years.[7] However, incarceration has been demonstrated to shorten life expectancy. While the causes of this are not yet fully known, the most recent study concluded that for an individual of forty-five (45) years of age, incarceration will reduce life expectancy by roughly four (4) to five (5) years.[8] Applied to Ms. Spayd, that means even the mandatory minimum prison sentence will be practically a life sentence. A loss of four to five years would mean an expected life expectancy of approximately seventy-four (74) or seventy-five (75) years. Even the probation officer's recommendation of twenty-five (25) years would mean that she faces a very real possibility of dying in prison.

Furthermore, Ms. Spayd was able to distribute these controlled substances because of her profession. As a result of this conviction, she has lost her medical license and, given the nature of this conviction, she will never get it back. She will never be in a position again to prescribe anyone medication. As a result, she will not be in a position to re-offend. A lengthy prison sentence is not necessary to protect the public from Ms. Spayd.

4. CONCLUSION

The jury convicted Ms. Spayd of several counts of drug distribution that resulted iun death. That is admittedly an inordinately weighty charge of conviction. Without waiving any of her previous rights or arguments, the question is what is the appropriate sentence for Ms. Spayd based upon her history and the nature and circumstances of this offense.

---

[6] UNITED STATES SENTENCING COMMISSION, THE EFFECTS OF AGING ON RECIDIVISM AMONG FEDERAL OFFENDERS (2017)(available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf).
[7] C.D.C., NATIONAL CENTER FOR HEALTH STATISTICS, PROVISIONAL LIFE EXPECTANCY ESTIMATES FOR 2021 (August 2022)(available at https://www.cdc.gov/nchs/data/vsrr/vsrr023.pdf).
[8] Sebastian Daza, Alberto Palloni, and Jerrett Jones, *The Consequences of Incarceration for Mortality in the United States*, 57 DEMOGRAPHY 577 (2020)(available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7710643/).

Ms. Spayd at this point is just seeking a sentence that allows her a reasonable possibility of release from incarceration at the end of her life. She will emerge like so many from emerge from the prison-industrial complex a far different person, her body and her mind stunted and broken. She will not be able to practice medicine in any way. She will not be able to distribute controlled substances. She will have lost decades of her life because of her own poor choices. Even under her own recommendation of five (5) years of supervised release, if she is released from custody, she will likely be on supervised release

There is no need in these circumstances for a sentence above the twenty (20) year mandatory minimum.

DATED this 8th day of June, 2023, at Anchorage, Alaska.

                          Steven M. Wells, PC
                          Attorneys for Defendant

By:   /s/ Steven M. Wells  .
       Steven M. Wells
       ABA #0010066

CERTIFICATE OF SERVICE

I certify that on June 8, 2023, I served a copy of the attached Sentencing Memorandum via CM/ECF on:

All Parties of Record

   /s/ Steven M. Wells  .
Steven M. Wells, PC

*United States v. Spayd*
Case No. 3:19-cr-111-JMK
Sentencing Memorandum
Page 9 of 9