IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


UNITED STATES OF AMERICA,

                Plaintiff,

    v.

JESSICA JOYCE SPAYD,

                Defendant.

No. 3:19-CR-00111-MAH-MMS-1

OPINION & ORDER
(REDACTED)

Steven D. Clymer
Michael J. Heyman
U.S. Attorney's Office (Anch)
222 West 7th Avenue, #9, RM 253
Anchorage, AK 99513
      Attorneys for Plaintiff



Michael Marks
Alaska Federal Public Defender
188 W. Northern Lights Blvd.
Suite 700
Anchorage, AK 99503
      Attorney for Defendant

1 – OPINION & ORDER

HERNÁNDEZ, Senior District Judge:

This matter is before the Court on Defendant Jessica Spayd's Motion for a New Trial, ECF 461. For the reasons that follow, the Court grants Defendant's Motion.

## BACKGROUND

In 2019, Defendant was charged with violations of federal law relating to her operation of a pain management clinic in Eagle River, Alaska. Mot. for New Trial ("Mot.") 2, ECF 461; *see also* Compl., ECF 1. The case was eventually assigned to United States District Court Judge Joshua Kindred in 2022.[1] ECF 148. After a 16-day trial, Defendant was found guilty on all counts. Jury Verdicts, ECF 320. And Judge Kindred subsequently sentenced her to 30 years of imprisonment. J. 3, ECF 370.

As described below, Defendant's Motion is based on the misconduct of Judge Kindred and members of the United States Attorney's Office ("USAO") in Alaska while her criminal proceedings were ongoing.

## I.      Judge Kindred and his relationships predating Defendant's trial.[2]

###    A.      ███████ .

Judge Kindred received his commission to be a federal district judge in the District of Alaska in early 2020. Mot. 5. In May 2020, he hired  as his term law clerk. *Id.* She worked in that role for two years before becoming his career clerk in 2022. *Id.* And as his career clerk, she worked extensively on his criminal docket. *Id.*

---

[1] Judge Kindred resigned on July 3, 2024; however, he was a judge during the relevant period. The Court, therefore, refers to him as Judge Kindred in this Opinion and Order.

[2] Because the Court does not rely on Defendant's allegations and discussion regarding defense attorney ███████ , the Court declines to include her in its recitation of the facts underlying the Motion.

2 – OPINION & ORDER

Judge Kindred maintained an unprofessional relationship with ███ throughout her clerkship. *Id.* at 5–6. That included engaging in flirtatious conversations and texting. *Id.* When a Special Committee of the Ninth Circuit investigated Judge Kindred, it described him as having "no filter" for the topics he would discuss with his clerks, including "his sex life" and "his interest in and communications with potential romantic and sexual partners." *Id.* at 6 (quoting *In re Complaint of Judicial Misconduct*, No. 22-90121 at 4 (2024)).

In 2022, ███ applied to be an Assistant United States Attorney ("AUSA") in the District of Alaska. *Id.* at 7. "On May 24, 2022, ███, while still clerking for Judge Kindred, accepted an offered one-year term position with the USAO" in Alaska. Resp. to Mot. for New Trial ("Resp.") 13, ECF 471. Judge Kindred did not isolate her from USAO-led cases, including *Spayd*, when she applied for the AUSA position or after she accepted it. *See id.*[3] And while still working as a clerk before her term with the USAO began, Judge Kindred issued three substantive orders in *Spayd*: docket numbers 204, an order granting in part and denying in part Defendant's Motion in Limine; 208, an order denying Defendant's Motion to Dismiss Indictment; and 239, an order resolving several pending motions in limine. *Id.* ███ may have been involved in drafting 204, denied working on 208, and may have discussed 239 with a co-clerk because it was a "topic of conversation" in Judge Kindred's chambers. *Id.*

---

[3] Although the government focuses on Judge Kindred's failure to isolate ███ after she *accepted* employment with the USAO, *see* Resp. 13 n.5, the Court notes that the need for screening may have arisen as soon as ███ submitted an application for employment with that office. *See* Code of Judicial Conduct, Canon 4(C)(4) (explaining that a law clerk should consult with their appointing authority if a firm or entity with whom the clerk "is seeking or has obtained future employment appears in any matter pending before the appointing authority"); *see also* Comm. on Codes of Conduct Published Advisory Op. No. 74 (noting that there may be situations in which precautionary measures should be take "even at a preliminary stage of the employment discussions").

3 – OPINION & ORDER

████ joined the USAO on September 26, 2022. Mot. 12. Although the USAO apparently did not provide her with formal guidance on avoiding conflicts, she "decided on her own not to take any cases assigned to [Judge] Kindred." *Id.* But ████ maintained a close personal relationship with Judge Kindred after she joined the USAO. *Id.* They continued texting, which included discussions about the upcoming trial in *Spayd*. *Id.* at 12–13. For example, she told Judge Kindred that Ryan Tansey, the lead prosecutor in *Spayd*, had stopped by her office to joke about that case. *Id.* at 13. "She wrote, 'He hasn't said much about you' to which Judge Kindred replied, 'Now I hate him.'" *Id.* (quoting Mot., Ex. D-5 at 9, ECF 461-6). When Judge Kindred asked whether she would watch any of the *Spayd* trial, she told him that she planned "to try and watch a lot" of the proceedings. *Id.* (quoting Ex. D-5 at 11).

