SCOTT BRADFORD
United States Attorney
District of Oregon
STEVEN D. CLYMER
Special Attorney
ANDREA STEWARD
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Telephone: 907-271-1202
Email: steven.d.clymer@usdoj.gov
Email: Andrea.Steward@usdoj.gov

Attorneys for United States of America

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JESSICA JOYCE SPAYD,<br>Defendant. | Case No. 3:19-CR-00111-SHR-MMS<br><br>Government's Sentencing Memorandum |

## Table of Contents

Page

Selected Trial Testimony .......... 4

A. Introduction .......... 5

B. Offense Conduct .......... 7

1. Spayd's Prescription Practices .......... 7

2. Spayd's Victims .......... 9

a. Fatal Overdoses Encompassed by Spayd's Guilty Plea .......... 9

i. J.L. [Count 1] .......... 9

ii. B.S. [Count 3] .......... 12

iii. L.D. [Count 5] .......... 14

b. Additional Fatal Overdoses Resulting from Spayd's Illegal Drug Distribution .......... 16

i. K.B. [Count 2] .......... 16

ii. E.K. [Count 4] .......... 18

c. Additional Victims .......... 21

3. Warnings That Spayd Ignored .......... 26

4. Illegal Prescriptions to an Undercover Officer .......... 28

C. Indictment, Trial, Conviction, and Sentence .......... 30

D. New Trial Order .......... 31

E. Plea Agreement and Guilty Plea .......... 32

F. Sentencing Guidelines Computation .......... 33

1. Applicable Guidelines Manual and 2026 Amendments .......... 33

2. Multiple Counts: U.S.S.G. § 3D1.1(a) (2026) .......... 34

3. Base Offense Level : U.S.S.G. § 2D1.1(a)(2) .......... 35

4. Maintaining a Premises for the Purpose of Illegally Distributing Controlled Substances: U.S.S.G. § 2D1.1(b)(12) .......... 35

5. Abuse of Position of Trust/Special Skill: U.S.S.G. § 3B1.3 .............................. 36

6. Vulnerable Victims: U.S.S.G. § 3A1.1(b)(1) .................................................. 36

7. Aggravating Role: U.S.S.G. § 3B1.1(c) .......................................................... 40

8. Drug Distribution to an Elderly, Pregnant, or Unusually Vulnerable Person: U.S.S.G. § 2B1.1(b)(15)(B) (2026) ................................................................. 44

9. Timely Acceptance of Responsibility .............................................................. 46

10. Sentencing Guidelines Computation ................................................................ 47

G. Section 3553(a) Sentencing Factors and Sentencing Recommendation ................. 49

H. Forfeiture and Restitution ........................................................................................ 57

I. Conclusion ............................................................................................................... 57

"[My wife] had a lower back injury from work, she was a certified nurse's assistant [who became addicted to Percocet and OxyContin that Spayd prescribed]. "[I]t became almost an every day, all day thing. She was consumed by trading, running short, owing somebody, trying to find more. It consumed her life in general. That's what her main focus was unfortunately.. . . . I physically brought her to the hospital because she tried to detox at home, and she was basically going through withdrawal symptoms… and they couldn't do anything for her…. during [both of her] pregnancies [she] was visiting Jessica Spayd…. She's spiraled downward, she's been in and out of jail at least six times."

- *Abraham Salmon, Trial Testimony* (Dkt. 269 at pp. 13-22).

"Almost every doctor that I encountered was alarmed by the amount of medication [Spayd had] given to [my mother, who had Alzheimer's. When she had knee surgery in 2015, the] doctors at the hospital were unable to get her pain under control because she had such a high tolerance for narcotics that she was in excruciating pain in the hospital. Jessica [Spayd] made sure that she had plenty of narcotics to leave the hospital with, and that night I sat with her, while she very shallow breathed all night long in her home. I was just hoping that she would make it through the night."

- *Chris Jones*, *Trial Testimony* (Dkt. #268 at pp. 148-49).

"K.B. no longer baked. She had lost her ability to truly do much more than sleep…. What I learned from the [pharmacist] was that the medication was prescribed at the … highest level possible for that particular item…. [I told Spayd] I was K.B.'s mother and that I was calling to discuss her medication, and that's about all I got to say…. I was being told that it was none of my business and the conversation ended…. The phone was hung up [by] Ms. Spayd."

- *Ruby Steppe, Trial Testimony* (Dkt. 288 at pp. 16-19, 24).

"[L.D.] was one of those cases that you remember … he was prescribed the highest dose of chronic narcotics that I had seen in our community. And it was striking how much he was on day-to-day. It was also striking because of his age as well, he was older. . . . I don't see daily doses that high in anybody…. Even cancer patients…. Ms. Spayd was prescribing the majority."

- *Dr. Andrew Elsberg, Providence E.R., Trial Testimony* (Dkt. 283 at pp. 16-18, 20).

"[I told Spayd] that I felt like I was possibly taking very high doses and that it kind of scared me…. Her response [was] that it was actually low dosages because many of the other patients were taking much higher dosages, mine were fine….. [after] Ms. Spayd was arrested … [I saw] Dr. Ninefeldt and learned [that] the amount of [] opiates that I was taking…. It was enough to kill a horse. I was off all [opioid] medications in December of that year…. Two months [after] being on opiates with the defendant for approximately a decade]."

- *E.R.V., Trial Testimony* (Dkt. 283 at pp. 50-55).

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its counsel of record, the United States Attorney for the District of Oregon, respectfully submits its sentencing memorandum.

## A. Introduction

Defendant Jessica Joyce Spayd has admitted that she caused three deaths through criminal conduct. In her plea agreement and by pleading guilty, she acknowledged using her position as a nurse practitioner to prescribe schedule II controlled substances to patients who entrusted her with their medical care; doing so while knowing that she was acting outside the usual course of professional practice and without a legitimate medical purpose; and thereby engaging in criminal conduct that resulted in three of her patients dying by overdose.

Tragically, these drug-induced fatalities are only isolated examples of Spayd's pervasive and long-term criminality. For over five years, Spayd operated what purported to be a legitimate clinic offering medical treatment for chronic pain and addiction. In reality, without legitimate medical purpose and outside the scope of professional medical practice, Spayd routinely prescribed staggeringly large quantities and dosages of highly addictive—and sometimes lethal—opioids and other drugs, often in notoriously dangerous combinations, to her patients. She did so without conducting physical examinations and without regard for either her professional obligations and training or the health, safety, and

lives of her patients. Spayd addicted patients to opioids and other drugs, or exacerbated addictions from which some already suffered. She made no meaningful effort to wean patients from opioids and instead often increased dosages, even when it was evident that these drugs degraded patients' quality of life and ability to function. She ignored numerous warning signs, both the ill effects that the drugs she prescribed had on her patients, including overdoses, and blunt communications from medical professionals who were horrified by Spayd's aberrant prescribing practices and expressed concerns to her, including pharmacists who refused to fill her prescriptions.

The three overdose deaths to which Spayd pleaded guilty were among five such fatalities for which a trial jury attributed criminal responsibility to her. Spayd's directive to non-medical staff members to issue prescriptions in her absence, her practice of signing prescriptions without seeing patients, her recorded interaction with an undercover law enforcement agent, and her falsification of medical records all made clear that Spayd abandoned anything resembling proper patient care. While her patients suffered and died, Spayd profited. She earned over $1.3 million from her clinic during the relevant time period, drove a BMW automobile, and enjoyed an envious lifestyle involving ski trips and a Hawaii vacation.

Spayd's plea agreement provides for a term of imprisonment between 20 and 30 years. The offense charged in all three counts to which Spayd has pleaded guilty—illegal drug distribution resulting in an overdose—requires a *minimum* 20-year prison term, even

where an overdose is non-fatal. The United States Probation Office ["USPO"], which had the benefit of involvement in Spayd's case when she was convicted in a jury trial, recommends a 360-month term of imprisonment. For reasons described below, the government respectfully concurs. That term would align with sentences recently imposed in two other fatal overdose death cases in the District of Alaska.

## B. Offense Conduct

Spayd was an Advanced Nurse Practitioner who operated a pain management and opioid addiction treatment clinic located in Eagle River, Alaska called "Eagle River Pain and Wellness." Spayd had authorization as a Drug Enforcement Administration ["DEA"] registrant to prescribe controlled substances, including those on schedule II, for legitimate medical purposes. Spayd had approximately 500 patients. PSR ¶¶ 14, 15.

### 1. Spayd's Prescription Practices

According to data from the Prescription Drug Monitoring Program ["PDMP"] database, which tracks prescriptions, from January 2, 2014, through October 7, 2019, Spayd dispensed approximately 45,358 controlled substance prescriptions for over 4.8 million pills. GEX 295 at p. 2.[1] Approximately 35,575 of those prescriptions were for opioids, for over 4.4 million opioid pills.[2] *Id.* Spayd routinely prescribed dosages five to

---

[1] "GEX" refers to government exhibits at Spayd's trial.

[2] This figure does not capture the fentanyl lollipops and fentanyl patches that Spayd prescribed.

fifteen times higher than the maximum safe daily dosages recommended by state and federal guidelines. PSR ¶ 15. Spayd distributed and dispensed approximately 6,123 opioid prescriptions per year. This is 35 times as many opioid prescriptions as an average nurse practitioner issues annually and about 4.6 times as many as an average pain medicine physician issues annually. GEX 295 at p. 2.

During this period—consisting of 2,104 days, or approximately 69 months—to each of 40 of her patients, Spayd issued over 250 prescriptions, meaning an average of over 3.6 prescriptions per patient per month; similarly, to each of 40 patients, Spayd prescribed over 25,000 pills, or an average of almost 12 pills per patient per day.[3] GEX 295 at p. 2. The PDMP data—which was available to Spayd and on which she could have could have relied to realize that she was dangerously over-prescribing opioids—showed multiple patient risk factors indicative of abuse, diversion, and/or addiction, including excessive prescriptions, excessive pills, pharmacy shopping,[4] out-of-state addresses, and polypharmacy, meaning dangerous pill combinations, such as opioids combined with benzodiazepines. *Id.* at pp. 6-7.

Spayd sometimes caused patients to receive prescriptions without having seen them. A former employee of Eagle River Wellness, Spayd's medical clinic, testified that in

---

[3] Seven patients were in both groups, meaning that during the 69-month period, Spayd issued over 250 prescriptions to each of these patients for more than 25,000 pills. GEX 295 at p. 3.

