Gretchen L. Staft
Ben W. Muse
Assistant Federal Defenders
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, Alaska 99503
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: gretchen_staft@fd.org

*Counsel for Defendant Jessica Joyce Spayd*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>JESSICA JOYCE SPAYD,<br>Defendant. | Case No. 3:19-cr-00111-SHR-MMS |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant Jessica Joyce Spayd, through counsel, Assistant Federal Defenders Gretchen Staft and Ben Muse, submits this memorandum in anticipation of her sentencing hearing scheduled for November 12, 2026 at 9:00 a.m. At sentencing, Ms. Spayd will ask the Court to impose a sentence of 240 months followed by a term of supervised release. Such a sentence reflects the nature and circumstances of the offense as well as Ms. Spayd's history and characteristics and is sufficient, but not more than necessary, to serve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I. BACKGROUND

In this case, Ms. Spayd has pleaded guilty to three counts of distribution resulting

in death, and she accepts complete responsibility for her actions. This section seeks to provide the Court with context for her prescription practices, not to excuse her behavior.

**A. Offense Conduct**

Ms. Spayd's prescribing practices caused the death of three of her patients: J.L., B.S., and L.D. In each case, she continued to prescribe high levels of opioids to individuals who she had reason to believe were misusing their medication.

J.L. passed away on October 15, 2014, at the age of 42. She had been a patient at Ms. Spayd's pain clinic for a little over two years.[1] She had life long chronic pain after being shot in the leg as a teenager.[2] J.L. was referred to Spayd by another provider who had started J.L. on an opioid prescription in 2007.[3] When she started at Spayd's clinic, she appeared to be going through opioid withdrawals.[4] Spayd started her at 30 mg of methadone and then titrated her 10 mg every three days until "she got the dose she was on before she saw me."[5] J.L. paid all cash, was jobless, and struggled with housing.[6] Spayd prescribed methadone because it was the most "affordable, long-acting pain medication" for J.L., who had limited means and was uninsured.[7] Spayd had reason to believe that J.L. was misusing the opioids she was prescribed. In October 2012, after the death of her

1 Day 6 Tr. at 66; Day 8 Tr. 22, 27.
2 Day 14 Tr. 32–33, 111–12.
3 Day 14 Tr. 112; Day 8 Tr. 21.
4 Day 14 Tr. 112-13
5 Day 14 Tr. at 112.
6 Day 15 Tr. 67.
7 Day 14 Tr. at 114.

husband, she overdosed on methadone and non-prescribed Xanax, and the hospital that treated her recommended tapering her off her opioid prescription. Spayd did not implement this advice and continued J.L. on the same dose.[8] She had positive UAs for non-prescribed drugs and was binge drinking.[9] Spayd continued her on a high level of opioid medication—roughly 1,100 MME to 1400 MME.[10] On October 14, 2014, she wrote J.L. a prescription for methadone and oxycodone, which she filled the same day.[11] J.L. passed away on October 15, and the medical examiner found her cause of death to be acute combined methadone, alprazolam, oxycodone, and oxymorphone intoxication.[12] J.L.'s blood methadone level of 1,100 ng/ml was within the fatal range reported for methadone-related fatalities.[13]

B.S. was 74 when she passed on December 22, 2015.[14] B.S. suffered from chronic pain due to the degeneration of her lumbar spine.[15] She became Spayd's patient in 2006 after a referral from another provider.[16] She was already on a methadone dose of over 200 mg per day for back pain, which Spayd tapered to 150 to 120 mg per day.[17] Spayd was unsuccessful in bringing her dosage any lower because of B.S.'s long-standing use and

---

8 Day 8 Tr. 34–44.
9 Day 8 Tr. 23-24, 32, 46–48.
10 Day 8 Tr. 24, 28, 43, 48.
11 Day 5 Tr. 111.
12 Day 6 Tr. 66-67.
13 Day 6 Tr. 63.
14 Day 9 Tr. at 37.
15 Day 9 Tr. 37
16 Day 14 Tr. 132–34
17 Day 14 Tr. 132-34.

tolerance.[18] Spayd discharged B.S. as a patient in 2010 when she tested positive for amphetamines on a UA, but took her back after B.S.'s husband intervened and expressed concern with taking his wife off pain management.[19] Spayd had ample reason to believe that B.S. suffered from opioid dependence.[20] On December 3, 2015, Ms. Spayd wrote B.S. a prescription for methadone (150 tablets) and hydromorphone (90 tablets).[21] On December 22, she passed away, and her cause of death was determined to be methadone intoxication by the state medical examiner.[22] A postmortem blood draw indicated that the methadone in her blood was 2.5 times the top of the fatal range, about 5000 ng/ml.[23]

L.D. was 74 when he passed on March 2, 2019.[24] Spayd treated L.D. as a patient for 17 years, and, by her own account, knew him very well.[25] L.D. suffered from chronic pain, having had many surgeries due to a car accident.[26] He was already on Oxycodone when he became Spayd's patient.[27] During his time as her patient, she raised tapering his dose of opioids with him repeatedly and tapered him at least twice, but each time relented when he said he couldn't work or keep up the house on less and became emotional.[28] She had reason to believe he was overusing his prescribed medications—there were 51 such instances in

---

18 Day 14 Tr. 132-34.
19 Day 14 Tr. 135–36.
20 Day 9 Tr. 38, 43, 45–47
21 Day 4 Tr. 99-104.
22 Day 4 Tr. 104-116.
23 Day 4 Tr. 99–104, 110–13.
24 Day 14 Tr. at 148.
25 Day 14 Tr. 147-48, 150.
26 Day 14 Tr. at 147.
27 Day 14 Tr. 150.
28 Day 14 Tr. 148-51.

his chart.[29] In fact, he was hospitalized for overmedicating in 2016, and the treating physician warned L.D. and Spayd that L.D. was at an extremely high risk of accidental overdose given his current levels of pain medication.[30] Ms. Spayd tried to taper L.D.'s dose again after his hospitalization, but it climbed back to pre-overdose levels.[31] At the time of his death, he was on three opioid prescriptions totaling 585 MME per day, to include fentanyl patches and oxycodone.[32] The state medical examiner concluded L.D. died from hypertensive cardiovascular disease and acute oxycodone and fentanyl toxicity.[33]

**B. Ms. Spayd's Background**

Ms. Spayd grew up in the Chicago area and had a difficult childhood due to her parents' mental health struggles. Her parents divorced when she was 11, and she resided with her father for the remainder of her childhood. Her mother struggled with mental illness and physically abused Ms. Spayd.[34] Her father attempted to protect her, but his job as a traveling salesman and his own struggles with bipolar disorder hampered this.[35]

Following nursing school, Ms. Spayd moved to Alaska in 2000 and began working at Alaska Native Medical Center as a registered nurse while she studied for and passed the

---

29 Day 9 Tr. 19-20.
30 Day 9 Tr. 21–22; Day 14 Tr. 153.
31 Day 9 Tr. 21–23.
32 Day 5 Tr. 26-27.
33 Day 4 Tr. 177–78.
34 Exhibit D-1, Psychiatric Evaluation by Dr. Charles Samenow, MD, MPH (filed under seal) at 4. *See also* Exhibit D-2, Curriculum Vitae of Dr. Charles Samenow, MD, MPH (filed in conjunction with Exh. D-1 under seal).
35 Exh. D-1 at 4.

national ANP certification examination.[36]

In 2001, she joined Aurora Pain Management, where she trained for roughly 12-18 months under Dr. Michael V. Taylor, a dual-board anesthesiologist with more than two decades of experience, who taught her opioid prescribing in an era when, as she testified, providers were "encouraged that we take what patients tell you as the truth" about their pain.[37] In 2002, Dr. Taylor wound down his practice and left state, and Ms. Spayd decided to open her own pain clinic—Eagle River Pain and Wellness—in June of 2002.[38]

### C. Eagle River Pain and Wellness

#### i. The Clinic's Rules

Eagle River Pain and Wellness was a referral-based specialty practice focusing on pain-management. Each patient—subject to limited exceptions[39]—was referred from other providers, and only after having diagnostic studies transmitted directly from the referring provider confirming a qualifying diagnosis.[40] This was done as a precaution, as Ms. Spayd explained, because "people falsify their records to get into pain management."[41] Her office manager screened the referrals, and Ms. Spayd declined patients who appeared to be multisourcing, whose urinalysis results were inconsistent, or whose diagnosis was not