B.    Karen Vandergaw.[4]

Karen Vandergaw, an AUSA with the Alaska USAO, developed a relationship with Judge Kindred after he received his commission. *Id.* at 7. As early as 2020, they developed a friendship in the courthouse athletic facility. *Id.* at 7–8. But it progressed such that they began exchanging explicit text messages and electronic messages. *Id.* at 7. Those messages included discussions of sex acts, discussions of performing sex acts with each other, and exchanges of nude photographs. *Id.*

Judge Kindred's law clerks observed his improper relationship with Vandergaw. *Id.* at 8. They observed their frequent texts, and Judge Kindred "jokingly" told the clerks that she had a crush on him. *Id.* Judge Kindred also told ████ that Vandergaw had sent him nude pictures. *Id.*

---

[4] Although Vandergaw's role is not as relevant to this Court's decision to grant the Motion, it includes a discussion of her role and relationship with Judge Kindred to provide context for the events underlying Defendant's Motion.

4 – OPINION & ORDER

Judge Kindred and Vandergaw's communications were not strictly personal. *Id.* Vandergaw discussed her application to be a federal judge with him. *Id.* And she claimed that he requested nude photographs of her in exchange for his help. *Id.* And they also discussed ongoing cases. *Id.* at 8–9. That included one case pending before Judge Kindred in which they apparently worked out a plea agreement to propose to a pro se defendant who Vandergaw was prosecuting. *Id.* at 9.

Vandergaw denies providing substantive input to fellow AUSAs regarding *Spayd*. Resp. 16. She may have provided some tips regarding cross-examining Defendant. *Id.* And on September 22, 2022, Vandergaw attended a trial preparation session for *Spayd*. *Id.* 16–17. Neither she nor the AUSAs leading the meeting recall her providing any input. *Id.* at 17. And Vandergaw asserts that she did not discuss *Spayd* with Judge Kindred. *Id.*

## II.    Events during Defendant's trial.

As Defendant's trial began, █████ and Judge Kindred continued texting. Mot. 13. On October 3, 2022, the day of jury selection in *Spayd*, they made plans to go to a bar after Judge Kindred finished with court. *Id.* At the bar, they had drinks, and Judge Kindred offered to drive █████ home. *Id.* Judge Kindred told her that he first needed to get something from his chambers, and she went with him. *Id.* While in his office, Judge Kindred "kissed her and grabbed her rear end." *Id.* They exchanged flirtatious texts after that encounter. *Id.* And when █████ asked what Judge Kindred would do when he saw her in the gallery the next day, he told her that he would try not to stare at her too much. *Id.* (citing Ex. D-5 at 18).

Judge Kindred and █████ continued to text the next day, including about *Spayd*. *Id.* at 14. They texted about Tansey's behavior, and █████ subsequently observed a portion of the

5 – OPINION & ORDER

proceedings. *Id.* And Judge Kindred texted her later that night to ask why she was avoiding his glances during the trial. *Id.*

On October 5, ███ and Judge Kindred again remained in communication, including discussing Tansey. *Id.* Vandergaw and ███ both observed portions of the *Spayd* trial that morning. *Id.* And later that day, Vandergaw and others in the USAO office asked ███ questions about how Judge Kindred would approach a legal issue. *Id.* Specifically, AUSAs asked how—in a separate case from *Spayd*— Judge Kindred would approach evaluating whether a defendant should receive a lesser sentence for substantial assistance in the government's case. *Id.* at 14 n.88.

On Friday, October 7, Judge Kindred and ███ again made plans to meet. *Id.* at 15. This time, it was "at a party [that] [Judge] Kindred's clerks were throwing him to celebrate his divorce." *Id.* After Judge Kindred left the party, he "reached back out to ███." *Id.* They arranged to meet to discuss their past kiss and their relationship. *Id.* Judge Kindred picked ███ up and drove her to his apartment. *Id.* While there, ███ alleges that he sexually assaulted her, including by forcibly touching her, ignoring her requests that he stop, and performing oral sex on her. *Id.* at 15–16 (quoting Mot., Ex. D-1 at ¶ 19, ECF 461-2). Eventually, he stopped and drove her home. *Id.*

Several days after that encounter, ███ told AUSA Seth Brickey-Smith a "sanitized version" of her relationship with Judge Kindred. *Id.* at 16. Brickey-Smith recommended that ███ report Judge Kindred's conduct to Vandergaw, who had been serving as a mentor to ███ since she started at the USAO. *Id.* ███ reported it to Vandergaw, but "Vandergaw's reaction made her uncomfortable." *Id.* Brickey-Smith also spoke to Vandergaw about ███'s

allegations. *Id.* at 17. And he had his own suspicions about Vandergaw's relationship with Judge Kindred. *Id.*

Judge Kindred reached out to ███ that same evening to express his concern that people were talking about him. *Id.* He was nervous about speculation regarding his personal life. *Id.* And he told ███ that Brickey-Smith had been talking about him and his relationships. *Id.* Judge Kindred told her that he planned to "'turtle for six months'" in hopes of rumors about him dying down. *Id.* at 17–18 (quoting Ex. D-5 at 36). Judge Kindred also told ███ that Vandergaw informed him that Brickey-Smith was investigating his relationships with former clerks. *Id.* at 18.