[4] "A total of 268 of Spayd's patients patronized between 3 and 17 pharmacies." *Id.* at p. 6. As explained in the text below, some pharmacies refused to fill Spayd's prescriptions.

response to "pressure" from Spayd, she and other employees signed prescriptions for opioids and other controlled substances for patients and also assisted Spayd in preparing prescriptions for Spayd to sign so that non-medical employees of the practice could provide these prescriptions to patients when Spayd was away from the clinic (and sometimes although she was present but nonetheless had not seen the patients), including in 2015 when Spayd was in California for over a month. Dkt. #283, pp. 74-76, 81. When Spayd was in town but nonetheless absent from the clinic, employees sometimes took pre-prepared prescriptions to Spayd's residence for her to sign without having examined the patients who would receive the prescriptions. *Id.* at pp. 78-79.

**2. Spayd's Victims**

**a. Fatal Overdoses Encompassed by Spayd's Guilty Plea**

**i. J.L. [Count 1]**

J.L was approximately 40 years old when she became Spayd's patient on August 22, 2012. Dkt. #298 at pp. 22, 27. J.L. had suffered a gunshot wound to her right leg earlier in life and had lower back pain. *Id.* She had been diagnosed with "sciatica down the leg, nerve injury and pain related to that [and] . . . traumatic arthropathy, which means she had an injured knee." *Id.* J.L.'s "primary pain complaints were related to the low back." *Id.* at p. 28.

Although J.L complained of lower back pain, "there was no evidence that she had an indication of medically significant spinal stenosis or any indication of sciatica or what

we call radiculopathy down the leg" and her "diagnoses were not supported by physical exam, MRI testing or electrodiagnostic testing." *Id.* at pp. 22-23. Spayd did not do a physical examination during J.L's initial visit or subsequent visits. *Id.* at pp. 29-32.

J.L. had a history of alcohol and illegal drug use and documentation indicated that she was a "chronic alcoholic." *Id.* at pp. 23-24. J.L. also had a history of mental illness and suicide attempts. *Id.* at p. 24. J.L. also had multiple past overdoses of pain medication and had been prescribed significant doses of opioids—1,000 to 1,100 MEQ[5]—before seeing Spayd. *Id.*

But, when J.L. first saw Spayd, J.L. reported that she had tapered off the medication she then was receiving, specifically methadone, oxycodone, and Ambien, and had not taken medication for a month. *Id.* at pp. 24-25. Despite that, Spayd "roughly continued" J.L.

---

[5] "MEQ" or "MME" means morphine equivalent. This measure quantifies opioid dosage. "[T]he higher the dose in terms of morphine equivalents, the more likely [it is] that the patient [is] going to undergo an overdose event or overdose death or severe adverse effects, like addiction. There [is] a correlation, not surprisingly, with dose and adverse and dangerous side effects." Dkt. #290 at pp. 130-31. "[A]n average morphine equivalency for someone who's got post-operative pain and might require opioids for a couple days to a week or so, a reasonable dose might be 30, 30 morphine equivalents." *Id.* at p. 131. As the government's pain management expert witness explained at trial:

> When we get up to 50 morphine equivalents, the data indicates that there is about a 200 percent increase in the risk of overdose and death compared to the lower doses of 20 or 30. So when we get to 50, the risk of adverse events is associated with twice as many lethal side effects. When we get up to 90 to 100, the risk of side effects increase even more. And when we get to a 90 to 100, give or take a little bit, something in there, the risk of an overdose or serious adverse effect is ten times.

*Id.* at p. 131, "There has been no evidence-based research to show that doses above 100 have -- has been more helpful in terms of treating chronic pain." *Id.* at p. 132.

on "high doses of methadone and oxycodone on [J.L.'s initial] visit," *id.* at pp. 25, 27, thereby "setting [J.L.] up for overdose" because if J.L. had stopped the medications as she told Spayd, she would have been "opioid naïve." *Id.* at p. 25. Indeed, Spayd "prescribed what is equivalent to 1,240 morphine equivalents of those two medications." *Id.* at p. 28. "[A] prudent provider would never have done that." *Id.* at p. 28.

Shortly after J.L's initial visit to Spayd, she overdosed, and was found at home in a pool of vomit, unconscious and non-responsive. She was revived by Narcan on the way to the hospital.[6] *Id.* at pp. 33-35. The medical staff at the hospital stated in its notes that J.L.'s "primary advanced nurse practitioner," meaning Spayd, was "aware that we have to get [J.L.'s] pain meds, weaning down" and that during J.L.'s stay, "[w]e have weaned some of the narcotic dependence before home." *Id.* at p. 37. Nonetheless, at J.L.'s next clinic visit, less than a month after the overdose, Spayd prescribed 1140 MEQ. *Id.* at p. 43.

While J.L. was Spayd's patient, she had eight urine drug screens showing use of unprescribed drugs, including benzodiazepines.[7] *Id.* at pp. 46-47. The drug screens also provided other warnings, including that J.L. had unprescribed methadone in her urine. *Id.*

---

[6] "Narcan . . . reverses opioid overdoses or opioid effects. It has no affect [sic] on other medications, such as benzodiazepines or sedatives or stimulants or antidepressants. It works specifically on the opioid receptors." *Id.* at p. 35.

[7] The Food and Drug Administration has issued warnings about "oversedation associated with the combination of opiates plus benzodiazepines," advising that "they should not [be prescribed together], unless there is a very specific medical reason [because] "[t]hey cause a large amount of oversedation, respiratory depression and are associated with overdose death." *Id.* at p. 41.

at p. 50. Although Spayd put J.L. on probation for one such dirty urine test, "nothing meaningful happened" to Spayd's prescription of drugs for J.L. as a result. *Id.* at p. 47. Indeed, Spayd later increased J.L.'s dosage. *Id.* at p. 48.

J.L. died at age 42, the day after receiving a prescription from Spayd and approximately two years after her previous overdose while under Spayd's care. *Id.* at pp. 53-55. J.L. died as "a result of acute combined methadone, alprazolam, oxycodone, and oxymorphone intoxication." *Id.* at p. 56. Spayd was "prescribing [J.L.] the methadone and oxycodone" and knew J.L. also "was taking alprazolam or Xanax" based on urine tests. *Id.*

Spayd has admitted, as part of her plea agreement, that on October 14, 2014, she knowingly and intentionally acted outside the usual course of professional practice and without a legitimate medical purpose when she wrote prescriptions for methadone and oxycodone for J.L.; that J.L. filled these prescriptions at a local pharmacy; and that the next day, J.L. overdosed and died as a result of use of the methadone and oxycodone that the Spayd prescribed.

**ii. B.S. [Count 3]**

B.S. was a patient of Spayd's for approximately ten years beginning in 2005. Dkt. #299 at pp. 37-30. Her primary complaints involved lower back pain, and she was diagnosed with degeneration of the lumbar spine. *Id.* B.S. had comorbidities, including hypertension, severe chronic and obstructive lung disease (COPD), and was oxygen

dependent. *Id.* at pp. 37-38. She had a history of running out of her medication early a sign of overuse), borrowing other people's controlled substances, using others' urine samples for testing, and using illegal substances, primarily THC. *Id.* at p. 38. Her urine screen showed an absence of some or all prescribed medications (suggesting that it was not her urine) and/or the presence of non-prescribed medications. *Id.* B.S. had opioid therapy in the past, receiving as high as 1,000 MEQ, without apparent improvement. *Id.* at pp. 38-39. She had been in a methadone program in the past, which is an indication of opioid addiction. *Id.* at p. 39.

B.S. showed no improvement in her function or quality of life while under Spayd's care, and was dismissed from the practice for a time because of her use of illegal substances. *Id.* at p. 39. There is no indication in the medical records, however, that Spayd referred B.S. for addiction treatment when this occurred. *Id.* at p. 47.

When B.S. returned as a patient, Spayd prescribed a high MEQ despite B.S. having "almost every aberrant predictor . . . that would point towards to an ultimate outcome of overdose and death." *Id.* at p. 40. B.S.'s MEQ was almost 1,500, which likely "would be accompanied by significant opioid-induced hyperalgesia," meaning that the opioids would "not improv[e] the pain but mak[e] the pain worse." *Id.* at pp. 40-41. B.S.'s MEQ level was "uncharted territory." *Id.* at p. 42. As the government's expert witness explained it: "We have no data that tells us how bad it is [with that MEQ level] and what the adverse effects are once we get up into the thousands." *Id.* One reason that there are no studies

about dosages this high is because "generally patients don't survive when they're receiving medications at that level." *Id.* at pp. 42-43. Spayd suspected that B.S. might be suffering from opioid-induced hyperalgesia, but made no effort to wean B.S from opioids, as would be indicated for that condition. *Id.* at p. 50. B.S. died of an overdose at age 74. *Id.* at p. 37.

Spayd has admitted, as part of her plea agreement, that on December 3, 2015, she knowingly and intentionally acted outside the usual course of professional practice and without a legitimate medical purpose when she wrote prescriptions for methadone and hydromorphone for B.S.; that B.S. filled these prescriptions at a local pharmacy; and that on December 22, 2015, B.S. overdosed and died as a result of use of the methadone and hydromorphone that the Spayd prescribed.

**iii. L.D. [Count 5]**

L.D. was under Spayd's care for approximately 16 years. Dkt. #298 at p. 91. Spayd prescribed for L.D. "oxycodone, OxyContin, and fentanyl, in the form of a Duragesic patch," for a total of around 600 MEQ, with a maximum of 690 MEQ in June 2009. *Id.* at pp. 91-92. Fentanyl patches are a problematic pain management medication "because if the patient starts having symptoms of overdose or if they're getting sedate and too sleepy and we're concerned about things, we can't simply stop the medicine and expect it to wear off. Usually it takes a couple days for it to wear off, because it's slow absorbing and then it's slow clearing from the body." *Id.* at p. 94.

L.D. was a non-compliant patient, often taking more than the prescribed dosage of his medications and reporting that he had run out before he should have. *Id.* at pp. 94-95; Dkt. #299 at pp. 12-14. Spayd's medical records for L.D. documented at least 51 instances of non-compliance with his medical treatment. Dkt. #299 at pp. 19-20. This was "consistent with his diagnosis of opioid abuse and addiction." *Id.* at p. 20. He frequently contacted the clinic to request more medication than he had been prescribed. Dkt. #298 at pp. 97-98. He also reported a pain score of 4 out of 10, which would mean "maybe you need something a little bit more than over the counter, but you don't need something in the order of multiple hundreds of MEQ." *Id.* at p. 97. L.D. had several motor vehicle accidents, which are an indication of "sedation or cognitive or response deficit, secondary to the medication." *Id.* at p. 95; Dkt. #299 at pp. 14, 19. "This individual might as well have put a sign on himself that says, I'm an addict." Dkt. #298 at p. 95.