---

36 Day 13 Tr. 190-92.
37 Day 13 Tr. 191-99.
38 Day 13 Tr. 198-200.
39 There were limited exceptions. The undercover patient the government introduced arrived without a referral, which Ms. Spayd described as "not a typical way a patient comes into my clinic." Day 14 Tr. 108.
40 Day 11 Tr. 69–70; Day 13 Tr. 203–04.
41 Day 13 Tr. 202-04.

chronic.[42] Spayd estimated that about 10% of referrals were declined.[43] By her estimate the clinic treated about 2000 patients over eighteen years, and about 10% never received opioid pain medication.[44]

Eagle River Pain and Wellness had many of the practices one would expect to see in a pain clinic:

- **Written Agreement.** She had patients enter into a pain management agreement that articulated clear terms for their treatment; Ms. Spayd modeled it on guidance from the American Academy of Pain Management;[45]
- **Consequences for Violations.** Depending on the violation, she shortened a prescription (for example, from thirty days to fourteen), added counseling, stopped opioids while keeping the patient in the practice, or dismissed the patient.[46]
- **Screening for Addiction**. She screened patients for addiction and did not accept those who were actively addicted;[47]
- **Pill Counts**. Patients brought medications in their original containers, and two staff members counted them with the patient present and logged the results;[48]
- **Observation.** She and her staff watched how patients walked and checked their arms for signs of injection;[49]
- **Urinalysis.** She required patients to submit to urinalysis to ensure they were properly using their prescribed medication;[50]
- **Record of Dismissed and Declined Patients.** She kept a list of patients fired by her clinic to prevent reenrollment.[51]

Although many of these safeguards were in place, Dr. King testified at trial that the

---

42 Day 11 Tr. 69–70, 92.
43 Day 13 Tr. 214, 218, 220.
44 Day 13 Tr. 214. Ms. Spayd acknowledged that the clinic's lists of declined and dismissed patients were incomplete. Day 14 Tr. 23.
45 Day 3 Tr. 184–85; Day 13 Tr. 211–12; Day 14 Tr. 67.
46 Day 11 Tr. 76; Day 13 Tr. 212–14; Day 14 Tr. 67.
47 Day 13 Tr. 210–11.
48 Day 11 Tr. 76–77; *see also* Day 12 Tr. 155.
49 Day 11 Tr. 166; Day 14 Tr. 126.
50 Day 5 Tr. 126–28.
51 Day 13 Tr. 217–20; Day 14 Tr. 20–23; Day 11 Tr. 75.

records showed they were frequently incomplete or not acted upon.[52]

### ii. The Clinic's Patients

Ms. Spayd provided care to an underserved population. Many of Spayd's clinic's patients presented with complex medical histories[53] and many had been using high levels of opioids long-term for chronic pain prior to their treatment by Spayd. For instance, J.L. arrived at Spayd's clinic on 1,000-1100 MME per day from prior providers.[54] More than half were on Medicare or Medicaid.[55] Many of her patients had lost care due to nationwide correction regarding opioid-based pain management that occurred in the 2010s.[56] S.C., a lupus and fibromyalgia patient, put it simply: Ms. Spayd "was the only provider that could take care of my needs" — no Valley pain clinic was accepting patients.[57]

And, many of her patients received appropriate care, and remain stable and functioning on long-term opioid therapy today. R.K., a two-year Spayd patient, was fourteen when he was electrocuted by 24,000 volts in 1968; he lost an arm and a leg. Over the following decades, he won gold medals on the U.S. Paralympic ski team and worked

---

52 Day 8 Tr. 29–32, 46–48; Day 9 Tr. 14-17, 43–45, 50–51, 57–58.

53 Dr. Teresa Bormann, the government's witness who inherited several of Ms. Spayd's patients, agreed those patients had "complex histories" — multiple surgeries over many years, compounded by mental-health issues. Day 4 Tr. 55–57, 68.

54 Day 8 Tr. 24–25; Day 14 Tr. 112–13.

55 Day 14 Tr. 36–37, 84.

56 *E.g.*, Pooja A. Lagisetty et al., Access to Primary Care Clinics for Patients With Chronic Pain Receiving Opioids, 2 JAMA Netw. Open e196928 (2019) (40.7% of Michigan clinics would not take a new patient on long-term opioids), available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2737896 (last visited Nov. 5, 2026).

57 Day 13 Tr. 112–13.

thirty years in telecommunications.[58] His successor providers maintain him on the same opioid based pain management regimen Ms. Spayd prescribed.[59]

*iii. Finances*

It does not appear that Ms. Spayd's actions were driven by a desire to maximize profits. The PSR notes that over a 7-year period she made approximately $1.3 million, which included her wages and net income from her clinic.[60] Her total reported income fluctuated across years from a high of $265,418 in 2013 to $120,533 in 2019.[61] During this time, Ms. Spayd did not live in luxury. She resided in a 1300 sq/ft condominium and drove a financed vehicle.[62] Judge Kindred, who presided over Spayd's trial and the first sentencing, reached the same conclusion: "It doesn't seem like she's lining her pockets in any substantial way, in any meaningful way."[63]

Ms. Spayd estimated that the bulk of her patients—roughly 60% in her final year—were Medicare or Medicaid beneficiaries.[64] Only 4% were uninsured and paid out of pocket.[65] Catering to this population was not lucrative. In fact, a prospective merger with another practice collapsed when the group found out about the clinic's high rate of

---

58 Day 13 Tr. 23–27.
59 Day 13 Tr. 23-47.
60 Dkt. 568 at ¶ 15; Day 3 Tr. 209–13.
61 Day 3 Tr. 211-12.
62 Day 14 Tr. 28–31.
63 Sentencing Tr. 41.
64 Day 14 Tr. 36–37, 84.
65 Day 14 Tr. 37.

Medicare/Medicaid patients.[66]

Most of her patients were long-term and came in via referral. She declined patients who did not meet her standards. She maintained safeguards intended to ensure drugs were not being abused and diverted, though she did not apply them consistently. While her practice was deficient, the record does not reflect that Ms. Spayd was operating her clinic to financially exploit the population she was serving.

### D. The Changing Policy Landscape

#### i. The Permissive Era (1990s to 2012)

The standards for the treatment of pain, particularly with regard to opiates, have fluctuated drastically since Ms. Spayd began her practice in the early 2000s. As one author notes, since the 1990s, "[m]any clinicians have experienced a sense of bafflement as the pendulum in opioid prescribing has swung to and fro."[67]

During the 1990s,

> [P]hysicians increased their prescription of opioids for the treatment of chronic pain in response to social pressure to treat pain as the fifth vital sign (atop temperature, heart rate, respiration rate, and blood pressure) and insurers' demands that physicians increase the number of their patients which could be done by regularly prescribing analgesics to manage chronic pain.[68]

---

66 Day 14 Tr. 37.

67 J.J. Fenton, Centering the patient in decisions about opioid tapering. *Expert Review of Clinical Pharmacology*, *17*(4), 305–307 (2024), available at https://www.tandfonline.com/doi/full/10.1080/17512433.2024.2318470 (last visited Nov. 3, 2026).

68 *See* Paul J. Larkin, *Ruan v. United States: An Important Ruling or Merely 'Sound and Fury'?*, Geo. J.L. & Pub. Pol'y 527, 536-37 (Aug. 2022) (noting physicians received pressure from several stakeholders to treat chronic pain with opioids), available at https://www.law.georgetown.edu/public-policy-journal/wp-

One provider summarizes their experience in this era:

> As a medical student in San Francisco in the 1990s, I felt fortunate to receive cutting-edge instruction from an attending physician regarding the optimal and safest approach to chronic pain management. I was taught that, for most patients with chronic pain, opioids were safer than alternative drugs, and that if pain was not well-controlled on a lower opioid dose, then the dose could be increased without limit based on patient tolerance. I was also taught that longer-acting opioids were preferred, because they prevent rebounds in the 'pain cycle,' so I typically switched patients to long-acting opioids along with short-acting opioids for breakthrough pain.[69]

Spayd thus began her career amidst a national effort to address the underassessment of pain. This led to the "overly aggressive treatment of pain" through opioids and fueled the prescription opioid epidemic that followed[70] and the corresponding increase in overdose deaths.[71] During this period, the scientific consensus was that "high dose" opioid therapy was >200 MME, and that high doses were generally acceptable if appropriate for individual patients.[72] Opioid prescriptions reached their peak in 2011-2012.[73] This was the

---

content/uploads/sites/23/2023/12/Ruan-v.-United-States_Larkin.pdf (last visited, Nov.5, 2026).