The next day, on October 12, Judge Kindred told ███ that he was worried and wanted to avoid a scandal. *Id.* He did not want people talking about him, and he reiterated his plan to lay low over the coming months. *Id.*

Judge Kindred and ███ continued to text, and on October 18, they returned to the topic of the *Spayd* trial. He told her that he had been the "most mad" he had ever been while on the bench after AUSA Michael Heyman—who was second chair—violated Federal Rule of Evidence 609 during the trial. *Id.* at 18–19. ███ told him that Heyman appeared unfazed in the office, but Judge Kindred told her that he "'confronted the hell out of'" him. *Id.* at 19 (quoting Ex. D-5 at 50).

The next day, Judge Kindred told ███ that Heyman apologized about the error. *Id.* But "Heyman's error drew a motion for mistrial from the defense, and counsel requested an opportunity to brief the issue." *Id.*

The *Spayd* trial continued, but on October 19, Vandergaw told a fellow AUSA that Brickey-Smith had been making comments that made her uncomfortable. *Id.* That was

7 – OPINION & ORDER

subsequently reported to Christina Sherman, the Criminal Chief at the USAO, but Vandergaw declined to make a formal report against Brickey-Smith. *Id.* at 19–20.

Sherman and First Assistant Kathryn Vogel met with Brickey-Smith on October 24 to follow up on the allegations regarding his comments. *Id.* at 20. Brickey-Smith told them— without revealing names—"that he had received information that a judge had engaged in misconduct with one AUSA and might have an inappropriate relationship with another AUSA." *Id.* He also expressed his suspicion that his inquiries regarding those relationships motivated the "false complaints against him." *Id.* Brickey-Smith told them that he had contacted the Alaska State Bar and the Ninth Circuit Judicial Conference. *Id.*

Brickey-Smith subsequently told ▮▮▮▮ about Vandergaw's false complaint. *Id.* at 21. ▮▮▮▮, in turn, told Judge Kindred and asked what she should do. *Id.* Judge Kindred picked up ▮▮▮▮, and they talked. Ex. D-1 at ¶ 23. He told her that they needed to stick together. *Id.* And he warned her to keep her head down and shut up, because he could make her life miserable. *Id.* Later that day, ▮▮▮▮ told Brickey-Smith that Judge Kindred wanted to meet with him. Mot. 21.

Brickey-Smith met with Judge Kindred on October 25. *Id.* In that meeting, Judge Kindred provided various pieces of advice to Brickey-Smith about navigating Vandergaw's complaint before calling her "crazy" and saying that she was "not credible." *Id.* at 21–22. Judge Kindred also said that he had rejected several romantic overtures from Vandergaw and had recently refused to meet with her. *Id.* at 22.

That same day, during trial, Judge Kindred returned to Heyman's evidentiary error and Defendant's motion for a mistrial. *Id.* He concluded that the government's error was unintentional, stated that a curative instruction was sufficient, and denied the motion for a mistrial. *Id.*

8 – OPINION & ORDER

The parties in *Spayd* rested on October 26. *Id.* at 22–23. And on October 28, the jury reached a guilty verdict. *Id.* at 23.

On November 7, Vogel followed-up with Brickey-Smith regarding his allegations about AUSAs in an inappropriate relationship with a judge. *Id.* He subsequently provided the names of those involved. *Id.* When Vogel met with ▮ on November 8, she provided a more complete version of events. *Id.* at 23–24. Vogel related what she learned to then-United States Attorney Lane Tucker. *Id.* at 24. And Tucker subsequently contacted Chief Judge Sharon Gleason to disclose that information and request that Judge Gleason reassign any cases in which Vandergaw, ▮, or Brickey-Smith appeared before Judge Kindred. *Id.*

The USAO began investigating the relationships of those involved with Judge Kindred but did not make any disclosures to the attorneys in *Spayd. Id.* at 25. Several months passed, and Judge Kindred sentenced Defendant to 30 years of imprisonment on June 15, 2023. *Id.* at 25–26.

### III. Post-trial events.[5]

Defendant timely appealed her conviction, and her opening brief was filed on February 5, 2024. *Id.* at 3. The Government's response was filed on August 27, 2024. *Id.*

That same day, the government sent counsel for Defendant a letter with three disclosures prompted by the Ninth Circuit's investigation of Judge Kindred.[6] *Id.* at 28; Mot., Ex. D-21, ECF 461-22. First, it disclosed that the senior AUSA referenced in the Ninth Circuit's Order attended a trial preparation meeting for *Spayd*, but that neither she nor others there recalled her providing

---

[5] Because the timeliness of Defendant's Motion is at issue, the Court includes a detailed discussion of when Defendant learned about the facts detailed above.