L.D. had a non-fatal overdose in 2016. Dkt. #299 at p. 20. The treating physician documented his concern about an "extremely high risk of accidental overdose including risk of brain injury or death," and recommended that L.D. "stop using the 25-microgram patch, decrease his daily oxycodone use by four tablets a day and discussed tapering his medications further with his pain provider." *Id.* at pp. 21-22. In response, "Ms. Spayd lowered the dose of opioids, but an actual wean procedure did not occur, and the patient was -- after the initial lowering the medications were escalated once again." *Id.* at p. 22.

Just before he passed away. L.D. was receiving 572 MEQ, close to what Spayd had been prescribing before the non-fatal overdose. *Id.* at pp. 23, 31.

Spayd received "almost two-dozen warning letters from insurance companies about the dosages that L.D. was on." *Id.* at p. 27. There were indications in Spayd's medical records that L.D. was applying two of his prescribed fentanyl patches at the same time. Dkt. #298 at pp. 98-99. He had two patches on when he died by overdose. *Id.* at p. 99.

L.D. collapsed and died on March 2, 2019. Dkt. #299 at 29. He was 71 years old. *Id.* at p. 31. Spayd has admitted, as part of her plea agreement, that on February 20, 2019, she knowingly and intentionally acted outside the usual course of professional practice and without a legitimate medical purpose when she wrote prescriptions for fentanyl and oxycodone for LD.; that L.D. filled these prescriptions at a local pharmacy; and that on March 2, 2019, L.D overdosed and died as a result of use of the fentanyl and oxycodone that the Spayd prescribed.

**b. Additional Fatal Overdoses Resulting from Spayd's Illegal Drug Distribution**

**i. K.B. [Count 2]**

K.B. was under Spayd's care for neck pain for four years, totaling approximately 60 visits. Dkt. #298 at p. 62. Spayd diagnosed K.B. as having cervical spinal stenosis with myelopathy and brachial neuritis or radiculitis but there was no documentation to support these diagnoses. *Id,* at pp. 62-63. K.B. suffered from bipolar disorder; schizophrenia, for which she had been prescribed a mood stabilizer; and obesity. *Id.* at pp. 63-64. K.B. also

had COPD, lung and liver issues, and hypertension. *Id.* at p. 64. She was homeless when she died by overdose. *Id.* From the outset of her treatment, K.B. sought opioids, which indicated opioid dependence. *Id.* at p. 71. "This individual . . . should not have been prescribed opiates at all. There was no indication they were successful in treating her pain." *Id.* at p. 72. Spayd nonetheless prescribed opioids, albeit initially at a level below what K.B. had been taking. *Id.* at pp. 70-73.

K.B. moved to Texas, where she had neck surgery from which she recovered. As documented in Spayd's medical records, after the successful surgery, K.B. stopped taking opioids and was taking only minimal medication. *Id.* at p. 67. K.B. thereafter returned to Alaska and again became Spayd's patient. *Id.* at p. 65. When K.B. first visited Spayd upon her return, K.B.'s urine tested negative for opioids. *Id.* at p. 74. Under these circumstances, K.B. was "opioid naive," meaning that her tolerance for opioids had declined from cessation of use and any opioid prescription should have been low dosage. *Id.* at p. 25. During this visit, Spayd, who had not seen K.B. for eight months, did not do a physical examination. *Id.* at pp. 76-77.

At this first post-return visit, Spayd nonetheless prescribed K.B. a combination of the opioid Dilaudid (hydromorphone) and Soma (carisoprodol), a muscle relaxant. "Dilaudid is sometimes . . . referred to as prison heroin. It does not have a good track record in chronic pain management. It's extremely potent, it's extremely addictive and it's very rapid acting." *Id.* at p. 69. Soma is "our most addictive muscle relaxant . . . because it has

a euphoria associated with it that patients look for just in and of its own.." *Id.* at p. 68. When coupled with "a sudden increase in high dose Dilaudid, that's a deadly combination." *Id.* at p. 69. The dosages of these drugs that Spayd prescribed to K.B. had an MEQ of 192, a level that presents a significant increase in the likelihood of overdose. *Id.* at pp. 67-68. This was "exceptionally dangerous," i*d.* at 67, creating "a huge possibility that there would be respiratory depression and overdose death, *id.* at p. 68.

K.B. died by overdose one day after this first return visit to Spayd's care. *Id.* at p. 66. In Spayd's trial, a jury unanimously found beyond a reasonable doubt that K.B. died as a result of her use of hydromorphone and carisoprodol that Spayd prescribed, Dkt. #321 at p. 2[8]; and that Spayd prescribed those controlled substances illegally, Dkt. #320 at pp. 3-4.

**ii. E.K. [Count 4]**

E.K. was under Spayd's care for approximately three years, from age 56 until her overdose death at age 59. Dkt. #299 at p. 52. E.K. reported neck and back pain. *Id.* at p. 53. Without conducting proper MRI testing necessary for an objective diagnosis, Spayd diagnosed E.K. as having "cervical radiculitis and cervical spinal stenosis." *Id.* at pp. 52-53. In Spayd's medical records, "there was no physical exam, MRI, or electrodiagnostic testing to suggest that there was anything wrong with [E.K.'s] spine, particularly to the point where it would require high-dose opioid therapy." *Id.* at p. 58.

---

[8] CM/ECF pagination.

E.K. was a smoker and an alcoholic and had mental health issues including depression, post-traumatic stress disorder [“PTSD”] from a past abusive relationship, and bipolar disorder. *Id.* at pp. 53-54, 62. This presented a “high risk situation” for prescribing opioids to her. *Id.* So did E.K.’s physical ailments. “She was obese, diabetic, hypertensive, asthmatic, had a history of renal failure, [and] suffered from sleep apnea.” *Id.* at pp. 53-34. E.K. also had “significant psychosocial risk factors.” *Id.* at p. 54. She was unemployed and had concerns about insufficient money. *Id.* E.K. had seen a number of providers before Spayd and opioid treatment had not improved her pain or function. *Id.* at p. 55. E.K. “was not a candidate for ongoing use of opioids, particularly since she had already failed several years of treatment.” *Id.* at p. 57. Spayd nonetheless prescribed the same dosage of opioids for E.K. that she already had been receiving “and then escalated it from there.” *Id.* at pp. 56-57.

On E.K.’s first visit, Spayd prescribed methadone, which E.K. already had been prescribed and also “added Percocet or oxycodone” and “also added Valium and the muscle relaxant, Robaxin.” *Id.* at p. 59. Valium is a benzodiazepine. *Id.* at p. 59. The combination of an opioid like methadone and oxycodone; a benzodiazepine like Valium, and a muscle relaxant like Robaxin is known on the street as the “holy trinity,” which is “a very street popular abusive and addictive combination that is favored because it produces a heroin-like euphoria and has all the addiction concerns and dangers associated with heroin when

you use that combination." *Id.* at pp. 59-60.[9] This combination "predisposes to respiratory depression overdose and death" and is the subject of warnings from government agencies and medical organizations. *Id.* at pp. 60-61.

During the period when she was prescribing these drugs for E.K, Spayd learned that E.K. was drinking excessively. *Id.* at pp. 62-65. "Alcohol has an effect similar to benzodiazepines in the sense that it can cause sedation, respiratory depression and disproportionately affects the breathing leading to respiratory depression and death when combined with --with the opioids." *Id.* at p. 65. Spayd also had clear indications that E.K. was not acting rationally, and using methamphetamine, all of which made it imperative that Spayd stop prescribing dangerous medications. *Id.* at pp. 65-71. Spayd nonetheless continued to write prescriptions for methadone, oxycodone, and Valium. *Id.* at p. 72. And, despite Spayd's receipt of multiple warning letters from insurance companies, Spayd increased E.K.'s dosage until she was prescribing E.K. 1,424 morphine equivalents. *Id.* at pp. 72-73. E.K overdosed and died within ten days of her last visit to Spayd. *Id.* at p. 75.

In Spayd's trial, a jury unanimously found beyond a reasonable doubt that E.K. died as a result of her use of the methadone, oxycodone, and diazepam (generic Valium) that

---

[9] Spayd did not dispute "that between 2014 and 2019, [she] wrote 1,445 of these types of prescriptions [for the holy trinity combination], totaling 135,511 pills." Dkt. #310 at pp. 193-94.

Spayd prescribed, Dkt. #321 at p. 2; and that Spayd prescribed those controlled substances illegally, Dkt. #320 at pp. 7-8.[10]

**c. Additional Victims**

Spayd's treatment of patients fortunate enough to avoid death by overdose was similar to that she provided to those who perished. Some examples of Spayd's prescription practices for patients who survived, and thus were able to testify about their experience with Spayd, follows. Significantly, some of these patients were able to terminate their use of opioids once they began receiving treatment from providers other than Spayd.

J.H. suffered chronic pain from a back and rotator injuries, Dkt. 269 at p.135. When his treating physician relocated, J.H. began to see Spayd in January 2014. *Id.* at pp. 136-39. When J.H. "first went and saw Ms. Spayd, there was no physical, no check, no nothing, just looked at my medical records, and then that was it." *Id.* at p. 138. Spayd never conducted a physical examination of J.H. *Id.* at p. 141. J.H. described his visits to Spayd as follows: "I'd go in, I talked to her, she talks to me, she tells me about her, I tell her about me, and then, and then I would get my script and then that would be it." *Id.* at p. 140. J.H. testified that these conversations were "very little" about him "and then we would talk about, you know, her -- her situations and what might be going on in her life. And it was just kind of like a -- seemed more of a friend talking to a friend-type deal." *Id.* J.H. often

---

[10] CM/ECF pagination.

had to remind Spayd what his prescriptions were supposed to be because "[q]uite a bit of times I would get prescriptions that I shouldn't have been getting." *Id.*

On J.H.'s first visit to Spayd, she prescribed 15 milligrams of oxycodone six times a day. *Id.* at p. 146. Within two to three months, this increased to nine times a day. *Id.* Spayd continued this prescription until J.H. left her care in December 2018. *Id.* at p. 147, 176. J.H. became addicted. *Id.* at pp. 148-49. J.H. had difficulty getting his medication because some "pharmacists would not fill Ms. Spayd's prescriptions." *Id.* at p. 153. Because of this, J.H. changed medical providers. *Id.* at p. 182. His new doctor reduced his opioid prescription and within five months J.H. was no longer taking opioids. *Id.* at pp. 183-84.