69 J.J. Fenton, *supra* note 61.

70 *Id.*

71 *See, e.g.*, Bingzi Hu, *At the Intersection of Competing Social Values: Evaluating the Criminal Law Approach Addressing the Opioid Crisis*, 15 L. J. SOC. JUST. 40, 42–43 (2022), available at https://ljsj.wordpress.com/wp-content/uploads/2022/04/volume-xv-ljsj-final.pdf (last visited Nov. 4, 2026).

72 Roger Chou et al, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 The Journal of Pain 113, 120 (2009), available at https://www.jpain.org/action/showPdf?pii=S1526-5900%2808%2900831-6 (last visited November 2, 2026).

73 Stefan G. Kertesz & Allyson L. Varley, *New Data on Opioid Dose Reduction—Implications for Patient Safety*, JAMA Network Open (June 13, 2022) ("[P]rescribing of opioids for pain reached its peak in 2011 to 2012. By 2020, prescribing per capita had decreased to levels last seen in 1993."), available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2793299 (last visited Nov. 4,

environment in which Ms. Spayd was trained and in which the prescribing underlying Counts 1 and 3 (October 2014 and December 2015) took place.

### ii. The Restrictive Turn (2012-2019)

As a response to the public health issues created by the overutilization of opioid based pain medication, policy actors attempted to limit the ability of prescribers and patients to receive this medication. Public health organizations offered guidance on the amount and duration of opioid prescriptions.[74] The most influential guidance issued during this time was the CDC's 2016 CDC Opioid Prescribing Guidelines [hereinafter "2016 CDC Guidelines"]. Though these were intended as precisely that, guidelines,[75] many states enshrined them in law, imposing strict dose limits and closely monitored prescribers' and patients' adherence to these limits.[76] For instance, in Alaska, the State Medical Board

---

2026).

[74] *See* Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain* (2016), available at https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm (last visited Nov. 4, 2026).

[75] *See* Stefan G. Kertesz et al., *Nonconsensual Dose Reduction Mandates are Not Justified Clinically or Ethically: An Analysis*, 48 J.L. Med. & Ethics 259, 260–64 (2020) ("The decline in opioid prescribing accelerated after the release of a consensus Guideline from the CDC in 2016."); Travis N. Rieder*, Is Nonconsensual Tapering of High-Dose Opioid Therapy Justifiable?*, 22 AMA J. Ethics 651, 652–53 (2020) ("The CDC guideline . . . has been widely misinterpreted as a mandate to deprescribe for existing patients—in particular, for legacy patients . . . ."); Hannah T. Neprash et al., *Abrupt Discontinuation of Long-term Opioid Therapy Among Medicare Beneficiaries*, 2012-2017, 36 J. Gen. Internal Med. 1576, 1576 (2021) ("2016 Guideline for Prescribing Opioids for Chronic Pain was leading physicians to indiscriminately curtail [long-term opioid therapy] for patients").

[76] Jennifer D. Oliva, *Dosing Discrimination*: *Regulating PDMP Risk Scores*, 110 Calif. L. Rev. 47, 47 (2022) ("Law enforcement conducts dragnet sweeps of PDMP data to target providers that the platform characterizes as 'overprescribers' and patients that it deems as high risk of drug diversion, misuse, and overdose."); Nathan Guevremont et al., *Physician Autonomy and the Opioid Crisis*, 46 J.L. Med. & Ethics 203, 204 (2018) (noting that opioid related "laws and regulations are

adopted the 2016 CDC Guideline "by reference as the standard of practice for prescribing controlled substances for pain management."[77] In addition, pharmacies imposed their own categorical limits, likely based in part on the 2016 CDC Guideline.[78] Due to this policy environment, many medical providers stopped accepting new chronic pain patients, while others dangerously decreased patients to low doses or suddenly took patients off the medication entirely.[79] This was the era when the prescribing under Count 5 (February 2019) took place.

### iii. The Overcorrection and Its Harms

This regulatory change brought about by the 2016 CDC Guideline came with negative consequences to some patients. In the US, over fifty million people suffer from chronic pain.[80] Many depend on effective pain treatment for functionality. Some are medically stable on high dose opioid prescriptions for extended durations.[81] Different patients have different needs. Unfortunately, the public health response—with its dose limits, reductions, and cut-offs—perhaps done under the best intentions, did not necessarily

extremely specific and restrictive" and "often fall outside the standard regulatory regime, limiting physician discretion to treat individual patients.").

77 *See* 12 AAC 40.975.

78 Day 14 Tr. 86-87

79 Kurt Kroenke et al., *Challenges with Implementing the Centers for Disease Control and Prevention Opioid Guideline: A Consensus Panel Report*, 20 Pain Med. 724, 725–26 (2019).

80 Stephen E. Nadeau et al., *Opioids and Chronic Pain: An Analytic Review of the Clinical Evidence*, Frontiers Pain Research at 1 (Aug. 17, 2021).

81 See Kelly K. Dineen, Definitions Matter: A Taxonomy of Inappropriate Prescribing to Shape Effective Opioid Policy and Reduce Patient Harm, 67 U. KAN. L. REV. 961, 963, 965 (2019).

achieve the best medical results for all patients, and, in some situations, it caused patients serious harm. Several studies provide compelling evidence that a forced taper or discontinuation of opioid medication can heighten the risk of suicide, overdose, and other mental health issues.[82] In fact, in 2019, the FDA issued a patient safety alert, warning providers that patients could be harmed by rapidly decreasing or discontinuing opioid medication.[83] In addition, the policy changes pushed many experiencing chronic pain to the illicit market. Following 2016, overdose deaths have increased rather than decreased.[84]

In a 2019 article, the authors of the 2016 CDC Guidelines noted, "Unfortunately, some policies and practices purportedly derived from the [2016 CDC Guideline] have in fact been inconsistent with, and often go beyond, its recommendations" to include

---

82 *See, e.g.*, Elizabeth M. Oliva et al., *Associations Between Stopping Prescriptions for Opioids, Length of Opioid Treatment, and Overdose or Suicide Deaths in US Veterans*, 368 BMJ m283 (2020) (in study of 1.39 million VA patients, stopping opioid treatment was associated with increased risk of overdose or suicide death, rising with length of treatment), available at https://www.bmj.com/content/368/bmj.m283 (last visited Nov. 5, 2026); Alicia Agnoli et al., *Association of Dose Tapering With Overdose or Mental Health Crisis Among Patients Prescribed Long-term Opioids*, 326 JAMA 411 (2021) (among 113,618 patients on stable, long-term, higher-dose opioids, tapering was associated with a 68% higher rate of overdose and more than double the rate of mental-health crisis), available at https://jamanetwork.com/journals/jama/fullarticle/2782643 (last visited Nov. 5, 2026); Marc Larochelle et al., *Comparative Effectiveness of Opioid Tapering or Abrupt Discontinuation vs No Dosage Change for Opioid Overdose or Suicide for Patients Receiving Stable Long-term Opioid Therapy*, *JAMA Netw Open.* (2022), available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2795159 (last visited Nov. 3 2026).

83 U.S. Food & Drug Admin., *FDA Drug Safety Communication: FDA identifies harm reported from sudden discontinuation of opioid pain medicines and requires label changes to guide prescribers on gradual, individualized tapering* (Apr. 9, 2019).

84 AMA 2021 Overdose Epidemic Report at 3 (2021), available at https://www.end-overdose-epidemic.org/reports/2021-ama-overdose-epidemic-report (last visited Nov. 5, 2026).

"inflexible application of recommended dosage and duration thresholds and policies that encourage hard limits and abrupt tapering of drug dosages, resulting in sudden opioid discontinuation or dismissal of patients from a physician's practice."[85]

As Dr. Elie Aoun, vice chair of APA's Council on Addiction Psychiatry, put it:

> We've gone from one extreme to the other: from overtreating pain in the '80s and '90s and all the negative consequences that entails, including addiction and new onset of criminal justice problems, to the recent restriction of access to opioids that may prevent people from getting pain management who need it.[86]

**iv. The 2022 Correction**

In 2022, the CDC issued a new Clinical Practice Guideline for Prescribing Opioids for Pain [hereinafter "2022 CDC Guideline"] to "discourage the misapplication of opioid pain medication dosage thresholds as inflexible standards."[87] It acknowledged that policies "purportedly drawn from" the 2016 CDC Guideline were not supported by that Guideline and had contributed to patient harm.[88] It removed numeric thresholds recommended in the

---

[85] Deborah Dowell et al., *No Shortcuts to Safer Opioid Prescribing*, The New England Journal of Medicine (2019), available at https://www.nejm.org/doi/full/10.1056/NEJMp1904190?referrer=https%3A%2F%2Fwww.google.com%2F (last visited Nov. 3, 2026).