[6] The United States had previously made two batches of disclosures identifying Judge Kindred-involved cases with potential conflicts of interest or appearances of impropriety, but *Spayd* was not among those cases. Mot. 27–28.

9 – OPINION & ORDER

any input on the matter. Ex. D-21 at 1–2. Second, it stated that the former Judge Kindred law clerk referenced in the Order provided non-case-specific advice about Judge Kindred shortly after beginning her employment with the USAO. *Id.* at 2. Finally, the government disclosed that the former clerk had attended some portion of the *Spayd* trial as an audience member and communicated with Judge Kindred during the trial. *Id.* The government specified that the clerk did not have communications about *Spayd* with the trial team, at least that they could recall. *Id.* And the government stated that it would disclose the contents of ███'s messages with Judge Kindred subject to a protective order. *Id.*

On August 28, 2024, Defendant's attorney, Michael Marks, wrote to AUSA Brian Wilson to request that the government "preserve any and all evidence related to the conflict of interest" between the USAO and Judge Kindred that is exculpatory or potentially useful. Resp., Ex. H at 1, ECF 471-11. Marks also described his understanding of the situation based on the government's lists, prior recusal and reassignment orders, the Ninth Circuit's report, and media coverage. *Id.* at 2. His understanding included that:

(1) the three prosecutors with conflicts were Brickey-Smith, Vandergaw, and ███;

(2) the government was aware of those AUSAs' identities and their conflicts with Judge Kindred in late October 2022;

(3) the senior AUSA referenced in the August 27 letter is Vandergaw;

(4) the former law clerk referenced in the August 27 letter is ███;

(5) the trial team referenced in the August 27 letter includes AUSAs Heyman and Tansey;

10 – OPINION & ORDER

(6) the government knew of, but did not disclose, the conflict of interest between Judge Kindred and AUSAs Vandergaw, █████, and Brickey-Smith during the pendency of Defendant's case; and

(7) the government knew of, but did not disclose, the conflict of interest between those same parties while the appeal was pending until August 27, 2024.

*Id.* Based on those facts, Marks requested that the government disclose communications between █████ and Judge Kindred, timelines and recitations of when the USAO became aware of the conflicts related to Judge Kindred, and a list of the AUSAs who attended the trial preparation meeting referenced in the government's letter. *Id.* at 4.

On September 23, 2024, the government produced two pages of discovery containing a written version of several text messages exchanged between Judge Kindred and █████ during Defendant's trial.[7] Def.'s Reply ("Reply") 3, ECF 479; Reply, Ex. D-24, ECF 479-2. Those texts included (1) Kindred expressing frustration at AUSA Heyman's performance during Defendant's trial; (2) █████ telling Judge Kindred that she was planning to attend a session of Defendant's trial and Judge Kindred replying that he would try not to stare at her too much; (3) comments by █████ indicating that AUSA Tansey was "losing his mind" and was frustrated about Defendant's trial; and (4) a back-and-forth about whether █████ was avoiding Judge Kindred's glances when she attended Defendant's trial. Ex. D-24. On October 3, 2024, the government produced the entirety of the text exchanges between █████ and Judge Kindred during Defendant's trial. Reply

---

[7] These pages may have first been produced on September 17, 2024. *See* Resp. 33 n.13 (asserting that these messages were voluntarily produced to Defendant on that date despite Defendant not filing any motion to compel as threatened in Marks' letter).

3. That disclosure included 63 pages of screenshots of the texts between ███ and Judge Kindred. Ex. D-5.

On October 9, 2024, Defendant moved the Ninth Circuit to stay her appeal in order to "file and litigate a motion for a new trial" in the district court. Resp. 34. She acknowledged that a stay was unnecessary to file such a motion in the district court, but she nonetheless asserted that it would be imprudent to pursue an appeal while also pursuing a motion for a new trial. *Id.* On October 16, 2024, the Ninth Circuit granted Defendant's motion to stay her appeal. *Id.*

Between October 16, 2024, and December 17, 2024, Defendant appears to have made an effort to resolve the case without having to file the motion for a new trial. *See* Gov't Resp. to Mot. to Vacate Deadline 2, ECF 420. "[T]hat effort principally or exclusively involved defense counsel attempting to persuade the government that it should agree to a new trial for [Defendant.]" *Id.* During that time—specifically, on December 12, 2024—the government produced discovery. *Id.*; *see also* Reply 4 n.2 (noting that the government produced a tranche of discovery that included "excerpts of interviews with Vandergaw and ███ and a transcript of an interview [Special Attorney] Clymer had conducted with ███ ").