L.M. was a patient of Spayd's for approximately ten years. Dkt. #279 at p. 10. Although Spayd's medical records reported physical examinations and diagnostic testing of L.M., these did not occur. *Id.* at 11-16. If Spayd was present during L.M.'s visits to the clinic, they would discuss "[w]hatever was going on in [Spayd's] life at the time." *Id*. at p. 11. When Spayd was not present, "[y]ou go in, you pay $25, you pick up your prescriptions, you walk out." *Id.* at p. 12. Although L.M. was taking opioids before she began seeing Spayd, her level of opioid use increased while under Spayd's care. *Id.* at p. 10. Spayd prescribed fentanyl, hydromorphone, and oxycodone, and Zanaflex, which is a muscle relaxant. *Id.* at pp. 10-11, 18.

L.M. also was taking Valium (a benzodiazepine) as prescribed by a mental health provider. Although Spayd was aware of this, *id.* at p. 17, L.M. did not remember Spayd ever telling her "that being on the Zanaflex, opioids and the benzodiazepine further increased [L.M's] chances of overdosing." *Id.* at p. 18. Spayd did not inform L.M. of two dozen warning letters that Spayd had received from L.M.'s insurance company concerning the dosages of opioids L.M. was taking. *Id.* at p. 25.

L.M. was addicted to the pills that Spayd prescribed. *Id.* at p. 19. L.M. described counting the opioid pills "everywhere you went to make sure you had enough when you were out, even if you were only gone two hours, you'd count them every day to make sure you had enough to run through the day. You count them every month to make sure you had enough to last the month." *Id.* at p. 26. L.M. described this as "crazy" and explained that "it ruled your life, how many pills you had." *Id.*

After Spayd's arrest. L.M. began to see a different provider. L.M.'s new provider testified that Spayd had L.M. on an unsafe level of opioids, *Id.* at p. 52, and that opioids were unnecessary for L.M.'s treatment, *id.* at pp. 49-50. When L.M. testified, she no longer was taking opioids. Her pain was managed by ibuprofen, ketamine injections, physical therapy, and a spinal stimulator. She testified that she had "very little pain" as a result of these treatments. *Id.* at p. 29.

E.R.V. had severe back pain and was taking opioids and probably addicted before being treated by Spayd. Dkt. #283 at pp. 39-41. Spayd immediately prescribed her opioids.

*Id.* at p. 43. Spayd did this after only a brief physical examination during which she touched E.R.V.'s back "a bit" while E.R.V. sat on a table. *Id.* at pp. 44-45. Throughout the next decade, Spayd prescribed her opioids. *Id.* at p. 45. E.R.V. was addicted to the opioids. *Id.*

Spayd never did any other physical examinations. *Id.* at p. 47. Despite that, Spayd's medical records documented examinations that had not occurred. *Id.* at pp. 47-48. In reality, E.R.V.'s office visits lasted five to ten minutes, part of which was devoted to discussing medical issues and the rest small talk. *Id.* at p. 52. When E.R.V. expressed concerns about high dosages, Spayd told her that her dosages were low compared to other patients. *Id.* at p. 51. When Spayd was not present, E.R.V. had to pay $25 to pick up a prescription. *Id.* at pp. 52-53.

After Spayd was arrested, E.R.V. stopped tasking oxycodone and Oxycontin, and a lower dose of morphine until she was done with that. Within two months, she was no longer taking any medications. *Id.* at pp. 54-55.

Former patient T.G. was referred to Spayd for treatment of migraine headaches and rejection sensitive dysphoria ["RSD"], which is emotional and physical pain triggered by real or perceived rejection, criticism, or failure. Dkt. #288 at p. 184-85. She was a patient of Spayd's for approximately 18 years. *Id.* at p. 184. Spayd either never or rarely conducted physical examinations and Spayd's medical records for T.G. contained fabricated descriptions of examinations. *Id.* at pp. 186-90, 192. Spayd and T.G. discussed medical matters on only about half of T.G.'s clinic visits. *Id.* at 185. Spayd nonetheless

prescribed fentanyl patches and fentanyl lollipops for T.G.'s migraines. *Id.* at pp. 185-86, 191-93. Over time, she prescribed 1,582 fentanyl lollipops for T.G. *Id.* at p. 193. Spayd never explained that migraines are not supposed to be treated with opioids. *Id.* at p. 207. Spayd did not attempt to reduce T.G.'s use of opioids. *Id.* at p. 190. When T.G. needed to pick up a prescription at the clinic and Spayd was not there, "her receptionist or secretary, whoever is there, [would] take your blood pressure, your temperature and your weight like they always do, and then you pay them $75 and they give you your prescriptions." *Id.* at 198-99. T.G. testified that when she changed physicians and began receiving medication other than fentanyl for her migraines, this saved her life "[f]rom fentanyl and Jessica [Spayd] and addiction." *Id.* at p. 203.

The son of S.J. testified that he brought his mother to appointments at the pain clinic. Dkt. #268 at p. 130-31. When Spayd was present, the visit would last three to four minutes and then a staff member would provide a written prescription. *Id.* at 131-32. Spayd was there roughly a third of the times that S.J. went to the clinic. Id. at p. 132. In 2017, S.J. developed dementia so her son accompanied her during interaction with Spayd. *Id.* at 132-33. Spayd did not do physical examinations of S.J. *Id.* at p. 133. Spayd was prescribing morphine tablets, fentanyl patches, Dilaudid (hydromorphone), and diazepam (Valium), as well as an amphetamine. *Id.* at p. 134-35. During these visits, Spayd did not discuss alternatives to opioids but did discuss her trip to Hawaii and ski trips. *Id.* at p. 135.

Family members of other Spayd patients described the years of harm caused to their loved ones by Spayd's prescription of excessive amounts of opioids and how their relatives recovered and escaped from addiction only after terminating treatment from Spayd. Dkt. #268 at pp. 186-95 (describing effect on her mother of Percocet and Xanax that Spayd prescribed, including "struggle[ing] with every day life"; losing job; making poor financial decisions; mixing up words; getting confused; and multiple hospitalizations); Dkt. #269 at pp. 15-21 (describing ex-wife being consumed by seeking and trading opioids).

**3. Warnings That Spayd Ignored**

Spayd's practice received warning letters from insurance carriers "frequently, every week" about Spayd's prescription of excessive amounts and dosages of opioids and dangerous mixtures of drugs. Dkt. #283 at pp. 105-06. The practice received four or five such letters every week. *Id.* at p. 107. At trial, the government introduced an exhibit consisting of over 2,400 pages of such letters. Exhibit 310; *see also* Exhibit 510 (example of letter warning of prescription of combination of an opioid analgesic, carisoprodol, and a benzodiazepine—the "Holy Trinity"—to a patients and explaining that "this combination has been subject to misuse; its strong abuse potential and additive central nervous system depressant effects may result in an increased risk of serious adverse drug events"); Exhibit 514 (example of letter warning of concomitant use of opioids and benzodiazepines" and instructing that patients should have "access to naloxone," which is used to reverse an opioid overdose); PSR ¶ 18 ("The investigation revealed that insurance companies sent

thousands of letters to Spayd addressing concerns they had regarding the number of opioids Spayd was prescribing."). Spayd's office staff put each of these letters in the front of the relevant patient's medical chart "to draw attention to [Spayd] to focus in on it." Dkt. #283 at p. 106. Spayd did not inform patients that she received these letters. Dkt. #279 at p. 25.

Pharmacies where Spayd's patients tried to fill her prescriptions attempted to contact Spayd, often unsuccessfully, to voice concerns. PSR ¶ 17 ("Numerous pharmacists throughout Alaska reached out to Spayd about their concerns of Spayd overly prescribing opioids and asked her to lower the dosages she prescribed to patients."). Some pharmacies stopped filling Spayd's prescriptions. Dkt. #268 at pp. 70-93, 124-25 (pharmacy at Joint Base Elmendorf in Anchorage, based on concerns about multiple instances of "high doses, such as when you equate them into the morphine milliequivalents, duplications of therapies, you know, with multiple pain controlled medications going to the same person, as well as "concerns about people's [sic] age . . . [a] some drug interactions," stopped filling Spayd's prescriptions); *id.* at pp. 162-68 (pharmacy at Fred Meyer, concerned about "fairly frequent early refills, prescriptions written, dated where it would be early but no indication to not fill until they were due; the quantities of the medications, the dosages that were being prescribed, the medications that were being prescribed" by Spayd, was able to successfully contact Spayd to discuss concerns less than a third of the time the pharmacy reached out despite over 100 efforts); Dkt. #269 at pp. 114-22 (pharmacy in Eagle River, where 25% of controlled substance prescriptions were from Spayd and which had a 1% success rate of

contacting her in approximately 100 attempts, refused to fill her prescriptions "[m]ultiple times per week"); *id.* at pp. 191-94 (grocery store chain had a policy of not filling Spayd's prescriptions, something not done with prescriptions from any other medical provider); *see also* PSR ¶ 17 ("By the end of 2018, pharmacy's [sic] including Safeway and Walmart, and the chief of pharmacy at Joint Base Elmendorf-Richardson (JBER), enacted policies prohibiting their pharmacists from filling Spayd's prescriptions because of her prescribing practices.").

In December 2018, Spayd expressed to a patient via text message how she felt about the pharmacists who would not fill her opioid prescriptions: "These pharmacists are f$&@ing my sh@t up!" GX 292.06. Rather than alter her prescription practices, "Spayd suggested to her patients they fill their prescriptions at different pharmacies in distant locations such as Fairbanks, and to rotate pharmacies to avoid detection." PSR ¶ 17.

**4. Illegal Prescriptions to an Undercover Officer**

In response to multiple complaints from physicians and pharmacists about Spayd's prescription practices, the DEA opened an investigation in 2018. Dkt. #298 at pp. 109, 113-14, 125. On May 9, 2019, an undercover task force officer posing as a drug seeking person sought oxycodone from Spayd at her clinic. *Id.* at pp. 116-18, 146. "The agent told Spayd that he had previously been purchasing 'blues' on the street (30 milligram of oxycodone), but that he wanted an oxycodone prescription so he could pass a urine drug screen for a new job." PSR ¶ 28. The undercover officer used slang terminology during

the visit and attempted to make it obvious that he was "a drug-seeking junkie." Dkt. #298 at pp. 118-19. Because traveling a long distance to see a specific doctor is a red flag that a person is drug-seeking, the undercover officer told Spayd that he could get prescriptions filled in Fairbanks. *Id.* at p. 126. He signed up for his initial visit to Spayd as a Suboxone patient, indicating that he was an addict. *Id.* at p. 123.