[86] Linda Richmond, *FDA Cautions Against Abruptly Stopping Patients' Opioids*, Psychiatric News (May 2019), available at https://psychiatryonline.org/doi/10.1176/appi.pn.2019.5b24 (last visited Nov. 3, 2026).

[87] Deborah Dowell et al., *CDC Clinical Practice Guideline for Prescribing Opioids for Pain* (2022), available at https://www.cdc.gov/mmwr/volumes/71/rr/rr7103a1.htm#print (last visited Nov. 4, 2026).

[88] CDC 2022 Guideline, *supra* note 83 ("Of particular concern, some policies purportedly drawn from the 2016 CDC Opioid Prescribing Guideline have been notably inconsistent with it and have gone well beyond its clinical recommendations. Such misapplication includes extension to patient populations not covered in the 2016 CDC Opioid Prescribing Guideline (e.g., cancer and palliative care patients), rapid opioid tapers and abrupt discontinuation without collaboration with

2016 CDC Guidelines.[89] It warned of the harm that could be caused by rapid tapering or abrupt discontinuation.[90] It stated that its recommendations "should not be applied as inflexible standards of care" and clearly expressed that they were "not intended to be implemented as absolute limits of policy or practice."[91]

It appears clear that providers should proceed with caution in prescribing opioids for chronic pain to those who have never used them. The evidence suggests that the initiation of opioids is not more effective than non-opioid treatment for chronic pain and carries greater risk to the patient.[92] But medical providers are presented with less clarity when presented with a patient who has taken opioids long term.[93] While long-term use can

---

patients, rigid application of opioid dosage thresholds, application of the guideline's recommendations for opioid use for pain to medications for opioid use disorder treatment (previously referred to as medication assisted treatment), duration limits by insurers and pharmacies, and patient dismissal and abandonment. These actions are not consistent with the 2016 CDC Opioid Prescribing Guideline and have contributed to patient harm, including untreated and undertreated pain, serious withdrawal symptoms, worsening pain outcomes, psychological distress, overdose, and suicidal ideation and behavior.")(citations omitted).

89 CDC 2022 Guideline, *supra* note 83.

90 CDC 2022 Guideline, *supra* note 83.

91 CDC 2022 Guideline, *supra* note 83 ("The recommendations related to opioid dosages are not intended to be used as an inflexible, rigid standard of care; rather, they are intended to be guideposts to help inform clinician-patient decision-making." And "The recommendations are not intended to be implemented as absolute limits for policy or practice across populations by organizations, health care systems, or government entities.").

92 Roger Chou et al., *Opioid treatments for chronic pain, Comparative Effectiveness Review, Rockville (MD): Agency for Healthcare Research and Quality* (US)(2020) (stating that, for patients with chronic pain, opioids are associated with small beneficial effects versus placebo but are associated with increased risk of short-term harms and do not appear to be superior to nonopioid therapy), available at https://www.ncbi.nlm.nih.gov/books/NBK556253/pdf/Bookshelf_NBK556253.pdf (last visited Nov. 3, 2026).

93 See J.J. Fenton, *supra* note 61 at 305-07.

come with a host of risks, so can tapering and discontinuation of opioids.[94] Thus, the current guidance at this point is that:

> For most patients prescribed long-term opioids, clinicians should take the time to guide patients toward an individualized decision about whether to continue or taper opioids and ensure that the decision to taper is aligned with the patient's values, goals, and preferences.[95]

**E. Why Ms. Spayd's Practice Deteriorated**

Again, there is no excuse for Ms. Spayd's deficient practice, but the record offers several explanations for her behavior.

**i. Caught Between Standards**

Ms. Spayd testified candidly about the difficulties she faced implementing the CDC's 2016 Guidance. She said she kept non-compliant patients at reduced quantities rather than discharging them because she did not want to push them into the illicit market where "people can die from one pill" of illicit fentanyl.[96] She also struggled with directing patients to non-consensually taper as she knew that such a taper carried risks of overdose and suicide.[97] She conceded that she did not adapt well to the shifting policy landscape: "I don't think I dealt with it very well. I mean, it was a really difficult time."[98]

That difficulty is visible in all three counts: she reduced B.S.'s dose and tapered L.D. at least twice, and she placed J.L. on probation, but in each case she stopped short of

---

94 *Id.* at 305.
95 *Id.* at 306.
96 Day 14 Tr. 67–68.
97 Day 14 Tr. 71–72.
98 Day 14 Tr. 72–73.

the discharge her own pain agreement contemplated.

### ii. Lack of Appropriate Boundaries

Ms. Spayd had difficulty setting appropriate professional boundaries with her patients. Spayd chose to provide care to underserved populations who presented complex cases and cared deeply for her patients. No one has asserted otherwise. This is echoed by those who filed letters on her behalf. Tony Arturo writes that Spayd is a "deeply trusting individual whose primary motivation was a genuine desire to alleviate human suffering," who assisted those facing financial hardship and were in severe pain.[99] Her friend Jennifer Magee echoes the same sentiment.[100]

But the record shows that, over time, Ms. Spayd had difficulty holding the limits her own clinic set, and most importantly, the professional boundary between medical provider and patient. There are many indicia of this. Visits that once lasted about fifteen minutes stretched to half an hour or more, and patients described "small talk" about Spayd's personal life filling most of them.[101] She provided her personal cell number to patients.[102] She also became romantically involved with a patient.[103]

She let her relationships with her patients cloud her professional judgment. Doubtless, for any empathetic person, this is always a difficult line to walk. And Ms. Spayd

---

99 Exhibit D-3, Support Letters, at 1.
100 Exh. D-3 at 6.
101 Day 5 Tr. 52, 77, 128, 133.
102 Day 3 Tr. 146.
103 Day 5 Tr. 86–88.

trained in a period when providers were "encouraged that we take what patients tell you as the truth" about their pain. She further described the nursing model she trained under as "patient-centered," with "empathy" as a core focus.[104] But her inability to enforce professional boundaries and her own rules caused harm. She struggled to follow through with difficult, but medically necessary, decisions. With L.D., who was her patient for 17 years, she described the decision to confront his early refills as "gut-wrenching," saying she did not want "to see a man that I respect … cry in my office."[105] She tapered him at least twice, but he would run out of his prescription and call Spayd, and she would relent and prescribe him additional opioids.[106] In another instance, she discharged B.S., only to cave and readmit her, after receiving a call from her husband.[107]

Ms. Spayd is not the only one to have these issues. Best practice dictates that practitioners should be monitored by their colleagues and professional bodies. They should avail themselves of professional development and be attuned to professional boundaries.[108] In Ms. Spayd's case, such safeguards were largely absent: Ms. Spayd practiced without an identified supervising provider or partner, with no other clinician in the office when she was unwell, and with office staff who were reluctant to confront their employer. No

---

104 Day 13 Tr. 194–99, 207–08.

105 Day 14 Tr. 150.

106 Day 14 Tr. 151; Day 15 Tr. 50.

107 Day 14 Tr. 133–36.

108 *See* Cindy A. Peternelj-Taylor & Olive Yonge, *Exploring Boundaries in the Nurse-Client Relationship: Professional Roles and Responsibilities*, 39 Perspect. Psychiatr. Care 55 (2003) (identifying "self-awareness and monitoring, debriefing, and availing oneself of supervision and education" as important tools for creating and maintaining boundaries).

professional body intervened when she was struggling: when the Board of Nursing requested ten of her charts roughly a year before her arrest, she produced them and, by her account, "never heard back."[109]

In many instances she allowed her relationships and sympathy for her clients to dictate her conduct rather than her professional judgment. When her patients pushed her, she struggled to say no. She did not always enforce her own rules when her patients did not follow them. As she testified, she justified her laxity by convincing herself that her actions were in her patients' best interest—if they did not remain with her, if they did not receive the drugs they sought, they would seek them elsewhere, potentially on the illicit market where they would be less safe.[110]

Her mental health providers have identified this issue, as reflected by Providence Behavioral Health records: "establishing boundaries" has been one of her major treatment goals.[111] Dr. Charles Samenow opined that Ms. Spayd's difficult childhood may have contributed to this difficulty:

> This examiner has conducted extensive research on boundary violating providers. A common theme among these providers is that they often experience family-of-origin trauma (chaos, neglect, or adverse events) that leaves them with psychological vulnerabilities. These vulnerabilities predispose these providers to needing to please patients, failing to set limits with them, and having an exaggerated sense of responsibility for their care.[112]

---

109 Day 14 Tr. 156–57.
110 Day 14 Tr. 66–68.
111 Exh. D-1 at 19.
112 Exh. D-1 at 19.

Certainly, Ms. Spayd's childhood, given her parents' struggle with mental health issues, and the abuse she experienced, was difficult.[113]

Blurred boundaries are one of the root causes of professional burnout.[114] This makes sense; without clearly defined professional boundaries with a patient, the task can be overwhelming.