On December 17, 2024, counsel for defense and the government met, and defense counsel attempted to persuade the government to agree to a new trial. Gov't Resp. to Mot. to Vacate Deadline 2. During that meeting, defense counsel described a possible resolution to avoid a motion for a new trial. *Id.* The government was interested in the proposed approach but required time to receive guidance and research potential issues. *Id.*

On January 16, 2025, the government extended Defendant an offer with similar—but not identical—terms to those that defense counsel had proposed at the meeting. *Id.* at 3. On January

12 – OPINION & ORDER

23, 2025, defense counsel replied to the proposal with questions and indicated that he had not yet spoken with Defendant about the proposal. *Id.*

On January 30, 2025, Judge Gleason entered an order requiring Defendant to—within 14 days—either file her motion for a new trial or file a notice that no such motion would be filed. *Id.*; *see also* Order, ECF 413.

On February 3, 2025, after further discussions between the government and defense counsel, "the government sent . . . a renewed settlement offer that addressed defense counsel's concerns, made additional concessions, and offered flexibility as to some terms." Gov't Resp. to Mot. to Vacate Deadline 3. On February 4, 2025, defense counsel informed the government that Defendant rejected the offer and "advanced a counteroffer with terms substantially different from those" proposed by defense counsel during the December 17 meeting, and he proposed that the parties discuss outstanding discovery on February 7, 2025. *Id.* at 3–4. On February 6, the government rejected Defendant's counteroffer and explained that it could not agree to terms different than those proposed during the December 17 meeting. *Id.* at 4.

On February 7, 2025, the parties discussed additional discovery, and the government produced additional documents on February 9, 2025. *Id.*; *see also* Reply 4 (noting that the government produced 1,683 pages of discovery on February 9).

On February 11, 2025, Defendant moved the Court to vacate the two-week deadline to allow time to review the recent disclosures from the government. Unopposed Mot. to Vacate Filing Deadline, ECF 414. Defendant proposed submitting a briefing schedule by February 27, 2025. *Id.* at 3.

On February 18, 2025, the government produced an additional 505 pages of discovery. Reply 4–5.

13 – OPINION & ORDER

A stipulated briefing schedule was imposed by Judge Gleason on March 11, 2025, Order, ECF 425, and the case was subsequently transferred to this Court, ECF 424.

## STANDARDS

Federal Rule of Criminal Procedure 33(a) provides that, on a defendant's motion, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." A motion for a new trial is "directed to the discretion of the district judge," but Rule 33 motions are generally disfavored and should only be granted in "exceptional" cases. *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981). Federal Rule of Criminal Procedure 25(b)(1) provides that "[a]fter a verdict or finding of guilty, any judge regularly sitting in or assigned to a court may complete the court's duties if the judge who presided at trial cannot perform those duties because of absence, death, sickness, or other disability." Under Rule 25(b)(2), "[t]he successor judge may grant a new trial if satisfied that: (A) a judge other than the one who presided at the trial cannot perform the post-trial duties; or (B) a new trial is necessary for some other reason." *See United States v. Cloud*, No. 22-30173, 2024 WL 49808, at *1 (9th Cir. filed on Jan. 4, 2024) (discussing transfer under Rule 25(b)).

The amount of time that a defendant has to file a motion for a new trial depends on the basis for the motion. *See* Fed. R. Crim. P. 33(b). "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). But "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

The Supreme Court has concluded that Rule 33's time limits are nonjurisdictional, inflexible claim-processing rules. *Eberhart v. United States*, 546 U.S. 12, 17–19 (2005) (noting

14 – OPINION & ORDER

that failure to raise time limits can result in the forfeiture of arguments based on them but explaining that "district courts must observe the clear limits" of time-based requirements when they are properly raised"); *see also* Wright & Miller, Federal Practice and Procedure § 590. But Federal Rule of Criminal Procedure 45 provides some flexibility: "[w]hen an act must be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made . . . after the time expires if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B); *see also* Fed. R. Crim. P. 45 Advisory Committee's Note to 2005 Amendment ("[I]f for some reason the defendant fails to file the underlying motion within the specified time, the court may nonetheless consider that untimely motion if the court determines that the failure to file it on time was the result of excusable neglect.").

DISCUSSION

**I.      Defendant's Motion is timely under Rule 33.**

Defendant advances two bases for why her Motion is timely. Mot. 29. First, she argues that the misconduct she cites is "newly discovered evidence," and the Motion is timely under that provision's three-year window. *Id.* at 30–32. Alternatively, she argues that her failure to timely file the Motion was the result of excusable neglect. *Id.* at 32–37. The Court concludes that her Motion is not based on newly discovered evidence, but the failure to timely file is the result of excusable neglect.

      **A.**     The bases for a new trial advanced by Defendant do not qualify as "newly discovered evidence," and Rule 33(b)(1)'s three-year window does not apply.