Spayd gave the undercover officer advice about how to avoid testing "dirty" during a drug test. *Id.* at p. 129. Although the undercover officer described past back pain, he did not state that he currently had back pain. *Id.* at pp. 135-36. Within ten minutes, Spayd told the undercover officer what she was going to prescribe for him. *Id.* at p. 119, 131-32. Spayd did not conduct a physical examination or examine his back, eyes, ears, nose, or throat. *Id.* at pp. 136-37. She never touched him. *Id.* at p. 137. Spayd nonetheless reported in her medical records that she did a physical examination during each of his visits. PSR ¶ 29.

On the first visit, Spayd provided a prescription for a six-day supply of oxycodone in exchange for $300 in cash. Dkt. #298 at pp. 138, 142. A few days later, on May 15, 2019, the undercover officer again visited Spayd and she doubled the dosage. *Id.* at pp. 133, 152, 156. On the undercover officer's next visit, he was told that Spayd was not present but there was a prescription waiting for him, for which the office staff requested a $25 fee. *Id.* at p. 156. On his fourth visit to the clinic, Spayd told him that the "DEA had visited the methadone clinic that she worked at and had been asking her boss a lot of

questions about her [so] she couldn't prescribe [him] oxycodone any more." *Id.* at p. 159. The agent received prescriptions for almost 200 opioid pills during the first three visits to Spayd's clinic, paying cash each time. PSR ¶ 28.[11]

**C. Indictment, Trial, Conviction, and Sentence**

On January 20, 2021, Spayd was charged in a superseding indictment with three counts of distributing and dispensing schedule II controlled substances resulting in death, in violation of 21 U.S.C. § 84l(a)(l) and (b)(1)(C) [Counts 1, 3 and 5]; and two counts of distributing and dispensing schedule II and schedule IV controlled substances resulting in death, in violation of 21 U.S.C. § 84l(a)(l), (b)(1)(c), and (b)(2) [Counts 2 and 4]. She also was charged with four counts of distributing and dispensing schedule II controlled substances, in violation of 21 U.S.C. § 84l(a)(l) and (b)(l)(C) [Counts 6 through 9]; and one count of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) [Count 10]. Dkt. #87.

Jury selection began on September 26, 2022. The jury was sworn on October 3, 2022. On October 28, 2022, after a trial involving 51 witnesses, the jury convicted Spayd

[11] Spayd also illegally prescribed oxycodone for her significant other by giving him prescriptions in the names of two people who were not patients of hers and were not aware that she did this. Spayd prescribed 4,590 oxycodone pills in this way and shared the pills with her significant other. When a pharmacist confronted Spayd, she initially lied, claiming that the prescriptions were for a long-time patient, but when the pharmacist expressed his disbelief, Spayd begged him not to report her conduct to the DEA. PSR ¶ 27.

on all counts. Dkt. #314. In June 2023, the district court imposed a 30-year term of imprisonment followed by a three-year supervised release term. Dkt. #369.

**D. New Trial Order**

Spayd appealed. While her appeal was pending, on July 8, 2024, the Judicial Council of the Ninth Circuit made public its order in *In re Complaint of Judicial Misconduct*, No. 22-90121, finding that Joshua M. Kindred, the district court judge who presided over Spayd's trial and sentenced her, created a hostile work environment for his law clerks.[12] One of these clerks had become an Assistant United States Attorney ["AUSA"] in the United States Attorney's Office for District of Alaska ["USAO"] shortly before Spayd's trial began. Without government opposition, Spayd moved the Court of Appeals for the Ninth Circuit to remand her appeal to the district court so that she could file a new trial motion challenging Kindred's failure to recuse himself from her case. After her remand motion was granted, Spayd moved the district court for a new trial.

On October 6, 2025, the district court ordered a new trial upon finding that Kindred committed error by failing to recuse himself, in violation of 28 U.S.C. § 455(a) and due process. Dkt. #505 at pp. 22-25. The court's finding of error rested on two grounds. First, the Kindred clerk who later became an AUSA continued to work on the *Spayd* case while still a clerk but after "applying for and accepting employment with the USAO." *Id.* at p. 22. The government acknowledged that this required Kindred's recusal from Spayd's

[12] Kindred resigned from the bench in July 2024.

case under 28 U.S.C. § 455(a). *Id.* Second, after this law clerk became an AUSA, she had personal and sexual entanglements with Kindred and exchanged text messages with him about both these entanglements and the *Spayd* trial while the trial was ongoing. *Id.* at pp. 22-23. None of this was known by or disclosed to the litigants. The district court further found that these failure-to-recuse errors were not harmless. *Id.* at pp. 23-24.

Although the district court found "that there is-at the very least-an appearance of bias or prejudice by Judge Kindred"; "an unconstitutional potential for bias"; and "that the average judge in Judge Kindred's position was not likely to be neutral," *id.* at p. 23, it did not address whether any of Kindred's decisions during trial unfairly prejudiced Spayd.

### E. Plea Agreement and Guilty Plea

On March 30, 2026, Spayd entered into a plea agreement under Fed. R. Crim. P. 11(c)(1)(C) with the government. Dkt. #548. Spayd agreed to plead guilty to Counts 1, 3, and 5 of the superseding indictment, each charging her with knowingly, intentionally, and unlawfully distributing and dispensing schedule II controlled substances, thereby resulting in a victim's death, with one victim identified in each count, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) and 18 U.S.C. § 2(b). The agreement further provided in part "that a term of imprisonment not less than 20 years and not more than 30 years is an appropriate disposition for this case" and expressed the parties' intent "to be bound by that agreement without regard to the advisory sentencing guideline range as determined by the Court at sentencing." Spayd also agreed to orders of forfeiture and restitution the same as

those imposed when she initially was sentenced, and a $300 special assessment. The agreement further provided for the government to move to dismiss the remaining counts in the superseding indictment after sentence is imposed.

On April 7, 2026, Spayd pleaded guilty under the terms of the agreement before the Honorable Matthew McCrary Scoble. Dkt. #553. On August 4, 2026, this Court accepted Spayd's guilty plea. Dkt. #567.

## F. Sentencing Guidelines Computation

### 1. Applicable Guidelines Manual and 2026 Amendments

The government concurs with the USPO that the 2025 Federal Sentencing Guidelines Manual applies to Spayd's sentencing. *See* PSR ¶ 36; U.S.S.G. § 1B1.11(a) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). But the government further recommends that the Court apply the 2026 guidelines amendments to Part D of Chapter Three, specifically, the guidelines rules for calculating an offender's offense level when there are multiple counts of conviction. These amendments became effective November 1, 2026. *See* Amendment 840. As explained below, application of the amended version of U.S.S.G. § 3D1.1 yields a result consistent with the USPO's recommended treatment of Spayd's three counts of conviction.

Finally, the government notes that under the 2026 amendments, former U.S.S.G. § 2D1.1(b)(16) has been renumbered as U.S.S.G. § 2D1.1(b)(15). *See* Amendment 837. This renumbered guideline is discussed below.

### 2. Multiple Counts: U.S.S.G. § 3D1.1(a) (2026)

Under the 2026 version of U.S.S.G. § 3D1.1(a), "[i]f there are multiple counts to which the same guideline applies and the guideline is [one listed in this subsection], determine the offense level applicable to these counts using the combined offense behavior taken as a whole." Here, the same Chapter Two guideline—U.S.S.G. § 2D1.1—applies to all three of Spayd's counts of conviction and that provision is listed in the amended U.S.S.G. § 3D1.1(a). As a result, Spayd's "combined offense behavior taken as a whole" is used to determine her offense level. This is consistent with the determination the USPO reached by applying the pre-amendment version of the guidelines rules for multiple counts. *See* PSR ¶ 37.[13]

As discussed below, however, this approach, although correct under the 2026 amendment, does not account for the fact that Spayd was convicted by her guilty plea of criminal conduct that resulted in harm to three victims, namely their overdose deaths, not just one. Although U.S.S.G. § 3D1.1(a) does not take into account harm to multiple victims, the Court can and should consider all the harm that Spayd's criminal conduct caused when applying the sentencing factors in 18 U.S.C. § 3553(a) to impose a term of imprisonment.

---

[13] Accordingly, the government withdraws the objection described at page 1 of the PSR Addendum.

### 3. Base Offense Level : U.S.S.G. § 2D1.1(a)(2)

The government concurs with the USPO's determination that Spayd's base offense level under U.S.S.G. § 2D1.1 is 38. PSR ¶¶ 38, 39. Spayd was "convicted of an offense under [21 U.S.C. § 841(b)(1)(C)] to which the statutory term of imprisonment of not less than 20 years to life applies." U.S.S.G. § 2D1.1(a)(2). Specifically, 21 U.S.C. § 841(b)(1)(C) provides in part that for a violation of 21 U.S.C. § 841(a)(1) "[i]n the case of a controlled substance in schedule I or II . . . if death or serious bodily injury results from the use of such substance [the defendant] shall be sentenced to a term of imprisonment of not less than twenty years or more than life."

### 4. Maintaining a Premises for the Purpose of Illegally Distributing Controlled Substances: U.S.S.G. § 2D1.1(b)(12)

The government concurs with the USPO's determination that Spayd's offense level should be increased two levels under U.S.S.G. § 2D1.1(b)(12) because she maintained the clinic she operated "for the purpose of . . . distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12); *see* PSR ¶¶ 40, 41. The application note to this provision provides in part that:

> [D]istributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for . . . distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. § 2D1.1, cmt. n.17.

Spayd's use of the clinic to routinely distribute and dispense controlled substances through prescription satisfies this standard.

**5. Abuse of Position of Trust/Special Skill: U.S.S.G. § 3B1.3**

The government concurs with the USPO's determination that Spayd's offense level should be increased two levels under U.S.S.G. § 3B1.3 because she "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." PSR ¶ 44. The USPO apparently relied on both Spayd's abuse of a position of trust—describing her state licensure as an Advanced Nurse Practitioner and her DEA registration as the means by which she illegally prescribed drugs—and her use of a special skill—explaining that Spayd "used her medical training, licensure, and DEA registration to facilitate the instant offense." PSR ¶ 45.