### iii. Burnout, Bipolar I and Alcohol Abuse

Ms. Spayd began to experience serious professional burnout, particularly during the period of charged conduct in this case. As Ms. Fountain, one of Spayd's staff members, testified, it "seem[ed] at times like the practice was too much for her … because Ms. Spayd cared for her patients."[115] Dr. Samenow notes that work stress and attendant burnout are a common circumstance in instances of medical providers misprescribing:

> It is this provider's experience from the large Vanderbilt cohort that burnout can be a contributing factor to misprescribing. Provider burnout has been associated with an increased number of prescriptions, poor documentation, relaxation in office practice, and less thorough medical practice. We observed that "burned out" providers would more easily give in to patient demands and/or be less likely to perform detailed histories and addiction screenings.[116]

During the offense conduct in this case, Ms. Spayd also suffered from both Bipolar I and alcohol abuse, both of which were poorly managed.

---

113 Exh. D-1 at 19.

114 *See* Joana Berger-Estilita et al., *Impact of Burnout on Anaesthesiologists*, 52 Turk. J. Anaesthesiol. Reanim. 54 (2024) (listing "blurred work-life boundaries" among root causes of burnout), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11074597/(last visited Nov. 4, 2026).

115 Day 5 Tr. 123.

116 Exh. D-1 at 14.

Ms. Spayd was diagnosed with Bipolar I in 2012.[117] She has suffered from symptoms of this disorder since she was a child.[118] Dr. Samenow opines that this likely contributed negatively to Spayd's actions:

> At the time of her offense, her bipolar disorder was poorly regulated. While there is no evidence that Ms. Spayd's prescribing was the result of mania, it is likely that her unaddressed hypomania/mania impaired her judgment and may have contributed to her poor office practices and poor boundaries.[119]

During this same time period, Ms. Spayd also struggled with alcohol abuse.[120]

It is Dr. Samenow's opinion that this combination (burnout, Bipolar I and alcohol abuse) contributed to Ms. Spayd's deficient practice in this case.[121]

This background does not change what happened to J.L., B.S. and L.D. Rather, it bears on Ms. Spayd's culpability. It does not show a provider who set out to exploit patients and profit off their vulnerabilities. Instead, it shows an overextended and unwell provider who deteriorated under the pressures of the job.

## II. U.S.S.G. Guidelines

The PSR calculates a total offense level of 39, with a corresponding guideline range of 262 to 327 months (Criminal History Category I).[122] However, this guideline range does

---

117 Dkt. 568 at ¶ 71.
118 Exh. D-1 at 8.
119 Exh. D-1 at 20.
120 Dkt. 568 at ¶ 75; Exh. D-1 at 10.
121 Exh. D-1 at 20.
122 PSR ¶ 91.

not fully implement the statutory objectives of sentencing, and Ms. Spayd accordingly asks this Court to grant a downward variance to 240 months.

## III. The Section 3553(a) Factors Support a Sentence of 240 months

The Court's task in sentencing is to identify and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.[123] Although the Sentencing Guidelines are the starting point for the calculation of an appropriate sentence, a district court "may not presume that the Guidelines range is reasonable."[124] Instead, the Court "must make an individualized assessment based on the facts" of each case, recognizing that a within-guidelines sentence may be greater than necessary to serve the purposes of sentencing.[125] "[T]he amount by which a sentence deviates from the applicable Guidelines range is not a measure of how 'reasonable' a sentence is. Reasonableness is determined instead by the district court's individualized application of the statutory sentencing factors."[126]

This memorandum will address the salient sentencing factors under § 3553(a).

1) <u>The Nature and Circumstances of the Offense</u>

Ms. Spayd was an overextended, solo medical practitioner who made very poor

---

123 18 U.S.C. § 3553(a).

124 *Gall v. United States*, 552 U.S. 38, 50 (2007).

125 *Id.*; *Kimbrough v. United States*, 552 U.S. 85, 91 (2007); *see United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.").

126 *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46-47).

decisions in managing her practice, did not exercise sound medical judgment, and failed her patients through her inaction.

Ms. Spayd ran a practice directed at those who suffered from chronic pain. Her patients came through referrals and many came into her clinic on high doses of opioids. For instance, J.L. arrived on 1000-1240 MME from prior providers and B.S. arrived on 200 mg of methadone.[127] These patients presented a complex medical profile: tapering or discontinuing their dose in the wrong way could cause them severe harm, or push them to the illicit market; but increasing or maintaining their dose could also be harmful.[128] Further, Spayd began her practice during a period of transition in pain management when the standards of practice regarding opioids were in flux, and she testified she struggled to navigate it.[129] Two of three counts predate the CDC's first national guideline in March 2016.

J.L, B.S., and L.D. each presented warning signs that they were abusing their prescriptions. Spayd's response was plainly inadequate. She saw those warning signs and kept prescribing anyway, maintaining or increasing their doses. She truly cared for her patients. She did not intend to hurt them. But she let her sympathy for her patients, rather than her professional judgment, control her decision making.

---

127 Day 8 Tr. 24, 28, 43; Day 14 Tr. 133-34.

128 Day 9 Tr. 152–53 (Dr. King agreeing that the risk of overdose or mental-health crisis after tapering "should be considered when weighing the risks and benefits," as should the risk of suicide); Day 4 Tr. 49 (Dr. Bormann agreeing that tapering a patient on long-term, high-dose opioid therapy is "[n]ot typically" a pleasant experience); Day 4 Tr. 55–57, 68 (Dr. Bormann agreeing that Ms. Spayd's former patients had "complex histories," including multiple surgeries and mental-health conditions).

129 Day 14 Tr. 71-72.

The government will likely stress that Ms. Spayd prescribed 4.4 million pills over five years.[130] Again, her patients generally came to her already on opioids, often at high doses.[131] That said, she prescribed too much. But two points put that superficially impressive number in context. First, medicine measures opioid dose per patient, in morphine milligram equivalents; the 4.4 million figure instead counts every tablet equally, whatever its strength.[132] Second, spread across the roughly 450 patients she was actively treating at any given time over five years, it comes to about five pills per patient per day.[133] Five tablets a day is not necessarily a high dose: five 10-milligram hydrocodone tablets, for example, total 50 MME, well below the 90-MME threshold identified in the 2016 CDC Guideline.[134] The figure measures the size and length of her practice, not the danger of any prescription.[135]

The failure of an overextended, unsupervised, and unwell clinician who stopped enforcing her own rules is quite different than the pill mill scenario present in many other cases featuring a doctor acting in a predatory fashion and intentionally selling prescriptions

---

130 Day 2 Tr. 28, 47; Day 9 Tr. 82–83; Day 15 Tr. 121.

131 Day 14 Tr. 31, 220; Day 8 Tr. 27–28; Day 14 Tr. 133–34; Day 4 Tr. 55–57, 68.

132 *See* CDC 2016 Guideline, *supra* note 69 (stating dosage recommendations in MME per day); Day 9 Tr. 82–83 (Dr. King's count of "actual pills").

133 Day 14 Tr. 222–23 (Ms. Spayd: "at any given time, I had about 400, 450 active patients"); Day 9 Tr. 82–83. 4.4 million ÷ (450 patients × 365 days × 5.25 years) ≈ 5.1.

134 CDC 2016 Guideline, *supra* note 69 (hydrocodone conversion factor of 1; recommending that clinicians avoid or carefully justify doses of 90 MME or more per day); *see* Day 14 Tr. 220 (patient taking Norco 10/325, "between four and six a day," when he came to Ms. Spayd).

135 *See* Mathew V. Kiang et al., *Opioid Prescribing Patterns Among Medical Providers in the United States, 2003–17*, 368 BMJ l6968 (2020) (high-volume prescribers largely treat long-term patients).

to a vulnerable class to maximize profit without consideration for the wellbeing of their patients. Ms. Spayd's conduct falls on the less aggravated side of the spectrum of conduct constituting the offense in question. A 240-month sentence is adequate under the circumstances.