In the Ninth Circuit, "a Rule 33 motion based upon 'newly discovered evidence' is limited to where the newly discovered evidence relates to the elements of the crime charged," and it "'must indicate that a new trial probably would produce an acquittal.'" *United States v. Hanoum*, 33 F.3d 1128, 1130 (9th Cir. 1994) (quoting *United States v. Lopez*, 803 F.2d 969, 977

15 – OPINION & ORDER

(9th Cir. 1986), *cert. denied*, 481 U.S. 1030 (1987)). In that case, the court explained that "[n]ewly discovered evidence of ineffective assistance of counsel" does not fall within the requirement that evidence be material to the issues involved nor indicate that an acquittal would be likely. *Id.*

Here, the facts cited by Defendant—misconduct and misbehavior by Judge Kindred and AUSAs—do not qualify as "newly discovered evidence." They do not relate to the elements of her charged crimes, which include distribution and dispensing of a controlled substance and maintaining a drug involved premises. *See* First Superseding Indictment, ECF 87. Therefore, the three-year window provided by Rule 33(b)(1) does not apply.

B.     Defendant's failure to timely file her Motion is the result of excusable neglect.

The parties agree that whether Defendant's failure to timely file her Motion is the result of excusable neglect should be evaluated under the four-factor test articulated in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 395 (1993). Reply 2; *see also Stutson v. United States*, 516 U.S. 193, 197–98 (1996) (extending the test to criminal cases after its first articulation in a bankruptcy proceeding). The four-factor *Pioneer* test is an equitable evaluation that "tak[es] account of all relevant circumstances," including (1) the danger of prejudice to the nonmoving party; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. *Pioneer Inv. Servs. Co.*, 507 U.S. at 395. Applying those factors here, the Court finds that Defendant's failure to timely file the Motion is the result of excusable neglect.

i.        The danger of prejudice to the nonmoving party.

When evaluating prejudice to the nonmoving party, the court considers the potential prejudice resulting from retrying the case after a delay, not the prejudice of having to respond to a belated motion. *United States v. McGowan*, No. CR 07-00113 MMM, 2012 WL 13109973, at *3–4 (C.D. Cal. filed on April 16, 2012). Such prejudice can include the effect of time on witnesses' memories and other burdens associated with re-trying a case after time has passed. *Id.*

Here, there is a period of between 124 to 166 days of delay that the government charges is attributable to Defendant. Resp. 38 (calculating the delay as beginning either on October 9 or August 28 and ending with the February 11 filing in the District Court in response to Judge Gleason's Order). Under either total, any witnesses' memory loss attributable to that period is relatively minor compared to the nearly two-year period between the trial and the government's disclosure. Thus, the Court finds that this factor does not weigh against finding excusable neglect.

ii.        The length of the delay and its potential impact on judicial proceedings.

As discussed above, a delay of 124 to 166 days related to Defendant's delayed Motion is relatively minor compared to the delay attributable to the government before its disclosure. And the government advances no additional, specific impacts beyond possible lost witness memory. Thus, the Court finds that this factor also does not weigh against finding excusable neglect.

iii.        The reason for the delay, including whether it was within the reasonable control of the movant.

The government argues that, upon learning of the basis for her motion, Defendant should have filed either her motion for a new trial or a motion to extend the time in which she could file it as she awaited further discovery. Surreply 2, ECF 484. It argues that, because she failed to do so, the delay is entirely attributable to her. *Id.* But Defendant argues that she initially did not

17 – OPINION & ORDER

have enough information to file a nonfrivolous motion, and the government is responsible for any delay due to its efforts to avoid producing discovery. Reply 4–5. To the extent that the government is correct, the Court declines to attribute that delay to Defendant rather than her counsel.

Courts have distinguished between excusable neglect in civil and criminal proceedings and noted that, "in determining what constitutes excusable neglect, the courts have generally been more solicitous of a criminal defendant's rights." *United States v. Moses*, No. CR 05 061 E BLW, 2006 WL 581191, at *4 (D. Id. filed on Mar. 8, 2006). Indeed, the Supreme Court has explained that "[w]hen a litigant is subject to the continuing coercive power of the Government in the form of imprisonment, our legal traditions reflect a certain solicitude for his rights, to which the important public interests in judicial efficiency and finality must occasionally be accommodated." *Stutson*, 516 U.S. at 196.

As a result, ineffective assistance of counsel has been recognized as a factor beyond the control of the movant and within the realm of excusable neglect. *Moses*, 2006 WL 581191, at *5 (finding that the third factor did not weigh against a defendant whose counsel declined to file a timely motion for a new trial despite the defendant's request that they do so); *see also United States v. Perez*, No. 2:22-cr-00333-MEMF, 2024 WL 1658233, at *6 n.6 (C.D. Cal. filed on April 17, 2024) (citing *United States v. Munoz*, 605 F.3d 359, 369–71 (6th Cir. 2010)) (explaining that evaluating ineffective assistance of counsel in the context of whether a defense counsel's errors were excusable neglect is distinct from the analysis in the Sixth Amendment context). For example, in *Perez*, 2024 WL 1658233, at *7, the court recognized that the motion was delayed due to a prior attorney discouraging the defendant from timely filing and his

18 – OPINION & ORDER

subsequent counsel requiring time to gather and review relevant materials. Despite those failures, the court found that the delay was due to excusable neglect. *Id.*

From the outset of the government's disclosures, defense counsel raised the possibility of filing a motion for a new trial. Indeed, Defendant's appeal was placed on hold on that basis. But nothing was filed by Defendant until Judge Gleason entered an order imposing a deadline for the motion, which prompted defense counsel to file a request for an extension of those deadlines. Based on the timeline and contents of the government disclosures discussed above, the Court concludes that the failure to timely file *something* in the District Court was an error.