**6. Vulnerable Victims: U.S.S.G. § 3A1.1(b)(1)**

The guidelines provide for a two level increase to the offense level "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). This enhancement applies where "a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant

Conduct) . . . is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3B1.1, cmt. n.2.[14]

"A victim is 'unusually vulnerable' when she is less able to resist than the typical victim of the offense of conviction." *United States v. Nielsen*, 694 F.3d 1032, 1034 (9th Cir. 2012) (internal quotation marks and citation omitted). But "[i]f the factor that makes the victim vulnerable is not 'unusual' for victims of the offense, the § 3A1.1(b) enhancement is not permitted." *United States v. Castaneda*, 239 F.3d 978, 981 (9th Cir. 2001). "The appellate courts have consistently refused to find a class of victims to be particularly susceptible to criminal conduct simply because they were statistically more likely to fall prey to the defendant's crime." *United States v. Castellanos*, 81 F.3d 108, 110-11 (9th Cir. 1996). "Instead, the victims to whom § 3A1.1 applies are those who are in need of greater societal protection." *Id.* at 111.

Out-of-Circuit decisions "have held that drug addiction is not enough, standing alone, to serve as the basis for this enhancement." *United States v. Guidry*, 817 F.3d 997, 1009 (7th Cir. 2016) (citing decisions). *Guidry* found that the district court had correctly

---

[14] Before November 1, 1995, an application note to this guideline provided in part that "[t]his adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant." U.S.S.G. §3A1.1, cmt. n.1; *see also United States v. Singh*, 54 F.3d 1182, 1191 (4th Cir. 1995) (describing targeting requirement); *United States v. Gary*, 18 F.3d 1123, 1128 (4th Cir. 1994) (explaining that "the defendant must have initially chosen his victim because of her particular vulnerability" because "[t]he enhancement relates to the conduct of the defendant and should not be associated with the severity of the victim's suffering"). But this application note and the targeting requirement that it described were removed from the federal sentencing guidelines effective November 1, 1995. *See* Amendment 521.

applied the § 3A1.1(b)(1) enhancement "not simply because [the female victim] was an addict, but because Guidry preyed on her addiction in order to force her to engage in sexual acts," thereby "appropriately consider[ing the victim's] individual situation." *Id.*; *see also* *United States v. Reeves*, 797 Fed. App'x 759, 761 (4th Cir. 2020) ("While drug addiction alone may not make a victim vulnerable . . . addiction coupled with additional, appropriate findings regarding the victim's situation can be sufficient.").

Spayd well knew that at least two of the three victims named in counts of conviction—J.L. and B.S.—had personal characteristics in addition to opioid addiction that made them susceptible to Spayd's overprescription of schedule II controlled substances outside the usual course of professional practice and without a legitimate medical purpose, and thus made them "vulnerable victims" within the meaning of U.S.S.G. § 3A1.1(b)(1). Specifically, as documented in Spayd's medical charts, these two victims of her illegal distribution and dispensing of opioid prescriptions resulting in death were unusually vulnerable due to physical and/or mental health challenges (and in B.S.'s case, age).

J.L., the victim whose fatal overdose is charged in Count 1, suffered from alcohol abuse, and "significant mental health comorbidities," such as depression and anxiety, and had a history of both suicide attempts and "multiple prior overdoses with pain medication," all as documented in Spayd's medical records.[15] J.L.'s mental health history and mental

---

[15] Trial testimony of Dr. Timothy King on October 12, 2022, Dkt. #275 at pp. 23-24.

health status at the time of her overdose were thus known to Spayd, and made J.L. particularly susceptible to overdose death resulting from Spayd's dispensing/distribution of controlled substances.

B.S., the victim whose fatal overdose is charged in Count 3, was 74 years old and struggled with "comorbid illnesses and psychosocial and mental health risk factors [including] hypertension [and] chronic obstructive lung disease," requiring supplemental oxygen.[16] B.S. had a history of running out of medication early, borrowing controlled substances from others, and used another person's urine for a urine screen.[17] Other urine screens showed the absence of prescribed medications and the presence of unprescribed medications.[18]

Although the USPO acknowledges that these fatal overdose victims had these personal characteristics, it nonetheless rejected application of U.S.S.G. § 3B1.1(b)(1), reasoning that "while these individuals were generally vulnerable, there is no indication that their individual vulnerabilities made them particularly susceptible to the specific criminal conduct in this case." PSR ¶ 43. But, coupled with drug addiction, each of these victims suffered from mental and physical health conditions that made each uniquely

---

[16] Trial testimony of Dr. Timothy King on October 17, 2022, Dkt. #299 at pp. 37-38.

[17] *Id*. at p. 39.

[18] *Id.*

susceptible to exploitation. These patients desperately needed proper medical assistance and were more likely than the general population to accept Spayd's method of treatment—excessive prescription of opioids—without question or objection and without seeking treatment elsewhere. *See United States v. Chang Ru Meng Backman*, 817 F.3d 662, 670-71 (9th Cir. 2016) (explaining that "an unusually vulnerable victim is one who is less able to resist than the typical victim of the offense of conviction.") (internal quotation marks and citation omitted).

**7. Aggravating Role: U.S.S.G. § 3B1.1(c)**

The guidelines provide for an additional two level increase under U.S.S.G. § 3B1.1(c) "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than [that which involved five or more participants or was otherwise extensive]." Such an increase requires that a defendant have organized, led, managed, or supervised other criminally responsible participants, U.S.S.G. § 3B1.1, cmt. nn.1, 2, which includes responsibility for relevant conduct under U.S.S.G. § 1B1.3, *see* U.S.S.G. § 1B1.1, cmt., n.1(H) (explaining that the term "offense" includes relevant conduct under U.S.S.G. § 1B1.3). Here, trial testimony showed that Spayd, at the minimum, "was an organizer, leader, manager, or supervisor in any criminal activity" involving multiple participants, requiring an increase of at least two levels under U.S.S.G. § 3B1.1(c).

Specifically, Sarah Fountain, a former employee of Eagle River Wellness, Spayd's medical clinic, testified that in response to "pressure" from Spayd, she and other

employees, three of whom Fountain named when she testified, signed prescriptions for opioids and other controlled substances for patients and assisted Spayd in preparing prescriptions for Spayd to sign so that non-medical employees of the practice could illegally provide prescriptions to patients when Spayd was not present in the office (and sometimes when she was present), including in 2015 when Spayd was in California for over a month.[19] When Spayd was in town but absent from the medical clinic, employees took prescriptions that had been prepared in advance to Spayd's residence for her to sign without having examined the patients who would receive the prescriptions.[20] Patients were charged a cash fee for these prescriptions that were issued without a medical appointment.[21] Patients testimony confirmed that when Spayd was not present at the clinic, they received prescriptions from staff members and were required to pay a fee. These employees, whom Spayd managed and supervised (and arguably organized and led), were criminally responsible participants as principals and aiders and abettors in the illegal distribution and dispensation of controlled substances. *See United States v. Fearnow*, 468 F. App'x. 466,

---

[19] Trial testimony of Sarah Fountain on October 16, 2022, at Dkt. #283, pp. 74-76, 81.

[20] *Id.* at pp. 78-79.

[21] *Id*. at p. 79; *see also* PSR ¶ 19 ("The investigation revealed Spayd pre-signed and predated prescriptions for periods when she would be out of town. In addition, there were times where Spayd instructed her office staff to sign her signature on opioid prescriptions when Spayd was not in the office. The prescriptions were handed out to patients for a cash 'prescription pickup fee.'").

468-69 (6th Cir. 2012) (applying U.S.S.G. § 3B1.1 enhancement when sentencing physician who used employees and interns to illegally issue prescriptions to patients).

The USPO nonetheless rejected application of the aggravated role enhancement, apparently because it concluded that the members of Spayd's administrative staff were not criminal "participants" in Spayd's illegal distribution and dispensation of controlled substances. Although the USPO acknowledged that Spayd "undoubtedly directed others to dispense controlled substances in an unauthorized manner," it reasoned that "[i]t is not . . . clear that [the administrative staff members who signed prescriptions when Spayd was away] acted knowingly and intentionally *outside the usual course of professional practice*, particularly in light of testimony indicating that these actions were undertaken in furtherance of the clinic's usual operations." PSR Addendum (emphasis added).[22] This ground for rejection of the enhancement confuses Spayd's liability with that of her non-DEA registrant staff members.

Because Spayd was a DEA registrant, she was "authorized" by subchapter I of Title 21 to distribute or dispense controlled substances unless she "knowingly or intentionally acted in an unauthorized manner," *Ruan v. United States*, 597 U.S. 450, 468 (2022), by providing prescriptions outside the usual course of professional practice and without a legitimate medical purpose. But although Title 21 "excepts, for example, licensed

[22] Only the first page of the PSR Addendum is paginated.

professionals such as dentists, veterinarians, scientific investigators, and pharmacists from the prohibition on dispensing controlled substances," *id.* at 462-63, when they act within the Act's authorization, it did not similarly exempt Spayd's non-registrant office staff. Unlike Spayd, they were not "authorized" to prescribe controlled substances under any circumstances. Thus, by writing prescriptions at Spayd's direction, the staff members violated 21 U.S.C. § 841(a)(1) even if doing so was "undertaken in furtherance of the clinic's usual operations" and even if the prescriptions would have been consistent with legitimate medical practice if written by an authorized provider. In short, it is a violation of Title 21 for a non-DEA registrant to prescribe a controlled substance under any circumstances, including by forging a registrant's signature. Nor is there doubt that the staff members acted knowingly and intentionally when they illegally distributed and dispensed controlled substances in this manner. Fountain testified that she knew it was wrong.[23] And defense witness Nicole Lenaghen testified that that the practice made her mad "[b]ecause . . . I didn't think it was okay to do,"[24] that it made her uncomfortable, and she took steps to end it.[25] In short, by having staff members sign controlled substance

---

[23] Trial testimony of Sarah Fountain on October 16, 2022, at Dkt. #283, pp. 74-75.

[24] Trial testimony of Nicole Lenaghen on October 19, 2022, at Dkt. #293, pp. 106.

[25] *Id.* at pp. 128-29.

prescriptions for patients in her absence, Spayd was an "organizer, leader, manager, or supervisor in . . . criminal activity" in which her staff members illegally participated.[26]

### 8. Drug Distribution to an Elderly, Pregnant, or Unusually Vulnerable Person: U.S.S.G. § 2D1.1(b)(15)(B) (2026)

Under U.S.S.G. § 2D1.1(b)(15)(B) (2026), a two-level enhancement applies where a defendant (a) receives an upward adjustment under U.S.S.G. § 3B1.1; and (b) "knowing that an individual was (i) less than 18 years of age, (ii) 65 or more years of age, (iii) pregnant, or (iv) unusually vulnerable due to physical or mental condition or otherwise particularly susceptible to the criminal conduct, distributed a controlled substance to that individual or involved that individual in the offense."