2) Mr. Spayd's History and Characteristics

Ms. Spayd's upbringing was tumultuous and stressful. She was one of two siblings, and her parents struggled with undiagnosed mental health issues that made it difficult for them to have stable relationships.[136] Her father was a traveling salesman who was frequently away at work and unable to protect her from her unpredictable mother, who vacillated between neglect, angry outbursts, and abuse.[137] Ms. Spayd would sometimes run away from home to get away from her mother, who would do things like hit her with a belt, put detergent down her throat, or push her down the stairs.[138] Her parents divorced when she was 11 years old. Following the divorce, her mother no longer wanted to be involved in her children's lives, so Ms. Spayd and her sister were raised primarily by their father thereafter.[139]

Despite these hardships, she was always a go-getter. She started working at age 15 and held multiple jobs through high school,[140] while also participating in tennis, cross-

---

136 PSR ¶ 63.
137 Exh. D-1 at 4.
138 *Id.*
139 PSR ¶ 62.
140 Exh. D-1 at 7.

country, and crew.[141] After graduating, Ms. Spayd bought an ice cream truck and sold ice cream. Her father discouraged her from going to college, believing a degree was unnecessary to do well in life.[142] Nonetheless, she was motivated to pursue a college education, and she explored various programs as she determined her career path. She had always had an interest in healthcare – even as a child she liked going to the doctor and was interested in science. While attending Long Island University, she did an internship at a nursing home and found she deeply enjoyed the experience of working with and helping residents of the facility, which prompted her decision to pursue a career in nursing.

She worked as a patient care technician at a local hospital and sold ice cream while she earned her prerequisites for nursing school at community college before formally enrolling in the nursing program at Aurora University. There she earned a Bachelor's Degree in Nursing (BSN) with a 3.7 GPA. She then went on to obtain her Advanced Practice Registered Nursing (APRN) degree at University of Texas at Arlington, earning a 4.0 GPA,[143] while simultaneously working as a RN in the surgical trauma unit at Parkland Hospital.

Her sense of adventure led her to Alaska in 2000, and she obtained a job as a nurse in the emergency room at Alaska Native Medical Center (ANMC) while studying for her APRN boards.[144] She did a clinical in pain management and found it to be a good fit with

---

141 Exh. D-1 at 8.
142 Exh. D-1 at 4.
143 Exh. D-1 at 7.
144 *Id.*

the experience she had gained in the surgical trauma unit in Texas, where she helped patients manage physical trauma and pain. She worked with Dr. Michael Taylor before starting the Eagle River Pain and Wellness clinic in 2002.

While establishing her practice, she also worked to build a fulfilling personal life here in Alaska. As detailed in the support letters submitted to the Court, Ms. Spayd developed strong personal ties and was active in her community. She was a faithful member of her church communities and was always at services on Sundays with a welcoming smile.[145] She served on the ski patrol and volunteered as a ski instructor for years with Challenge Alaska, a small non-profit organization that teaches individuals with mental and physical limitations to successfully ski at Alyeska. Those close to Ms. Spayd describe her as a intelligent, kind, caring, and compassionate person who went out of her way to help and support others going through difficult times.[146]

She is also a devoted mother. She had always wanted to have children, and after getting married in 2007, she and her husband tried for several years to conceive a child. She struggled with infertility and went through ten rounds of invitro fertilization over the course of three years,[147] which at one point resulted in an ectopic pregnancy and miscarriage. This process took an enormous toll on Ms. Spayd – not only the repeated rounds of intense hormones and physical trauma, but also the emotional rollercoaster of

---

145 Exh. D-3.
146 *Id.*
147 PSR ¶ 65.

hope and devastation – and worsened symptoms of what would later be diagnosed as bipolar disorder.

Though Ms. Spayd faced many mental health challenges throughout the course of her life, she did not receive any formal mental health treatment until well into adulthood. She was diagnosed with depression in her 30s but did not maintain regular treatment for that condition. When her son was born in 2010, she was absolutely overjoyed. She finally had the child she had always wanted and doted on him through her stress and exhaustion. However, she increasingly struggled with anxiety, insomnia, and other symptoms during this time period, which led her to self-medicate with alcohol to sleep at night. In 2012, she sought outside help and was formally diagnosed with bipolar disorder. Diagnosis is not a cure, however. For years, as she and her treatment team experimented with various treatment tactics and medication combinations, she struggled to adequately control her symptoms, which led to erratic behavior, multiple hospitalizations, and significant overwhelm over the course of the following years. The details about the impact this had on her practice have been previously detailed.

Despite these struggles, she strove to be a good mother. Even after her divorce, successfully co-parented her son with his father under a 50/50 shared custody arrangement. She did her best to instill in him positive values and to engage him in enriching activities. She took him hiking, camping, swimming, to the theater, and countless other activities. She could not be prouder of her son, who is now a well-rounded high school honor roll student. He recently told her he wants to be a nurse practitioner when he grows up.

Separation from her child is by far the most severe punishment Ms. Spayd, or her innocent son, will face in this matter.[148]

3) <u>Seriousness of the Offense, Respect for the Law, Just Punishment, and Rehabilitation</u>

This is certainly a very serious offense, and no sentence will undo the grave consequences to the victims in this case. Ms. Spayd's imprisonment over the course of two decades will serve as a constant reminder of the harm she caused to others in her medical practice. In determining whether any time beyond the mandatory minimum sentence is warranted, the Court must consider not only the circumstances of the offense, but also Ms. Spayd's unique characteristics and circumstances:

> For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender. His past may be taken to indicate his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him."[149]

That is to say, the punishment "should fit the offender and not merely the crime.'"[150]

Ms. Spayd does not present an ongoing risk of danger to the public. The danger in this case was tied solely to her practice of medicine. She has surrendered her nursing license and will never again practice medicine, foreclosing any possibility of re-offense. Moreover,

---

[148] "Long sentences are … immensely hard on prisoners and cruel to their families, as it's usually very difficult for a prisoner to re-integrate into his family and community after very long prison sentences." Judge Alex Kozinski, Criminal Law 2.0, 44 Geo. L.J. Ann. Rev. Crim. Proc. (2015) at page xii-xiii.

[149] *Com. of Pa. ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937).

[150] *Pepper v. U.S.*, 562 U.S. 476, 477-8 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

not only does she have no prior criminal history, but she was compliant and abided by the terms of her conditions during her two and a half years in the community on pretrial release, and has had no disciplinary infractions while incarcerated, even despite the interruptions and inadequacy of her mental health treatment in custody.[151] The lack of access to consistent and adequate psychiatric treatment during her time in custody has resulted in harsher experience for Ms. Spayd while in custody than other inmates who do not suffer from such conditions.[152]

Despite the difficulties she has faced in custody, she has persevered and striven to better herself through programming and productive activities and to help others do the same. Prior to her transport back to Alaska, Ms. Spayd had been active in the FIT (Female Integrated Treatment) Program at BOP, a residential treatment program that provides integrated, individualized cognitive-behavioral treatment for substance use disorders, mental illness, and trauma related disorders, as well as vocational training, to female inmates.[153] Additionally, her time back at Hiland Mountain Correctional Center has been spent in the HOPE (Healing Opportunities in Program and Education) Wing, which is a residential mental health program requiring its participants to maintain a 40-hour per week program of therapeutic programming, employment, and other education courses.[154] Not

---

151 Exh. D-1 at 9.

152 *United States v. Carty*, 264 F.3d 191, 196 (2d Cir.2001) ("confinement conditions may in appropriate cases be a permissible basis for downward departures").

153 PSR ¶ 12; additional information regarding the FIT program is available at https://www.bop.gov/policy/progstat/5240_001.pdf (last visited Nov. 4, 2026).

154 Id.; additional information about the HOPE Wing is available at

only is she dedicated to confronting the issues that contributed to her past struggles and mistakes, she helps others do the same, serving as a peer supporter and mentor.[155]

She is engaged in programming solely for the betterment of herself and others, as such programming will not provide her a path to early release. The nature of her conviction renders her ineligible for RDAP or First Step Act credits, so the only reduction she will receive during service of her sentence is good time credit. On a mandatory minimum sentence of 240 months, with full good time credit, she will not be released until she is nearly 70 years old. She will not see her son outside prison walls until he is 30.

4) A Sentence of 20 Years Will Accomplish Deterrence and Promote Respect for the Law

There is a great deal of empirical research illustrating the counterintuitive proposition that lengthier sentences of incarceration are, generally, an ineffective deterrent.[156] The mandatory minimum at issue in this case has been in place for 40 years.