But the Court declines to find that the delay associated with that error is attributable to Defendant rather than her counsel. This is not a case like *Moses* or *Perez*, in which ineffective assistance of counsel was specifically raised by the defendants as a basis to explain the delay. Nevertheless, the concept is relevant here, and the Court attributes the failure to file at least a motion requesting additional time to defense counsel rather than Defendant. It does so in recognition of the "certain solicitude" for a defendant's rights recognized by the Supreme Court. And because the Court finds that the delay was not within the reasonable control of Defendant rather than her counsel, it finds that this factor weighs in favor of finding excusable neglect.

> iv.     Whether the movant acted in good faith.

The government argues that, because Defendant disclaims any responsibility for the delay, it is impossible to evaluate whether she acted in good faith. Resp. 40. The Court disagrees.

From October 2024 through early February 2025, when Defendant rejected the government's proposal, defense counsel sought to resolve the dispute without having to file a motion for a new trial. There is no evidence that the filing was purposefully delayed in order to

19 – OPINION & ORDER

weaken the government's case. Therefore, the Court finds that Defendant acted in good faith and that this factor weighs in favor of finding excusable neglect.

In sum, after evaluating the four factors outlined in *Pioneer*, the Court finds that the delay in filing the Motion was the result of excusable neglect.

## II. Defendant is entitled to a new trial.

### A. Recusal was necessary.

Defendant asserts that Judge Kindred should have disqualified himself from this matter pursuant to due process principles and to comply with 28 U.S.C. § 455(a), which requires a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Mot. 37. Defendant advances several bases that "independently and together disqualified" Judge Kindred. *Id.* at 39. As discussed below, the Court focuses on ▮▮▮▮'s work as a law clerk on the case and her ongoing relationship with Judge Kindred after joining the USAO.

"[R]ecusal is appropriate whe[n] 'a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned.'" *United States v. Carey*, 929 F.3d 1092, 1104 (9th Cir. 2019) (quoting *Yagman v. Republic Ins.*, 987 F.2d 622, 626 (9th Cir. 1993)). "[T]he reasonable person is not 'hypersensitive or unduly suspicious, but rather instead a well-informed, thoughtful observer.'" *United States v. Federico*, No. 12-cr-00862-YGR-2 (HSG), 2018 WL 9802133, at *2 (N.D. Cal. filed on Aug. 24, 2018) (quoting *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008)). The standard "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Holland*, 519 F.3d at 913. Nevertheless, "[u]nder § 455(a), impartiality must be 'evaluated on an *objective* basis, so that

20 – OPINION & ORDER

what matters is not the reality of bias or prejudice but its appearance.'" *Carey*, 929 F.3d at 1104 (quoting *Liteky v. United States*, 510 U.S. 540, 548 (1994) (emphasis in *Carey*)); *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.'") (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)). "Disqualification under § 455(a) is necessarily fact-driven and may turn on subtleties in the particular case." *Holland*, 519 F.3d at 913.

In addition, "[t]he Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge." *Hurles v. Ryan*, 188 F. Supp. 3d 907, 916 (D. Ariz. 2016), *aff'd*, 914 F.3d 1236 (9th Cir. 2019). A judge must recuse themself from presiding over a case "when the likelihood of bias on the part of the judge 'is too high to be constitutionally tolerable.'" *Williams v. Pennsylvania*, 579 U.S. 1, 4 (2016) (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 872 (2009)); *see also Chen ex rel. Chen v. Albany Unified Sch. Dist.*, 56 F.4th 708, 725–26 (9th Cir. 2022) ("[I]n *Caperton* . . ., the Court reaffirmed that due process requires a decisionmaker's recusal, not only when he or she has a direct, personal, substantial, pecuniary interest in a case . . ., but also when the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.") (internal citations and quotations omitted). The relevant question is not whether the judge "harbors an actual, subjective bias, but instead whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." *Williams*, 579 U.S. at 8 (internal citation and quotation marks omitted).

The Court concludes that a reasonable person—a well-informed, thoughtful observer—would have reasonably questioned Judge Kindred's impartiality in this case. Here, ██████ worked as a law clerk on *Spayd* despite applying for and accepting employment with the USAO. And the government concedes that even *that* warranted Judge Kindred's recusal under 18 U.S.C. § 455(a).[8] Resp. 45. But after she joined the USAO, ██████ and Judge Kindred continued to talk about the *Spayd* trial. They discussed the performance of the AUSAs prosecuting Defendant, including Judge Kindred's frustration with Heyman for violating a rule of evidence. And they discussed ██████'s attendance at various portions of the trial, with Judge Kindred even asking her whether she was purposefully avoiding his glances while he presided over the trial.