All of the requirements for application of this enhancement are satisfied here. As noted above, trial testimony from Sarah Fountain and Nicole Lenaghen establish that the U.S.S.G. § 3B1.1 precondition is satisfied, namely that an upward adjustment for an aggravated role in the offense is warranted. *See* pages 40-44, *supra*. It is true that the USPO reached a contrary conclusion, determining that the U.S.S.G. § 3B1.1 aggravated

[26] In a letter to the USPO, Spayd's counsel contested the aggravated role enhancement by describing what counsel characterized as a "conflict" between the Sarah Fountain testimony and testimony from defense witness Nicole Lenaghen. PSR Addendum. But Lenaghan's testimony did not conflict with Fountain's testimony or otherwise exonerate Spayd from application of the aggravated role enhancement. Although Lenaghan denied that there was a "policy" for staff members to sign prescriptions, she testified that she had done this "on just a couple of occasions" when Spayd was "home not feeling well," Dkt. #293 at pp. 85-86, and further acknowledged that she did not know how many times other staff members had signed prescriptions. *Id.* at p. 102. The USPO did not adopt this defense argument.

role adjustment is not applicable and therefore that the precondition for what now is U.S.S.G. § 2D1.1(b)(15)(B) (and formerly was U.S.S.G. § 2D1.1(b)(16)) is not satisfied. PSR Addendum. But, as explained above, this conclusion by the USPO concerning U.S.S.G. § 3B1.1(b) rests on a misunderstanding of the basis for liability of Spayd's staff members as "participants" in her criminal scheme. *See* pages 42-44, *supra*. Because the staff members were participants, the aggravated role enhancement in U.S.S.G. § 3B1.1 does apply, and thus this precondition to U.S.S.G. § 2D1.1(b)(15)(B) (2026) is satisfied.

The other requirements for application of U.S.S.G. § 2D1.1(b)(15) (2026) also are present here. This is because at least one person to whom Spayd distributed controlled substances through prescriptions had at least one of the following personal characteristics, all of which were known to Spayd because of her treatment of such persons as patients:[27]

- **65 years old or older:** B.S. and L.D., two patients whose fatal overdoses resulted from Spayd's illegal proscription of opioids, were 74 and 71 years old, respectively, when they died. *See* pages 14, 16, *supra*.
- **Pregnant:** According to the USPO:

> [I]nvestigation and testimony at trial showed that the defendant prescribed opiates to at least one victim-patient, J.S., whom the defendant knew was

[27] If this enhancement applies, the Court should not also apply the vulnerable victim enhancement in U.S.S.G., § 3A.1.1(b)(1). *See* U.S.S.G. § 2D1.1, cmt. n.20(A)(2026) ("If the defendant distributes a controlled substance to an individual or involves an individual in the offense, as specified in subsection (b)(15)(B), the individual is not a 'vulnerable victim' for purposes of §3A1.1(b),"). If, however, the Court decides that U.S.S.G. § 2D1.1(b)(15)(B) (2026) does not apply, the above-described application note would not foreclose application of U.S.S.G. § 3A1.1(b)(1).

> pregnant while under her care, and whom the defendant knew or should have known was abusing opiates, placing those prescriptions outside the appropriate standard of medical care. Investigation and trial testimony showed that J.S. suffered at least three miscarriages while under the defendant's care.

PSR ¶ 43.

- **Unusually Vulnerable:** As explained at pages 36 to 40, *supra*, patients J.L. and B.S., both of whom died as a result of overdoses caused by Spayd's prescription of controlled substances for them, were unusually vulnerable due to their physical and mental health challenges and therefore were uniquely susceptible to Spayd's criminal prescription of opioids. Spayd was well aware of this as their medical provider.[28]

**9. Timely Acceptance of Responsibility**

If, at the sentencing hearing, Spayd continues to demonstrate acceptance of responsibility for her criminal conduct, her offense level should be decreased by two levels under U.S.S.G. § 3E1.1(a). In that event, the government intends to move for an additional one-level decrease under U.S.S.G. § 3E1.1(b) to credit Spayd for timely notifying the government of her intent to plead guilty.

---

[28] If this enhancement applies, the Court should not also apply the vulnerable victim enhancement in U.S.S.G. § 3A1.1(b)(1). *See* U.S.S.G. § 2D1.1, cmt. n.20(A) (2026) ("If the defendant distributes a controlled substance to an individual or involves an individual in the offense, as specified in subsection (b)(15)(B), the individual is not a 'vulnerable victim' for purposes of §3A1.1(b),"). If, however, the Court decides that U.S.S.G. § 2D1.1(b)(15)(B) (2026) does not apply, the above-described application note does not foreclose application of U.S.S.G. § 3A1.1(b)(1).

### 10. Sentencing Guidelines Computation

As described above, the following sentencing guidelines apply here (with the entries in bold recommended by the USPO):

| | | |
|---|---|---|
| **Base offense level** | **U.S.S.G. § 2D1.1(a)(2)(A)** | **38** |
| **Premises for illegal drug distribution** | **U.S.S.G. § 2D1.1(b)(12)** | **2** |
| **Abuse of position of trust** | **U.S.S.G. § 3B1.3** | **2** |
| Aggravated role in offense | U.S.S.G. § 3B1.1(c) | 2 |
| Vulnerable victims; or | U.S.S.G. § 3A1.1(b)(1) | |
| Distribution to a pregnant woman, person 65 or older, or susceptible victim | U.S.S.G. § 2B1.1(b)(15)(B)(iii) (2026) | |
| **Acceptance of responsibility** | **U.S.S.G. § 3E1.1(a)** | **-2** |
| **Timely notice of intent to plead guilty and government motion** | **U.S.S.G. § 3E1.1(a)** | **-1** |
| Total offense level | | 43 |

However, the government brings to the Court's attention a message the government sent to defense counsel on March 12, 2026, in which it proposed a case settlement agreement. In the message, government counsel estimated that if Spayd were to plead guilty to three counts charging illegal drug distribution causing overdose death counts—which she has done—her total offense level would be 40, which would yield an imprisonment range of 262 to 360 months.[29] The government's estimate, which it then believed to be correct, was derived from the post-trial PSR, which applied a different

[29] The upper end of the range in the guidelines sentencing table for an offense level of 40 and a criminal history category of I is *365* months, but the government's estimate incorporated a proposed 360-month cap on Spayd's prison term.

"grouping" analysis, and did not include offense level enhancements for Spayd's aggravated role in the offense, Spayd having illegally prescribed controlled substances to a pregnant woman, or the vulnerability of Spayd's victims.[30]

Although such an estimate is likely not binding on the government here,[31] in the interest of fairness and to avoid appellate litigation, the government nonetheless recommends that the Court determine that the applicable advisory guidelines imprisonment range here is 40, based on the government's estimate. (The USPO has recommended a post-acceptance-of-responsibility offense level of 39. PSR ¶¶ 50, 91.) An offense level of 40, coupled with a criminal history category of I, yields an imprisonment range of 262 to 365 months.

---

[30] Nor did it include credit for acceptance of responsibility.

[31] In the Second Circuit, written government guidelines estimates during plea negotiations are known as "*Pimentel* letters." *See United States v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991). Such estimates are not binding. *United States v. Gilmore*, 599 F.3d 160, 162 (2d Cir. 2010); *see also United States v. Allen*, 644 F. Supp. 2d 422, 430 (S.D.N.Y. 2009) ("However, a *Pimentel* letter is not a binding contract between the defendant and the Government and the estimated sentencing range discussed in the letter does not represent a bargained-for sentence."). Spayd's plea agreement makes no mention of an agreed-upon or estimated sentencing guidelines range or offense level. Nor was there discussion of an agreed-upon or estimated guidelines range or offense level at Spayd's change of plea hearing. At the hearing, while represented by counsel, Spayd stated under oath that no one promised or guaranteed her anything to get her to plead guilty other than what was discussed on the record and stated in her plea agreement,. Dkt. #563 at p. 23 (transcript of change of plea hearing).

## G. Section 3553(a) Sentencing Factors and Sentencing Recommendation

Whether the Court adopts the USPO's determination of Spayd's offense level (39) or the government's determination (40), or determines that a different offense level applies,[32] the government joins the USPO recommendation that the Court impose a 360-month (30 year) term of imprisonment. For a number of reasons, such a term is "sufficient, but not greater than necessary" to satisfy the need for Spayd's sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). Such a sentence also would be consistent with "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.*, at (a)(1), and avoid unwarranted sentencing disparity, *id.* at (a)(6). This is true for the following reasons:

First, unless the sentencing guidelines, as calculated by the Court, provide for a 360-month term of imprisonment, which is the upper end of the imprisonment range permitted under the plea agreement, they do not adequately account for Spayd's criminality. A guidelines base offense level of 38, which applies here, does not accurately reflect the severity of the harm—multiple overdose deaths—that Spayd's criminal conduct wrought. If Spayd's illegal distribution and dispensation of opioid prescriptions had caused a *single*

---

[32] There is no dispute that Spayd is in criminal history category I. Because Spayd's offenses of conviction resulted in death, she is not eligible for a two-level reduction under U.S.S.G. § 4C1.1. *See id.* at (a)(4).

life-threatening overdose, *even one not fatal*, her base offense level would have been the same level 38. The triggering requirement for this base offense level under U.S.S.G. § 2D1.1(a)(2) is conviction for an offense under 21 U.S.C. § 841(b)(1)(C) with a statutory imprisonment range of 20 years to life. This range is triggered where an offender distributes or dispenses a schedule I or II controlled substance and "death *or serious bodily injury* results from the use of such substance." 21 U.S.C. § 841(b)(1)(C) (emphasis added). And even a non-fatal overdose, if life-threatening, can by itself qualify as "serious bodily injury." *See* 21 U.S.C. § 802(25)(A) ("The term 'serious bodily injury' means bodily injury which involves . . . a substantial risk of death."); *United States v. Wendel*, No. 24-4606, 2026 WL 2455134, at *2 (9th Cir. Aug. 21, 2026) ("Here, Velasquez's overdose meets the definition of 'serious bodily injury' based on the evidence, including the amount of Narcan needed to revive him.").

Accordingly, Spayd's base offense level of 38 does not account for the fact that her illegal prescription of schedule II controlled substances caused not merely a single life-threatening overdose, but instead multiple overdoses, at least five of which were fatal (as a unanimous jury found beyond a reasonable doubt), with three of these being encompassed by Spayd's guilty plea. As the USPO has aptly explained: "The harm wrought by the defendant is incalculable – to the literal extent that the U.S. Sentencing Guideline implicated to establish the offense level for the defendant's crimes is structurally incapable of accounting for all of the deaths that the defendant caused." PSR at p. 3.