---

https://doc.alaska.gov/institutions/hiland-mountain-programs.

[155] *Pepper v. United States*, 562 U.S. 476, 492–93, 131 S. Ct. 1229, 1242–43, 179 L. Ed. 2d 196 (2011) (exemplary post-offense conduct may be taken as the most accurate indicator of a person's "present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him."); *U.S. v. Thavaraja,* 740 F.3d 253 (2d Cir.2014) (where defendant convicted of conspiring to provide support to terrorist organization and guidelines 240 months, court's sentence of 108 months not unreasonable in part because "for the six years he was incarcerated he was a model prisoner who tutored other prisoners." ); *United States v. Maurer*, 76 F.Supp.2d 353, 362 (S.D.N.Y.,1999) (low end sentence warranted in part because defendant "has proved to be a model prisoner for the time in which he has been incarcerated" before sentencing) .

[156] *See, e.g.*, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006); Charles Loeffler et al., *The Impact of Incarceration on Recidivism*, 5 Annual Review of Criminology 133 (2022), available at https://www.annualreviews.org/content/journals/10.1146/annurev-criminol-030920-112506 (last visited Sept. 16, 2026)("Most studies we review, in fact, find that the experience of postconviction

Congress enacted the "death results" penalty in the Anti-Drug Abuse Act of 1986, imposing a 20-year mandatory minimum when "death or serious bodily injury results from the use of" a distributed Schedule I or II substance."[157] If this incredibly severe minimum penalty deterred as anticipated, one might expect a precipitous decline in drug-related deaths following 1986. But sadly, that is not the case. By the government's own accounting, the age-adjusted overdose death rate nearly quadrupled between 2002 (8.2 per 100,000) and 2022 (32.6), *more than doubling* in the single decade after 2014 (14.7).[158] The 2022 toll of 107,941 deaths was the highest ever recorded,[159] and overdose remains the leading cause of death for Americans aged 18–44.[160]

However, to the extent that a penalty could serve to deter similarly situated medical professionals, a sentence beyond the mandatory minimum sentence is far greater than necessary to achieve that goal. The revocation of medical licensure, loss of a practitioner's

---

imprisonment has little impact on the probability of recidivism.").

[157] 21 U.S.C. § 841(b)(1)(C); *see Burrage v. United States*, 571 U.S. 204, 209–10 (2014)(describing the enhancement and its 1986 origin).

[158] Merianne R. Spencer, Matthew F. Garnett & Arialdi M. Miniño, *Drug Overdose Deaths in the United States, 2002–2022*, NCHS Data Brief No. 491, at 1 (Nat'l Ctr. for Health Statistics Mar. 2024), available at https://www.cdc.gov/nchs/products/databriefs/db491.htm (last visited Sept. 15, 2026); Matthew F. Garnett & Arialdi M. Miniño, *Drug Overdose Deaths in the United States, 2023–2024*, NCHS Data Brief No. 549, at 1 (Nat'l Ctr. for Health Statistics Jan. 2026), available at https://www.ncbi.nlm.nih.gov/books/NBK621157/ (last visited Sept. 15, 2026).

[159] Merianne R. Spencer, Matthew F. Garnett & Arialdi M. Miniño, *Drug Overdose Deaths in the United States, 2002–2022*, NCHS Data Brief No. 491, at 1 (Nat'l Ctr. for Health Statistics Mar. 2024), available at https://www.cdc.gov/nchs/products/databriefs/db491.htm (last visited Sept. 15, 2026)

[160] Statement from CDC's Nat'l Ctr. for Injury Prevention & Control on Provisional 2024 Overdose Death Data (May 14, 2025), available at https://www.cdc.gov/media/releases/2025/2025-statement-from-cdcs-national-center-for-injury-prevention-and-control-on-provisional-2024.html (last visited Sept. 15, 2026).

entire career and business, a criminal conviction, and *any* amount of jail time are sufficient deterrents to licensed medical professionals.

Indeed, it appears that one of the most effective deterrents for overprescribing practices is intervention from the medical examiner's office or licensing body. In one study, physicians who had a patient die of an overdose were sent "an injunction to prescribe safely from their county's medical examiner." The study found that "this intervention led to reductions in high-intensity prescribing, reductions in the likelihood that an opioid-naïve patient received a prescription, and a reduction in overall community intake."[161] Consequences to a provider's ability to practice medicine is of greatest significance to medical providers, and to the extent providers may be deterred by another's prosecution, a sentence over 20 years is far greater than necessary to achieve that goal. Ms. Spayd will emerge from custody an old woman with no medical license and no ability to prescribe.

5) <u>The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct</u>

Sentencing data illustrates that a sentence of 20 years would not create an unwarranted disparity. As set forth in Judiciary Sentencing Information, defendants facing an identical guideline range to Ms. Spayd received an average sentence of imprisonment of 185 months and a median sentence of 180 months.[162] Significantly, she is before the

---

[161] Jason N. Doctor et al., *Opioid Prescribing Decreases After Learning of a Patient's Fatal Overdose*, 361 Science 588 (2018).
[162] PSR at 4.

Court facing a higher minimum penalty than she would face for Second Degree Murder involving "the unlawful killing of a human being with malice aforethought" which carries no mandatory minimum.[163]

A recent Sentencing Commission Report provides the following nuanced data on drug distribution resulting overdoses:[164]

Figure 17. Overdose Outcome and Sentence Length, Fiscal Years 2019–2023




163 *See* 18 U.S.C. § 1111.

164 USSC, Overdoses in Federal Drug Trafficking Crimes at 9 (2025), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2025/2025_Overdose.pdf (last visited Nov. 5, 2026).

Even in cases involving multiple overdoses, including at least one fatal overdose, the average sentence is 177 months and the median sentence is 156 months.

Sentences faced by medical professionals who distribute controlled substances are influenced heavily by charging and negotiation decisions of the prosecution. Doctors sentenced for unlawful prescribing practices involving multiple deaths have received vastly disparate sentences based on the charging and negotiation decisions of the prosecution, often well below the mandatory minimum sentence Ms. Spayd now faces.

*Alaska*

The Court need not even look beyond the District of Alaska for illustration of such disparity. For example, in ***U.S. v. David Chisholm*****,** 3:21-cr-00056-SLG, a pain doctor in Alaska was convicted of Unlawful Dispensing and Distribution of a Controlled Substance. From 2014 to 2019, while operating Camelot Family Health, Dr. Chisholm prescribed nearly 2 million dosage units of primarily opioids to approximately 350 patients – a very high rate for a family physician. Patient records often lacked any justification for the medications, and there were no pain management plans for his patients.[165] Many of Dr. Chisholm's patients, most of whom had some type of criminal history, had multiple PDMP profiles because he wrote them prescriptions under multiple names, allowing them to continue to obtain opioids without being questioned by insurance.[166] During undercover operations, Dr. Chisholm wrote oxycodone prescriptions with little or no examinations to

---

165 *U.S. v. David Chisholm*, 3:21-cr-00056-SLG (D. AK), Dkt. 33. at 2.
166 *Id*. at 3.

obviously drug-seeking undercover agents, who either declined to submit UAs or submitted dog urine.[167]

Despite a lack of medical justification or pain management plans, some of Dr. Chisholm's patients had MME opioid dosages as high as 1,000 mg/day.[168] He also often prescribed combinations of medications, including concurrent opioids, benzodiazepines, sedatives, and muscle relaxants (the "Holy Trinity" as dubbed by the government).[169] He *admitted*[170] that his unlawful prescribing practices contributed to the deaths of five of his patients, who ranged in age from 41 to 57 years old, from 2016-2018.[171] Despite his reckless practices and the deaths of these five patients, Dr. Chisholm received a sentence of just ***34 months***.[172]

A sampling of cases outside the District of Alaska reveals many other cases involving multiple patient deaths for which medical professionals received sentences at or below the mandatory minimum sentence in this matter.

*After Trial*

***U.S. v. Saad Sakkal***, 1:18-cr-00088-MRB (SD Ohio): After rejecting a pretrial offer for 46-57 months,[173] a doctor was convicted after trial of 35 counts of illegal distribution of

---

167 *Id.* at 4.
168 *Id.* at 3.
169 *Id.*
170 *Chisholm*, Dkt. 13 at 4.
171 *Chisholm*, Dkt. 33 at 4-8.
172 *Chisholm*, Dkt. 40
173 *U.S. v. Saad Sakkal*, 1:18-cr-00088-MRB (SD Ohio), Dkt. 94, 2020 WL 2193293.

controlled substances, including distribution resulting in death, as well as use of a registration issued to another person. According to the government, Dr. Sakkal was responsible for the deaths of 8 of his patients.[174] He received the mandatory minimum sentence of **240 months**.