Those facts are concerning and raise questions about Judge Kindred's impartiality and the appearance of bias. But they become even more alarming when considered in light of how the entanglements worsened over the course of the trial. The relationship between Judge Kindred and ██████ intensified as they became romantically involved, but that escalated further when Judge Kindred allegedly sexually assaulted ██████. ██████ disclosing those events to Brickey-Smith, and later Vandergaw, prompted internal complaints and reporting within the USAO. When that was reported back to Judge Kindred by Vandergaw, he sought to intervene—all while trial in *Spayd* was ongoing. The rumors and turmoil led Judge Kindred to repeatedly tell ██████ that he wanted to lay low and let the talk about him fade away.

The Court considers all of the facts and subtleties presented by this case. And it acknowledges that this is a unique case given that neither ██████ nor Vandergaw made an appearance in the trial or worked on it as an AUSA. But given ██████'s work as a law clerk and

---

[8] The government's argument regarding the harmlessness of her involvement in the case, Resp. 66, is addressed below.

22 – OPINION & ORDER

Judge Kindred's connections to—and communications with—individuals within the USAO over the course of the *Spayd* trial, the Court finds that there is—at the very least—an appearance of bias or prejudice by Judge Kindred that warranted his recusal under 18 U.S.C. § 455(a).

For the same reasons, Judge Kindred's recusal was warranted by the Due Process Clause. The events occurring throughout Defendant's trial created an unconstitutional potential for bias, and the Court concludes that the average judge in Judge Kindred's position was not likely to be neutral.

> **B.** Judge Kindred's error in failing to recuse himself was not harmless.

The government argues that any error by Judge Kindred in failing to recuse himself was harmless because Defendant has not shown that Judge Kindred favored the prosecution.[9] Resp. 66–67. The Court disagrees.

"Section 455 does not, on its own, authorize the reopening of closed litigation." *Liljeberg*, 486 U.S. at 863. But as noted, Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Supreme Court has concluded that, when determining whether a judgment should be vacated and a new trial ordered "for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's

---

[9] The government also argues that Federal Rule of Criminal Procedure 52(a), which provides that "[a]ny error . . . that does not affect substantial rights must be disregarded," is the proper lens through which to view harmless error rather than the considerations under *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988). But, in keeping with its analysis in *United States v. Hernandez-Zamora*, 3:21-cr-00062-MAH-MMS, ECF 406 at 10–11, the Court analyzes the *Liljeberg* factors. And it further notes that the Supreme Court has recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," including the right to an impartial judge. *Chapman v. California*, 386 U.S. 18, 23, 23 n.8 (1967) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)).

23 – OPINION & ORDER

confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. In addition, courts must "continuously bear in mind that 'to perform [their] high function in the best way justice must satisfy the appearance of justice.'" *Id.* (quoting *In re Murchison*, 349 U.S. at 136 (citation omitted)).

First, there is a substantial risk of injustice to Defendant if this Court were to deny her Motion given the appearance of bias or prejudice by Judge Kindred during her first trial. Indeed, the facts here create "precisely the kind of appearance of impropriety that § 455(a) was intended to prevent. The violation is neither insubstantial nor excusable." *Liljeberg*, 486 U.S. at 867. And any injustice to the government in having to re-try the case is outweighed by that faced by Defendant.

Second, granting a new trial in this case will not produce injustice in other cases. In *Silverton Mountain Guide LLC. v. U.S. Forest Serv.*, No. 3:22-cv-00048-SLG, 2025 WL 715842, at *5 (D. Alaska filed on Feb. 21, 2025), the court noted that "vacating this case may have the deleterious effect of litigants attempting to relitigate all of Judge Kindred's closed [] cases in which the USAO represented a party." But the facts in that case, in which the plaintiff sought a new trial by arguing that Judge Kindred's conflicts of interest with some AUSAs—who had no connection to its case—should be imputed to the entire USAO, *id.* at *3, do not rise to the level seen here. This case presents a unique and extreme set of circumstances that are unlikely to create a basis to relitigate all of Judge Kindred's closed cases.

Finally, the Court finds that, under these circumstances, the risk of undermining the public's confidence in the judicial process if a new trial is not ordered is high. Therefore, Judge Kindred's error in failing to recuse himself is not harmless.

24 – OPINION & ORDER

In sum, under these unique and extreme circumstances, the Court concludes that Judge Kindred was required to recuse himself and that a new trial is warranted. Therefore, the Court grants Defendant's Motion for New Trial.

## CONCLUSION

The Court GRANTS Defendant's Motion for New Trial [461].

IT IS SO ORDERED.

DATED: **August 24, 2025** .

MARCO A. HERNÁNDEZ
United States Senior District Judge

25 – OPINION & ORDER