To sentence Spayd as if she is responsible only for only a single dangerous overdose would create unfair disparity by treating Spayd the same as an offender whose crime is far less harmful, such as a drug addict who causes an overdose by sharing drugs with an associate. Thus, consideration of "the nature and circumstances of the offense," and the need of Spayd's prison term "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as deter others who might commit crimes like Spayd's, the Court should impose an imprisonment term at the upper end of what Spayd's plea agreement permits, even if this requires a variance above the applicable guidelines range.[33]

Second, and similarly, Spayd's base offense level of 38 does not account for her illegal distribution and dispensation of *over four million* dangerous and addictive opioids to approximately *500 people over a more than five-year period*. The USPO determined that Spayd illegally prescribed opioid pills with a converted drug weight of 31,259 kg. PSR ¶ 39; *see also* PSR ¶ 107, Factor 1 ("These deaths occurred in the context of a much broader and extended course of conduct during which the defendant prescribed nearly 4.5 million opioids to approximately 506 patients throughout Alaska, far exceeding medical norms and directly resulting in at least five deaths"). Spayd's illegal prescription of this enormous

---

[33] It also merits mention that Congress has decided that a 20-year prison term is the *minimum* required for a defendant whose illegal drug distribution causes a single overdose involving serious bodily injury or death. Given the extent and nature of Spayd's long-term criminality, any term that is not substantially greater than that minimum would fly in the face of Congressional intent.

quantity of opioids alone, without regard to overdoses, fatal or non-fatal, would result in a base offense level of 36. U.S.S.G. § 2D1.1(c)(2). Further, the overall quantity of the opioids that Spayd illegally prescribed fails to reflect the damage that her prescription of excessive doses and dangerous combinations of drugs, all contrary to well-accepted medical guidance, PSR ¶ 16, caused to each of her many patients. Accordingly, Spayd's base offense level of 38 is an insufficient measure of her extensive, multi-faceted, and long-running criminality. Thus, the same sentencing factors described above—the nature and circumstances of Spayd's crimes, the need for just retribution and punishment (including to vindicate the damage done to victims), promotion of respect for the law, and general deterrence—all weigh in favor of a 30-year prison sentence.

Third, when considering "the history and characteristics of the defendant," the Court should note that Spayd, who was a trained and licensed [a]dvanced nurse practitioner who was aware of the medical risks implicated by her prescribing practices," PSR ¶ 107, Factor 1, ignored literally thousands of warnings that her illegal conduct was causing significant harm to her patients. Spayd received written warnings from insurance companies and pharmacists, complaints and expressions of concern from patients and their family members, and reports from patients of their declining health without improvement in the quality of their lives or their function.[34] Although Spayd "contemplated the possibility that

[34] "Between 2014 and 2019, at least thirty-six of Spayd's patients died and agents noted that this was "an 'astronomically high number' for a pain management practitioner." PSR ¶ 20.

her criminal acts might be detected by the DEA," *id.*, she nonetheless chose to ignore all these red flags. She disregarded the insurance letters that her employees placed in patient files so that she would see them, and thus chose not to reduce dosages or avoid toxic mixtures of drugs that she prescribed to unwitting patients. Telephone calls from pharmacies went unanswered and instead of heeding these warnings, Spayd "advised patients on methods to evade pharmacy policies developed to block her own hazardous prescriptions from being filled." *Id.* As the USPO put it, Spayd "killed multiple people without any apparent qualms." PSR at p. 3. Instead, Spayd was concerned only about getting caught. She would ask members of the clinic staff whether they thought any new patient was a DEA agent. Dkt. #283 at p. 117.

Fourth, Spayd engaged in related criminality and wrongdoing. She "pressured" clinic employees to commit crimes by filling out prescriptions when she was absent from the clinic and to charge a fee when patients picked up those prescriptions. She falsified patient medical records. She completed and signed prescriptions in advance for her staff to give to patients in her absence, thereby prescribing schedule II controlled substances without any evaluation or other contact with patients to assess their condition. She coached an undercover DEA agent about how to defeat a urine test. She lied to a pharmacist and DEA agents about prescriptions she wrote in a false names to help feed her significant other's opioid habit and falsely denied to DEA agents that she knew the significant other. PSR ¶ 31.

Fifth, the USPO-recommended 360-month prison term aligns with sentences that other federal courts have imposed in cases involving factually similar offenses of the same (and lesser) severity; a shorter prison term would not. *See* 18 U.S.C. § 3553(a)(6) (proving that a sentencing court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). Examples of sentences imposed in federal cases involving criminal conduct less culpable and dangerous than Spayd's follow: *United States v. Volkman*, 797 F.3d 377 (6th Cir. 2015) (rejecting challenge to multiple life terms of imprisonment for physician who dispensed opioid prescriptions outside ordinary course of medical practice and for no legitimate purpose and thereby caused four fatal overdoses); *United States v. Webb*, 655 F.3d 1238 (11th Cir. 2011) (physician sentenced to life in prison after conviction on multiple counts of unlawful distribution, including three overdose deaths, as well as wire fraud and health care fraud); *United States v. O'Brien*, 738 Fed. App'x 38 (3d Cir. 2018) (district court imposed a 360-month sentence for physician who was convicted of illegally dispensing schedule II and other drugs over a three-year period, thereby causing a single overdose death); *United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013) (affirming as reasonable a 30-year prison term for a physician who illegally dispensed schedule II controlled substances causing one overdose death); *United States v. Lang*, 717 Fed. App'x 523 (6th Cir. 2017) (affirming 3,360-month sentence for a defendant, not a medical professional, who operated a "pill mill" out of a pain clinic; no conviction for overdose deaths).

Indeed, a 360-month prison term is necessary here to avoid unwarranted disparity with other defendants with similar records who recently have been sentenced in the District of Alaska for similar offenses involving less egregious and harmful criminality. Specifically, the government urges the Court to consider *United States v. Sean Mobley*, 3:25-CR-00044-001 TMB ["*Mobley*"] and *United States v. Jacob Cotton*, 1:25-CR-00002-TMB ["*Cotton*"].

Mobley was a drug dealer, who, over a two-day period in 2024, while believing that he was distributing fentanyl, distributed carfentanil, a highly potent synthetic opioid used to sedate large animals like elephants. Two people to whom Mobley distributed small user amounts of carfentanil—one of whom received .25 grams through an intermediary for $100—used the drug and overdosed. Although one was revived, the user to whom Mobley supplied the drug directly, who was 16 years old, died after Mobley was unable to locate Narcan and abandoned her. *Mobley*, Dkt. #33 (plea agreement) at pp. 6-7. Mobley pled guilty to two counts of illegal distribution of a controlled substance causing death or serious bodily injury, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). *Id.* at Dkt. #59 (district court's acceptance of guilty plea). Mobley was in criminal history category I. *Mobley* PSR at ¶ 69. On January 22, 2026, the district court imposed a 360-month term of imprisonment. *Mobley*, Dkt. #59 (sentencing); #62 (judgment).

Cotton was convicted by jury of one count of conspiracy to illegally distribute fentanyl, causing death, in violation of 21 U.S.C. §§ 846, 841(a)(1) & (b)(1)(C), and one

count of distribution of a fentanyl, causing death (of a different person), in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C). *Cotton*, Dkt. #119 (verdict form). The conviction resulted from Cotton shipping 250 fentanyl pills to a co-conspirator who had agreed to distribute them and share the profit with Cotton. Over a two-day period in January 2023, both this co-conspirator and a person to whom he sold some of the pills died of fentanyl overdoses from ingesting the pills. *Id.* at Dkt. #69 at pp. 3-4 (government trial memorandum). Cotton was in criminal history category I. *Cotton* PSR at ¶ 34. On September 21, 2026, the district court imposed a 300-month term of imprisonment reduced by seven months to account for time spent in state custody before trial. *Cotton*, Dkt. #153 (sentencing); Dkt. #157 (judgment).

Obviously, Spayd's criminal conduct is significantly more egregious that the offenses that either Mobley and Cotton committed and thus deserving of a prison sentence no shorter than the 360-month term that Mobley received. Mobley and Cotton each were small-scale dealers whose short-term distribution of small quantities of drugs caused two overdoses (only one of which was fatal in Mobley's case). By comparison, for over five years, Spayd illegally distributed over four million opioid pills, often in dangerous combination with other drugs, to hundreds of victims who trust she abused. Spayd's prescriptions caused at least five patients to perish by overdose. Those who avoided that fate had their lives significantly degraded by addiction resulting from or exacerbated by Spayd's illegal drug distribution. Spayd engaged in related criminality throughout,

including by falsifying medical records, issuing prescriptions without seeing patients, and having non-medical staff complete and sell prescriptions for a fee.

For all these reasons, a term at the upper end of the agreed-upon plea agreement range (360 months) is warranted without regard to whether the applicable sentencing guidelines range encompass that term. The parties agreed that such a disposition would be appropriate even if the top of the guidelines range as determined by the Court was lower. Dkt. #548 at p. 2.

**H. Forfeiture And Restitution**

In her plea agreement, Spayd agreed to an order of restitution "consistent with page 7 of the judgment filed on June 22, 2023, at Docket #370." Dkt. #548 at p. 7. That judgment provided for restitution of $3,690.00 with respect to two victims. Spayd further agreed that "the property identified in the preliminary order of forfeiture dated January 13, 2023, at Docket #335, is subject to forfeiture to the United States." Dkt. #548 at pp. 7-8.

**I. Conclusion**

For the reasons stated above, the government respectfully requests that the Court adopt the recommendation of the USPO and impose a 360-month term of imprisonment followed by a three-year term of supervised release, as well as a $300 special assessment.

It further requests that the Court order forfeiture and restitution consistent Spayd's plea agreement.[35]

RESPECTFULLY SUBMITTED November 5, 2026, at Anchorage, Alaska.

SCOTT BRADFORD
United States Attorney for the District of Oregon

Steven D. Clymer
Special Attorney
Acting Under Authority Conferred by 28 U.S.C. § 515
United States Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2026, a true and correct copy of the foregoing was served electronically on defense counsel.

United States Attorney's Office

[35] With the Court's permission. the United States will call an expert on pain management medicine, Dr. Timothy King, to testify at sentencing. The government also asks for leave of the Court to split it sentencing argument, with Assistant United States Attorney Andrea Steward addressing application of the guidelines and Special Attorney Steven D. Clymer addressing the sentencing factors set out at 18 U.S.C. § 3553.