***U.S. v. Bernard Shelton***, 2:17-cr-20701-DPH-APP (SD MI): Dr. Shelton was convicted at trial of 21 counts of Unlawful Distribution of Controlled Substances, including Distribution Resulting in Death. Shelton falsified records, prescribed to patients with visible track marks on their arms, and prescribed over 5.5 million doses of controlled substances over the course of 3 years, including over 2.7 million doses of opiates.[175] His practices caused the overdose deaths of at least 3 patients and the non-fatal overdose of at least 1 more.[176] He was sentenced to **240 months**.

***U.S. v. Lisa Hofschulz***, 2:18-cr-00145-PP (ED WI): APRN Lisa Hofschulz was convicted at trial of distribution resulting in death as well as 14 additional counts of drug distribution without a legitimate medical purpose.[177] The government submitted evidence that Ms. Hofschulz, the leading prescriber of oxycodone and methadone among all Medicaid prescribers in Wisconsin,[178] contributed to the deaths of at least 5 patients.[179] She was sentenced to **240 months**.

---

174 *Sakkal*, Dkt. 40 at 5.

175 *Id. U.S. v. Bernard Shelton*, 2:17-cr-20701-DPH-APP (SD MI), Dkt. 220.

176 *Id.*

177 *United States v. Hofschulz*, 105 F.4th 923, 926 (7th Cir. 2024) (affirming convictions).

178 *Id*. at 926.

179 *U.S. v. Hofschulz*, 2:18-cr-00145-PP (ED WI), Dkt. 211 at 15-17.

***U.S. v. Edward Feldman***, 8:14-cr-00521-JDW-AEP (MD FL): A jury as well as the 11th Circuit found that Dr. Feldman was responsible for the death of 3 patients, as well as a sophisticated money laundering scheme involving nearly $7 million related to his illegal pill-mill.[180] Feldman ultimately received a sentence of **240 months**.[181]

***U.S. v. Dwight Bailey***, 1:17-cr-00036-JPJ (WD VA): After a two-week jury trial, Dr. Bailey was convicted of 61 counts of illegal drug distribution, including 24 counts of unlawfully distributing Schedule II controlled substances. Although prosecutors did not charge the death enhancement for sentencing purposes, evidence at trial showed that Dr. Bailey contributed to the fatal overdoses of at least 5 of his patients as well as non-fatal overdoses of at least 3 additional patients.[182] Dr. Bailey continually prescribed opiates, benzodiazepines, and sleeping pills to patients who were clearly misusing them and prescribed more than 140,000 oxycodone pills to one patient alone, all while earning over $750,000 a year.[183] He was sentenced to 151 months,[184] which was later reduced to **121 months** following Guideline Amendment 821.[185]

---

180 *U.S. v. Feldman*, 936 F.3d 1288, 1320 (11th Cir. 2019) (evidence established beyond a reasonable doubt that defendant's schedule II prescriptions were the but-for cause of death of 3 patients, but error in jury instruction).

181 *U.S. v. Edward Feldman*, 8:14-cr-00521-JDW-AEP (MD FL), Dkt. 415.

182 *U.S. v. Dwight Bailey*, 1:17-cr-00036-JPJ (WD VA), Dkt. 144 at 1-2.

183 "Lebanon Doctor Sentenced on Federal Drug Distribution Charges," DOJ (2/7/19) at https://www.justice.gov/usao-wdva/pr/lebanon-doctor-sentenced-federal-drug-distribution-charges.

184 *Bailey*, Dkt. 153.

185 *Bailey*, Dkt. 199.

*Following Plea*

***U.S. v. Michael Kostenko***, 5:16-cr-00221-1 (SD WV): Dr. Kostenko was originally charged with 3 death counts and 17 counts of unlawful distribution. 16 patients died under his care.[186] After 1.5 days of trial, Kostenko agreed to plead guilty to a single count of unlawful distribution. He admitted that on just one *single day*, 271 patients arrived at his residence seeking oxycodone prescriptions, and that wrote over 370 oxycodone prescriptions totaling 22,255 pain pills from his upstairs bedroom without seeing any of the patients, and that his staff handed out the prescriptions and collected over $20,000, which they deposited in structured amounts.[187] He was sentenced to **240 months**.[188]

***U.S. v. Robert Rand***, 3:16-cr-00029-MMD-CSD (NV): Dr. Rand was indicted for distribution resulting in the death of 2 of his patients as well 5 additional charges of conspiracy and unlawful distribution of a controlled substance.[189] Pursuant to a plea agreement, Rand pled to an amended information charging Involuntary Manslaughter (which carries a maximum penalty of 8 years and no mandatory minimum) [190] and Distribution of a Controlled Substance.[191] He was sentenced to **120 months**.[192]

---

186 "Beckley area physician sentenced to 20 years in federal prison for oxycodone crime," DOJ (8/23/17) at https://www.justice.gov/usao-sdwv/pr/beckley-area-physician-sentenced-20-years-federal-prison-oxycodone-crime

187 *U.S. v. Michael Kostenko*, 5:16-cr-00221-1 (SD WV), Dkt. 103

188 *Kostenko*, Dkt. 147.

189 *U.S. v. Robert Rand*, 3:16-cr-00029-MMD-CSD (NV), Dkt. 569.

190 18 U.S.C. § 1112.

191 *Rand*, Dkts. 590, 592.

192 *Rand*, Dkt. 668.

***U.S. v. Javeen Sangha***, 2:24-cr-00236-SPG (CD CA): Jasveen Sangha, a.k.a. "The Ketamine Queen," contributed to the deaths of at least 2 people, including actor Matthew Perry, during a long-running drug scheme and was sentenced to **180 months**.[193]

***U.S. v. Raymond Kraynak***, 4:17-cr-00403-MWB (MD PA): Dr. Kraynak was charged with distribution resulting in the death of 5 of his patients, as well as 14 additional counts.[194] Pursuant to a plea agreement,[195] the death counts were dismissed, and he was sentenced to **180 months** on 12 counts of Unlawful Distribution and Dispensing of a Controlled Substance Outside the Course of Professional Practice.[196]

***U.S. v. Pawankumar Jain*****,** 2:14-cr-01261-RB (D. NM): Dr. Jain was originally charged with 7 death counts, in addition to 56 counts of Unlawful Distribution of Schedule II Substances and 73 counts of Health Care Fraud.[197] 135 counts, including the death counts, were dismissed pursuant to a plea agreement, which provided for a sentencing range of 42-108 months.[198] Despite dismissal of the death counts, the government emphasized at

---

193 DOJ, "North Hollywood Drug Dealer Who Sold Ketamine that Killed Actor Matthew Perry Sentenced to 15 Years in Federal Prison" (4/8/26) at https://www.justice.gov/usao-cdca/pr/north-hollywood-drug-dealer-who-sold-ketamine-killed-actor-matthew-perry-sentenced-15 (last visited Nov. 4, 2026).

194 *U.S. v. Raymond Kraynak*, 4:17-cr-00403-MWB (MD PA), Dkt. 3.

195 *Kraynak*, Dkt. 216.

196 *Kraynak*, Dkt. 275; *see also* Dkt. 273 (court describing "overwhelming evidence of guilt.")

197 *U.S. v. Pawankumar Jain*, 2:14-cr-01261-RB (D. NM), 2015 WL 13815247 (2015).

198 *Jain*, 2016 WL 11712993 (2019).

sentencing that Dr. Jain's prescriptions were the but-for cause of death of at least 4 patients.[199] He was sentenced to **108 months**.[200]

6) The Need to Provide Restitution to Any Victims of the Offense

Ms. Spayd has satisfied the previously-imposed restitution obligation in this matter.

## IV. CONCLUSION

For the foregoing reasons, a sentence of 240 months followed by a term of supervised release is sufficient, but not more than necessary, to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

DATED at Anchorage, Alaska this 5th day of November, 2026.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Gretchen L. Staft*
Gretchen L. Staft
First Assistant Federal Defender

*/s/ Ben W. Muse*
Ben W. Muse
Assistant Federal Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on November 5, 2026. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Gretchen L. Staft*

199 *Jain*, 2019 WL 11093882 (2019).
200 *Jain*, 2:14-cr-01261-RB (D. NM), Dkt. 126.